IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

STEVEN SALAITA,                                )
                                               )
        Plaintiff,                             )
                                               )
                                               )        Case No. _____
v.                                             )
                                               )
CHRISTOPHER KENNEDY, Chairman                  )
of the Board of Trustees of the University     )
of Illinois; RICARDO ESTRADA,                  )
Trustee of the University of Illinois;         )
PATRICK J. FITZGERALD, Trustee of              )
the University of Illinois; KAREN              )
HASARA, Trustee of the University of           )        JURY TRIAL DEMANDED
Illinois; PATRICIA BROWN HOLMES,               )
Trustee of the University of Illinois;         )
TIMOTHY KORITZ, Trustee of the                 )
University of Illinois; EDWARD L.              )
MCMILLAN, Trustee of the University of         )
Illinois; PAM STROBEL, Trustee of the          )
University of Illinois; ROBERT EASTER,         )
President of the University of Illinois;       )
CHRISTOPHE PIERRE, Vice President              )
of the University of Illinois; PHYLLIS         )
WISE, Chancellor of the University of          )
Illinois; THE BOARD OF TRUSTEES                )
OF THE UNIVERSITY OF ILLINOIS;                 )
and JOHN DOE UNKNOWN DONORS                    )
TO THE UNIVERSITY OF ILLINOIS,                 )
                                               )
        Defendants.                            )
                                               )
                                               )

1

**COMPLAINT**

NOW COMES Plaintiff, STEVEN SALAITA, by his attorneys LOEVY & LOEVY and the CENTER FOR CONSTITUTIONAL RIGHTS, and complaining of Defendants CHRISTOPHER KENNEDY; RICARDO ESTRADA; PATRICK J. FITZGERALD; KAREN HASARA; PATRICIA BROWN HOLMES; TIMOTHY KORITZ; EDWARD L. MCMILLAN; PAM STROBEL; ROBERT EASTER; CHRISTOPHE PIERRE; PHYLLIS WISE; THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS; and UNKNOWN DONORS TO THE UNIVERSITY OF ILLINOIS, states as follows:

**Introduction**

1.        Professor Steven Salaita, an American academic with an expertise in Native American and Indigenous Studies, exercised his First Amendment right as a citizen to speak publicly on political and humanitarian issues that have been debated fiercely in this country and around the world. For voicing his views, the administrators of the University of Illinois—through defendants Chancellor Wise, President Easter, Vice President Pierre, and members of the Board of Trustees (collectively hereinafter "University Administration" or "the Administration")—suddenly and summarily dismissed him from a tenured faculty position.

2.        These officials did so after duly authorized University personnel recruited Professor Salaita and fully vetted his scholarship and prior teaching evaluations; after he formally accepted the University's offer of a tenured faculty position in its American Indian Studies Program; and after it induced him to rely on its contractual promise to resign from his tenured faculty position at another university. It did so despite Professor Salaita's stellar academic credentials and without notice or due process. No one—not even the University Administration—disputes the fact that it acted based on Professor Salaita's speech.

3.      The speech at issue consists of messages critical of Israeli policy that Professor Salaita posted to his personal Twitter account in July 2014, after the state of Israel launched "Operation Protective Edge," an aerial bombardment and ground campaign in the Gaza Strip. Professor Salaita saw the news images of Palestinian children killed and felt compelled to speak out. He did so by posting Twitter messages critical of the Israeli government and its political leaders, and highlighting the impact of its policies. In the United States, Professor Salaita's criticisms of Israeli state policy are infrequently heard from American politicians or presented in the mainstream national media. The University Administration, facing pressure from wealthy University donors, fired Professor Salaita for his political speech challenging the prevailing norm.

4.      Through its actions, the University Administration not only violated Professor Salaita's constitutional right to free speech, they also trampled on long-cherished principles of academic freedom and shared faculty-administration governance of the University. For these reasons, the University has faced near-universal condemnation from within the academic community. For example, the University's Senate Committee on Academic Freedom and Tenure concluded that Salaita's termination violated principles of academic freedom and violated Professor Salaita's due process rights; sixteen academic departments within the University have voted "no-confidence" in the Administration; more than 5,000 academics from around the country have pledged to boycott the University, resulting in the cancellation of more than three dozen scheduled talks and conferences at the University and jeopardizing job searches across the University; and a number of the most important nationwide academic organizations in the country have condemned the University Administration for its improper treatment of Professor Salaita, including:

- American Association of University Professors

- Modern Language Association

- American Anthropological Association

- American Historical Association

- American Philosophical Association

- American Sociological Association

- American Studies Association

- Society of American Law Teachers

5.     Professor Salaita has suffered severe economic, emotional, and reputational damage as a result of the wrongful conduct of the University, the above-named University officials, and the donors to the University who demanded that the University break its contract with Professor Salaita. Professor Salaita's prominent scholarship and excellent teaching credentials had allowed him to obtain a lifetime-tenured faculty position at a major American university—the pinnacle achievement for an academic. Having relied on the University appointing him to its faculty with tenure, he surrendered his prior tenured position. He has also been denied the opportunity to teach, is jobless and without tenure, and his academic career is in shambles. Moreover, without a university affiliation, Professor Salaita suffers irreparable harm since, among other things, his ability to publish articles in academic journals and to present his scholarship to his colleagues is severely diminished. The scholarly activities of which he has been deprived are the lifeblood of his profession, and crucial to the trajectory of his once flourishing academic career.

6.     Plaintiff Steven Salaita brings this action under 42 U.S.C. § 1983 and § 1985, and state law. He seeks equitable and monetary relief for violations of his constitutional rights, including free speech and due process, and for breach of contract, promissory estoppel, tortious

interference with contractual and business relations, intentional infliction of emotional distress and spoliation.

## The Parties

7.        Plaintiff STEVEN SALAITA is a resident of the state of Virginia.

8.        Defendant THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS (the "BOARD OF TRUSTEES" or "BOARD") is an Illinois corporation, commonly referred to as the University of Illinois. The Board of Trustees has a role in the academic hiring process. At all times relevant to the actions described in this Complaint, the BOARD OF TRUSTEES was acting under color of law.

9.        For the 2013 fiscal year, the University of Illinois (through the Board) received approximately 12% of the money needed to fund its operations from the State of Illinois. Larger funding sources to the University included student tuition and fees, and federal grants and contracts. Since 2009, the University has received more funding from student tuition and fees than from the State of Illinois; and since 2010, the University has received more funding from the federal government than from the State of Illinois. The Board of Trustees is not protected by state sovereign immunity under the Eleventh Amendment.

10.       Defendants CHRISTOPHER KENNEDY, RICARDO ESTRADA, PATRICK FITZGERALD, KAREN HASARA, PATRICIA BROWN HOLMES, TIMOTHY KORITZ, EDWARD McMILLAN, and PAM STROBEL are members of the Board of Trustees of the University of Illinois (collectively, the "Trustee Defendants") and are all residents of Illinois. They each voted for, facilitated and approved Professor Salaita's firing.

11.       Defendant ROBERT EASTER is the President of the University of Illinois and a resident of Illinois. He facilitated, recommended and approved Professor Salaita's firing.

12.     Defendant CHRISTOPHE PIERRE is the Vice President for Academic Affairs of the University of Illinois and a resident of Illinois. He facilitated, recommended and approved Professor Salaita's firing.

13.     Defendant PHYLLIS WISE is the Chancellor of the University of Illinois at Urbana-Champaign and a resident of Illinois. She facilitated, recommended and approved Professor Salaita's firing.

14.     Each of the individual Defendants listed above, all Board of Trustee members or senior officials at the University of Illinois, is sued in his or her official capacity for equitable and injunctive relief, and monetary damages because the University is not entitled to sovereign immunity. Each of the individual Defendants above is also sued in his or her individual capacity. And each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this complaint.

15.     Defendants JOHN DOE DONORS TO THE UNIVERSITY OF ILLINOIS are unknown contributors to the University who threatened future donations to pressure the University to terminate Professor Salaita. They each communicated with University officials regarding Steven Salaita's employment and demanded that the University breach its contractual obligations and promises to Professor Salaita or else they would withhold financial contributions to the University.

## Jurisdiction and Venue

16.     This Court has jurisdiction over this action under 28 U.S.C § 1331 because Counts I, II and III of this action arise under federal law. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. This Court also has jurisdiction under 28 U.S.C. § 1332: Professor Salaita is a citizen of Virginia, all of the named Defendants are citizens of Illinois, and the amount in controversy exceeds $75,000.

17.     Venue is proper under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district. The Board of Trustees' meeting to discuss Professor Salaita's tweets and to support a decision to terminate Professor Salaita's appointment occurred in Chicago, on July 24, 2014. All of the Trustee Defendants, with the exception of Trustee Defendant Estrada, were present at that Chicago meeting; Defendants Wise, Easter and Pierre were also in attendance. The University also has a Chicago campus, and nearly all of the Trustee Defendants work and reside in this district. Moreover, as set forth below, Steven Miller, a wealthy University donor, resides and works in Chicago, and exchanged correspondence with Defendant Wise on July 23 and July 24 about Professor Salaita. Chancellor Wise and Miller later met in Chicago on the morning of August 1 to discuss Professor Salaita's appointment. That same day, Chancellor Wise prepared a letter informing Salaita that he would not be appointed.

### General Allegations

*Professor Salaita's Qualifications*

18.     Professor Salaita is a nationally recognized scholar on the effects of colonization on indigenous people. He earned his undergraduate degree in political science and his Master's degree in English from Radford University in Virginia. He then earned a Ph.D. at the University of Oklahoma in English with a concentration in Native American Studies and Theory and Modernity in 2003. He worked as an Assistant Professor at the University of Wisconsin-Whitewater, teaching American and ethnic American literature, from 2003 to 2006. In 2006, he was hired by Virginia Tech's English Department. He earned a lifetime tenured position three years later. He was, at the age of 33, a fully-tenured professor of English and scholar in Native American Studies.

19.     Professor Salaita has been an extremely prolific academic, writing and publishing widely and frequently. He has written six books; been published in top refereed journals; written

dozens of other journal articles, book chapters, and book reviews; and given dozens more conference presentations and invited lectures. Based on his scholarship, Professor Salaita received the Myers Center Outstanding Book Award in 2007, was a finalist for the Hiett Prize in the Humanities in 2008, and received the RAWI Distinguished Service Award in 2010.

*Professor Salaita Is Recruited by the University Of Illinois*

20.     In late 2012, the American Indian Studies Program at the University of Illinois at Urbana-Champaign began the rigorous search process to hire a new full-time faculty member. The Program's acting director, Professor Jodi Byrd, assisted by an academic search committee, cast a wide net, advertising the position across the country.

21.     This broad search resulted in dozens of applications, including one from Professor Steven Salaita. Professor Salaita's submission included a cover letter, curriculum vitae, and names of references. This initial material was later supplemented with an academic writing sample and a packet of evaluations from Professor Salaita's former students and his peers.

22.     Professor Salaita's student evaluations from Virginia Tech were stellar. They unequivocally demonstrate his commitment, skill and fairness as a teacher. Overall, he received the highest rating—"Excellent"—from his students over 90% of the time or more in almost every semester; he never received a rating below "Good." In the category of "concern and respect" for students, where students reflect on a teacher's fairness, receptivity to their concerns, and respect of differing viewpoints, Professor Salaita received the following ratings in each of six different courses:

a)  Course 1 (30 students): 28 Excellent; 2 Good.

b)  Course 2 (30 students): 30 Excellent.

c)  Course 3 (10 students): 10 Excellent.

d)  Course 4 (29 students): 28 Excellent, 1 Good.

e)  Course 5 (28 students): 28 Excellent.

f)  Course 6 (28 students): 25 Excellent, 2 Good, 1 No Response.

23.     The search committee also consulted with experts in the field of Native American

Studies from outside the University to obtain their evaluations of Professor Salaita as a scholar and

teacher.

24.     Professor Salaita's scholarly and teaching accomplishments met the needs of the

Program, and earned him an invitation to visit the University for an on-campus interview. He

traveled to Champaign in the winter of 2013 to meet the search committee, Program faculty,

graduate students, faculty from other departments who were potential scholarly collaborators for

Professor Salaita, and some University administrators. He also gave a "job talk" to faculty and

students—the traditional forum through which faculty can assess a candidate's intellect, creativity,

and temperament.

*Offer and Acceptance*

25.     After interviewing and hosting similar visits from at least two other candidates,

the search committee made its decision. On September 27, 2013, Brian Ross, then the interim dean

of the College of Liberal Arts and Sciences, wrote to Professor Salaita to offer him a tenured

position in the American Indian Studies Program at the University. One week later, on October 3,

2013, Dean Ross sent a revised offer letter that reflected the appropriate salary, and to which

Professor Salaita responded. Dean Ross's offer letter stated that "[u]pon the recommendation of

Professor Jodi Byrd, Acting Director of American Indian Studies, I am pleased to offer you a

faculty position in that department at the rank of Associate Professor at an academic year (nine-

month) salary of $85,000 paid over twelve months, effective January 01, 2014. This appointment

will carry indefinite tenure." Dean Ross's letter also conveyed that "this recommendation for appointment" was subject to approval by the Board of Trustees.

26.     The letter also stressed that the University "subscribe[s] to the principles of academic freedom and tenure laid down by the American Association of University Professors (AAUP)," and enclosed a copy of the AAUP's *1940 Statement of Principles on Academic Freedom and Tenure*.

27.     Dean Ross also sent Professor Salaita a document entitled, "General Terms of Employment for Academic Staff Members," which included language stating that Professor Salaita "will receive a formal Notification of Appointment from the Board once the hiring unit has received back from the candidate all required documents, so the appointment can be processed." This document explained that such documents required by the Board for formal processing of Professor Salaita's appointment consisted of routine employment eligibility information and tax information. Dean Ross's letter went on to inform Professor Salaita that "[w]hen you arrive on campus, you will be asked to present proof of your citizenship," further suggesting that there were no other steps remaining in the hiring. At the bottom of the letter was a space for Professor Salaita's signature, below the statement "I accept the above offer of October 03, 2013." Dean Ross asked Prof. Salaita to return a signed photocopy of the letter "[i]f you choose to accept our invitation" to join American Indian Studies.

28.     On October 3, Professor Byrd likewise wrote to Professor Salaita, saying that she was "thrilled to send you this letter to supplement the offer letter you received from interim Dean Brian Ross." Professor Byrd went on to explain some of the resources that Professor Salaita would have available to him when he came to campus the following fall. She also explained that the Program "recognize[s] that you are a scholar in the height of your productivity," and for that

reason, the Program would arrange for Professor Salaita to have some time away from teaching in the near future to devote to his research. In addition, Professor Byrd "formally commit[ted] to working diligently to find [Professor Salaita's wife] Diana a career path at Illinois that will meet her needs."

29.     Professor Salaita discussed the offer with Professor Byrd and confirmed that he would be allowed to postpone his start date from the January 2014 timeframe in Dean Ross's offer letter to August 2014, so he could complete his teaching commitments at Virginia Tech. Professor Salaita then signed the statement of acceptance, dated it "10/9/13," and returned the signed offer-acceptance letter to Dean Ross.

30.     On October 9, Dean Ross sent a letter to Professor Salaita confirming that the University had received Professor Salaita's acceptance of its offer, and stating, "I look forward to your arrival on campus." The Program made Professor Salaita's selection public sometime in late October or early November of 2013.

31.     In addition to going through a rigorous process, Professor Salaita's appointment had also been approved by Chancellor Wise and the Provost of the University.

*Professor Salaita Resigns From Virginia Tech and Prepares to Move to the University of Illinois*

32.     After accepting the University's offer, Professor Salaita began working with Program faculty to prepare for his arrival. Salaita was scheduled to teach two courses in the Fall 2014 semester, Introduction to American Indian Studies and Indigenous Thinkers. He had been assigned an office, ordered course books and a new computer, and was coordinating with administrative staff to finalize his office furniture and obtain University identification. Students were able to enroll in his courses. Between the time he accepted the offer and August 2, 2014, he was in regular contact with Program faculty about his upcoming arrival on campus.

33.     Professor Salaita made a second visit to the campus with his wife and young son in March 2014 as a guest of the American Indian Studies Program. On that visit the Program hosted a dinner for him where he met again with most of the department faculty.

34.     In May 2014, Professor Salaita formally notified Virginia Tech that he would be leaving, effective in August. Professor Salaita's wife also resigned from her full-time job at Virginia Tech, and they arranged for a tenant to move into their Blacksburg residence after their departure.

35.     With the University's permission and blessing, and as is common in academia, Professor Salaita began to identify himself professionally with the University of Illinois during the summer of 2014. He presented papers at three conferences during the summer of 2014, and at all three, he was introduced and credentialed as an associate professor in the American Indian Studies Program at the University of Illinois.

36.     The University signaled repeatedly that it likewise already considered him a member of the faculty. In the late spring Chancellor Wise sent Professor Salaita an invitation to a fall reception for new faculty, addressed to him as a member of the American Indian Studies Program. In July 2014, University officials informed Professor Salaita that he was welcome to begin using his University of Illinois email account.

*Professor Salaita's Reliance on the University's Actions*

37.     The University's post-acceptance conduct, discussed above, further confirmed Professor Salaita's understanding that he was already a member of the University's faculty.

38.     Based on the communications and conduct above, as well as standard academic hiring practices, including practices at the University of Illinois, Professor Salaita reasonably

believed that approval of the Board of Trustees was a mere formality and that his position with the University of Illinois was certain so long as he remained legally eligible to work.

39.     The University's hiring practices are consistent with standard practices in academic hiring. Under those practices, a tenured professor recruited by a new university is expected to resign from an existing tenured position on the promise that the new university's trustees will ultimately confirm the tenured appointment. Academics (especially those who challenge conventional views) would be required to risk losing tenureship entirely if a new university's chancellor or board decided to overrule the faculty hiring committee's decision. The University's own Committee on Academic Freedom and Tenure, in its report criticizing the administration's actions in dismissing Salaita, recited as follows: "[O]ffers made by high administrative officers, a president or a dean, are customarily regarded as binding and [] any enervation of that reliability would throw the process by which colleges and universities engage new faculty members into complete chaos to the detriment of both institutions and faculty members." (Internal quotations omitted.)

40.     Under the norms governing University hiring, it is therefore virtually unheard of for a university's board to overrule a faculty hiring decision after the university has obtained the recruited faculty member's acceptance of an offer of a tenured position. On information and belief, it had never happened before at the University of Illinois.

41.     Professor Salaita further believed, consistent with the AAUP's *1940 Statement of Principles on Academic Freedom and Tenure* and the University's "General Terms of Employment for Academic Staff Members," which the University referenced and sent to him as part of his offer, that he was entitled to the protections of the First Amendment, academic freedom principles and the University's Statutes.

13

*The University's Espoused Commitment to Free Speech and Academic Freedom*

42.     Like many universities across the country, the University of Illinois holds itself

out as committed to principles of academic freedom. The University of Illinois Statutes (the

"Statutes"), which govern the operation of the University, state that:

> It is the policy of the University to maintain and encourage full freedom within the law of
> inquiry, discourse, teaching, research, and publication and to protect any member of the
> academic staff against influences, from within or without the University, which would
> restrict the member's exercise of these freedoms in the member's area of scholarly
> interest.

Article X, § 2.a. of the Statutes (emphasis added).

43.     Academic freedom does not stop at the boundaries of the campus. The Statutes

further provide that "As a citizen, a faculty member may exercise the same freedoms as other

citizens *without institutional censorship or discipline*." Article X, § 2.b. of the Statutes.

44.     So strong is the University's espoused commitment to academic freedom and the

free speech rights of its faculty that, where it determines that a faculty member's exercise of those

rights is objectionable or reflects poorly on the University, the Statutes do not authorize, or even

contemplate, dismissing a faculty member for such speech. The Statutes state that, at most, the

University may distance itself from, or voice its disapproval of, the faculty member's comments.

Article X, § 2.c. of the Statutes.

45.     Article X, § 2 of the Statutes echoes the language of the American Association of

University Professors' ("AAUP") *1940 Statement of Principles on Academic Freedom and Tenure*.

Like many universities, the University of Illinois explicitly avows that it adheres to those

principles. In fact, a copy of the *1940 Statement* is given to newly-hired faculty—including

Professor Salaita himself—at the time they accept a tenured position with the University. As the

title of the Statement suggests, academic freedom is promoted chiefly through the institution of

14

tenure—indefinite appointment to the academic faculty, subject to removal only for adequate cause unrelated to the content, manner or viewpoint of the faculty member's speech and ideas, and only if pursuant to due process.

46.     The United States Supreme Court has underscored that protection of academic freedom is of constitutional significance, as it is vital to the American universities' unique commitment to fostering free thought and advancing knowledge: "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Board of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) (internal citations omitted).

47.     Because tenure is a serious commitment on the part of a University to a scholar— one that a university reserves for scholars it truly believes will contribute to the University's academic mission and enhance its scholarly prestige—the process for selecting tenured faculty at the University of Illinois is rigorous.

48.     Under the Statutes, "[r]ecommendation to positions on the academic staff shall ordinarily originate with the department or . . . with the officers in charge of the work concerned." Article IX, § 3.d. of the Statutes. This provision reflects a second value of the University that is embedded in numerous provisions of the Statutes and indeed is required by the University's accreditors: shared governance. The AAUP, in its 1966 Statement on Government of Colleges and Universities, places special emphasis on responsibilities of a governing board of a multi-campus

university for "protecting the autonomy of individual campuses or institutions . . . and for implementing policies of shared governance."

49.    Shared governance—as between faculty and administration—ensures that new faculty are identified and recruited by those members of the University community best equipped to assess a candidate's academic credentials and scholarly potential. It also protects the integrity of the academic units of the University by insulating the hiring decisions of those units from external pressures, including the influence of the politically or financially powerful.

50.    Academic departments, which naturally have an interest in maintaining the reputation of their academic programs, subject prospective faculty members to careful screening, including interviews, job talks, campus visits, review of scholarly writing, review of former student and peer evaluations, and consultation with experts in the field outside the department.

51.    The faculty hiring process is thus almost entirely the province of the faculty departments and dean. This delegation of all but the ministerial role of finalizing faculty appointments is codified in the Statutes and communicated to faculty recruits.

52.    Once the department faculty have made a decision to appoint a scholar to a tenured position, the Statutes provide that the recommendation is then "presented to the dean of the college for transmission with the dean's recommendation to the chancellor/vice president," Article IX, § 3.d. of the Statutes, who in turn presents the recommendation to the Board of Trustees. "All appointments . . . *shall* be made by the Board of Trustees on the recommendation of the chancellor/vice president concerned and the president." Article IX, § 3.a of the Statutes (emphasis added).

53.    Consistent with the delegation of the faculty hiring process to the academic departments, the Chancellor's recommendation and the Board's approval are, and have been, a

mere formality at the University of Illinois. This delegation of substantive hiring authority by the Board to its academic faculty makes sense given that few, if any, of the members of the Board are academics themselves, and as such they are not competent to assesses the scholarly or teaching qualifications of individuals recommended for faculty appointments nor do they possesses the requisite expertise to evaluate field and departmental priorities. Indeed, so deferential is the Board to the academic judgment of University faculty that in the ordinary course, the Board will not vote to approve an appointment until *after* the new faculty member has arrived on campus and begun teaching. And all new academic hires—sometimes well over a hundred of them—are approved *en bloc*, in a single vote. Ordinarily, these new faculty members will not even be mentioned by name at the Board meeting, and very little information about them is needed or provided. The University's Committee on Academic Freedom and Tenure, in discussing the University's appointment process, stated as follows: "Until the September 2014 board meeting, the language of the board item for such appointments indicated that '[t]he following new appointments to the faculty at the rank of assistant professor and above, and certain administrative positions, have been approved since the previous meeting of the Board of Trustees and are now presented for your Confirmation.'"

54. This is because the Board's action operates as a ratification of the informed decisions of the faculty. This voting procedure reflects the fact that the Board does not possess the competence to evaluate the academic credentials of the candidates that it is called upon to approve for hiring. The Board's role in ratifying faculty hiring decisions has never been viewed as an opportunity to second-guess or overturn the recommendations of the faculty involved in the hiring decision, as the values of academic freedom and shared governance do not permit such a process.

55.     This process is so well established at UIUC that newly-recruited faculty such as Professor Salaita receive "General Terms of Employment" with the University's offer letter stating that "[n]ew academic staff members *will receive* a formal Notification of Appointment from the Board once the hiring unit has received back from the candidate all required documents, so the appointment can be *processed*" (emphasis added). The documentation referred to is nothing more than the sort of routine employment information necessary to confirm an individual's employment eligibility and to set up their tax withholdings and payments, such as a W-4, I-9, and direct deposit form.

56.     Ultimately, the University's Committee on Academic Freedom and Tenure concluded it was likely that "none of those involved in the appointment process seriously considered that Board approval might be withheld."

57.     Just as the selection of faculty for tenured positions is rigorous, so too is the process by which a tenured faculty member may be dismissed. "Due cause for dismissal shall be deemed to exist only if *(1)* a faculty member has been grossly neglectful of or grossly inefficient in the performance of the faculty member's university duties and functions; or *(2)* with all due regard for the freedoms and protections provided for in Article X, Section 2, of these Statutes, a faculty member's performance of university duties and functions or extramural conduct is found to demonstrate clearly and convincingly that the faculty member can no longer be relied upon to perform those university duties and functions in a manner consonant with professional standards of competence and responsibility; or *(3)* a faculty member has while employed by the University illegally advocated the overthrow of our constitutional form of government by force or violence." Article X, § 1.d. of the Statutes.

58.     Further, no tenured faculty member may be dismissed without, at a minimum, consultation by the President with the Faculty Advisory Committee, receiving a statement of the charges against the faculty member, and a hearing before the Committee on Academic Freedom and Tenure, at which the faculty member may be represented by counsel and may call witnesses in his or her defense. After the Committee on Academic Freedom and Tenure makes findings, conclusions, and a recommendation, the faculty member may object to them and may request a hearing before the University's Board of Trustees.

59.     As with the University's statement on academic freedom, these provisions for termination with cause also reflect the standards set out by the AAUP in its 1940 Statement. Interpreting that statement, the AAUP has stated that it regards the failure by a board of trustees to complete the appointment of a professor offered a tenured faculty position as a summary dismissal—*i.e.*, an action that violates procedural protections contemplated by the AAUP and the University's own standards. *See* August 29, 2014 letter from AAUP to Chancellor Phyllis Wise, attached hereto as Exhibit A.

*Professor Salaita's Protected Speech*

60.     Professor Salaita has a personal Twitter account, which he used to share thoughts and ideas with his "followers," *i.e.*, other Twitter users who voluntarily sign up to receive his tweets (often family and friends). Twitter is a forum designed to facilitate instantaneous commentary and reactions to current events; in fact, Twitter describes its mission as "to give everyone the power to create and share ideas and information instantly, without barriers." Exchanges are informal and, with a 140-character limit, tweets are intended to be pithy; they are inherently not designed to capture nuance and subtly. As with many Twitter users, Professor Salaita's tweets span subjects as broad as his intellectual curiosity. Sometimes he uses Twitter to

share humor. But more often, he uses it to share unique ideas and to provoke thought. This sometimes consists of sharing his own viewpoints, and at other times consists of "re-tweeting" (forwarding to others) interesting writings of others.

61.     In recent years, Professor Salaita has used his Twitter account as an outlet for his thoughts and reactions to events in the Middle East. As an American citizen and as a person of Arab descent, Professor Salaita has long been concerned about American foreign policy in the Middle East and the issues surrounding the conflict between Israel and Palestine.

62.     Many of his tweets about Israel and Palestine are intended to challenge prevailing views of the issue and to bring texture to an increasingly politicized and polarized debate. And although Professor Salaita frequently disagrees with American and Israeli state policy in the region, his tweets take aim at state policy, not at any religious or ethnic group.  Neither his views nor his tweets are antisemitic. Indeed, Professor Salaita has used his Twitter account to expressly oppose antisemitism. For example, he has tweeted that he is fundamentally opposed to antisemitism, calling it a horror. And when the well-known rapper Macklemore wore a costume that evoked age-old Jewish stereotypes, Salaita took to his Twitter account to criticize the rapper for invoking an image used to dehumanize Jewish people for many centuries.

*July 2014 Hostilities in Gaza*

63.     In early July 2014, the state of Israel launched a military campaign in Gaza. Over more than six weeks, three Israeli civilians and 65 Israeli soldiers were killed, while the Israeli air and ground campaign took 2100 Palestinian lives. According to the United Nations, approximately 1500 of the Palestinians killed were civilians, including more than 500 children. Like many others, Professor Salaita was dismayed, particularly at the killing of children.

64.     Professor Salaita felt an obligation to speak out, and did so using his Twitter account. He usually sent the tweets from home in the evening after putting his son to bed. His habit was to read or watch accounts of what was happening in Gaza from sources such as The New York Times, The Guardian, Al Jazeera English, and a variety of social media, and tweet his reactions.

65.     He was disturbed by what he felt was widespread apathy and equivocation at the killing of children. Commensurately, his tweets were deeply critical of Israeli state policy and Israeli government leadership. He blamed Israeli Prime Minister Benjamin Netanyahu for the deaths of Palestinian children; and he criticized the Israeli policy of expanding settlements in territories captured during the 1967 War in contravention of international law. His tweets were provocative, often strongly-worded, and meant to challenge prevailing views and to shake people out of their moral slumber.

66.     Strong language aside, none of his tweets targeted criticism at Judaism or Jewish people. Indeed, his tweets make clear that his criticisms are directed at the policies and actions of the Israeli government, and are not grounded in any antipathy toward Jewish people or their religious beliefs. He explained, for example, that he refused to conceptualize the dispute between Israel and Palestine as a religious or ethnic conflict, stating further that he agreed with many Jewish people and disagreed with many Arabs.

67.     In one tweet, he explained the motivation for his speech, saying that there is no justification for the killing of children. He made clear that his view was universal, and reflected a belief that Jewish and Arab children are equal in the eyes of God.

*The University's Initial Reaction to Professor Salaita's Protected Speech*

68.     Around July 26, at the height of the Israeli campaign in Gaza, Robert Warrior, who is Director of the American Indian Studies Program, reluctantly contacted Professor Salaita to

relay a message from the Chancellor. Warrior told Salaita that according to Chancellor Wise, the University was aware of his tweets and would be monitoring his social media to ensure that he did not use University equipment to engage in that type of discourse. This admonition confirmed that Professor Salaita was already considered an employee of the University.

69.     Indeed, just a few days before, on July 22, the Urbana News-Gazette had quoted a university spokesperson as saying, in response to questions about Professor Salaita's tweets, that "faculty have a wide range of scholarly and political views, and we recognize the freedom-of-speech rights of all of our employees." The university spokesperson also wrote, "Professor Salaita will begin his employment with the university on Aug. 16, 2014. He will be an associate professor and will teach American Indian Studies courses."

70.     Professor Salaita continued to prepare for his move to Illinois, arranging for movers to pack up his home in Blacksburg, Virginia. As late as July 25, 2014, Professor Salaita was reassured that the University would cover the full cost of the move.

71.     Then, on August 2, 2014, just two weeks before his August 16th start date, and without any forewarning, Professor Salaita received an email enclosing a letter from Chancellor Wise and Vice President Christophe Pierre, dated August 1, informing him that "your appointment will not be recommended for submission to the Board of Trustees in September." Wise and Pierre offered no explanation at all for this decision, nor did they offer Professor Salaita notice of the reasons for his dismissal or an opportunity to be heard. The refusal to recommend him to the Board of Trustees for appointment was in direct contravention of the University's contractual promise to do so in Dean Ross's October 3 letter.

72.     Professor Salaita was shocked. He tried immediately to contact Robert Warrior to clarify exactly what the Chancellor's letter meant. Professor Warrior stated that he had only just

found out about the letter that same day. He expressed sympathy and concern for Professor Salaita and his family, and also told Professor Salaita that he was committed to seeing the appointment through.

73.     The impact of the University Administration's actions on Professor Salaita and his family was immediate. Without a job in Illinois—and without the promised funds to pay movers—Professor Salaita instead had to recruit family members to help him and his wife pack their home in a single day and move into his parents' home so that the tenant could move in. The Salaitas lost the earnest money that they had put down on a condominium in Illinois, as well as a deposit they had made with the University's premier day care center. The Salaitas no longer had any income.

74.     Ashamed to admit he had been fired, Professor Salaita initially told very few people about his termination.

75.     Then, on August 6, the online publication *Inside Higher Ed* revealed that the University Administration had terminated Professor Salaita's appointment. In the wake of that initial disclosure, other news outlets caught on to the story and began investigating, in several instances seeking documents from the University under the Freedom of Information Act. A disturbing narrative slowly emerged.

*The Decision to Terminate Professor Salaita*

76.     Professor Salaita's tweets had reached a few media outlets supportive of Israeli policy. Beginning on July 21, 2014, these outlets began reprinting a handful of the most strongly worded tweets expressing criticism of Israeli policy and actions. The cherry-picked tweets that were published were taken in isolation and used to paint Professor Salaita as an antisemite and an advocate of violence. Professor Salaita is neither of these things. Not included were tweets in

which Professor Salaita denounced antisemitism, advocated non-violence, or affirmed the equality of Jews and Arabs.

77.     Based on these few tweets, and the distorted picture of Professor Salaita that they were used to paint, several students, alumni, and donors wrote to Chancellor Wise. In their letters and emails, obtained under the Illinois Freedom of Information Act, they made clear that they disagreed with Professor's Salaita's views critical of Israeli policy.

78.     Several of the writers openly stated that they would withdraw financial support from the University if it did not terminate Professor Salaita's appointment. One writer who described himself as a "multiple 6 figure donor" stated that his and his wife's "support is ending as we vehemently disagree" with Professor Salaita. Another writer informed the Chancellor that she and her husband would cease contributing to the University and would "let our fellow alumni know why we are doing so. We will encourage others to join us in this protest, as perhaps financial consequences will sway you…." Yet another donor, who noted that his name was on plaques on campus buildings based on his generous financial support, wrote to the Chancellor to say that he was reconsidering whether to continue donating to the University based on his strong disagreement with Professor Salaita's views regarding Israel.

79.     On July 23, 2014, just one day after a University spokesperson had affirmed the University's commitment to Salaita's appointment, the Chancellor received an email from Steven Miller, the owner of a Chicago-based venture capital firm and a donor to the University. Miller is on the University's Business Council and the board of the Hillel Foundation, and has an Endowed Professorship in Business at the University of Illinois in his name. Miller asked to meet with Wise to "share his thoughts about the University's hiring of Professor Salaita." The Chancellor responded by telling Mr. Miller that she had "just recently learned about Steven Salaita's

background, beyond his academic history," and then rearranged her schedule to meet with Miller in Chicago on August 1.

80.     Also on July 23, 2014, Chancellor Wise met with an unknown donor, who gave her a two-page memo about Professor Salaita and urged the University Administration to terminate his appointment. That night, Chancellor Wise sent an email to several University's officials focused on fundraising to recount her meeting with the donor: "He gave me a two-pager filled with information on Professor Salaita and said how we handle the situation will be very telling."

81.     In contravention of the Illinois State Records Act, Chancellor Wise subsequently destroyed the two-page memo, notwithstanding that the document was presented to the Chancellor as part of an effort to influence the Chancellor's decision regarding her official duties.

82.     On July 24th, the Board of Trustees held a meeting in Chicago. In an executive session, they discussed Professor Salaita's tweets. Just before the meeting, the Board was provided with a handful of news stories about the tweets, but was given no other background material about Professor Salaita, his many other tweets, his scholarship or his teaching.

83.     As the Board began to discuss the matter, one of the student trustees used the internet to find the tweets that had been the subject of online news stories, and read them to the Board. The Board decided at the meeting that it would support a decision to terminate Professor Salaita's appointment. There was no consultation with the Dean of the College of Liberal Arts and Sciences, nor anyone in the American Indian Studies Program or involved on the search committee that hired him, nor was any effort made to evaluate Professor Salaita's statements on the Middle East, much less his academic scholarship, teaching credentials, or teaching evaluations. And certainly no one asked Professor Salaita for an explanation. The entire executive session lasted just ten minutes.

84.     Professor Salaita had no idea this meeting had taken place, and had no notion that his job was in jeopardy. After all, two days *after* this meeting, Professor Salaita obtained confirmation that his moving expenses would be covered.

85.     On August 1, in the morning, Chancellor Wise and Steven Miller were finally able to meet in person in Chicago. On information and belief, Mr. Miller informed the Chancellor that he would reduce or withhold his monetary contributions to the University if Professor Salaita was allowed to teach there. The Chancellor's letter of termination to Professor Salaita was dated the same day.

*The Negative Reaction and the University's Pretextual Reasoning*

86.     As news of Professor Salaita's firing spread, sixteen departments within the University voted "no confidence" in the University's Administration. Robert Warrior and other faculty in the American Indian Studies Program expressed their strong support for Professor Salaita and urged the University to change course and reinstate him. Thousands of scholars from around the world announced their intention to boycott the University of Illinois on the grounds that it had violated cherished principles of academic freedom, free speech, and shared governance.

87.     On August 22, amid growing criticism of the University Administration, Chancellor Wise published an open letter to faculty in which she attempted to explain the firing of Professor Salaita. She admitted that the Administration's decision was based on Professor Salaita's tweets expressing his political opinions, but denied that the Administration had acted on the basis of Professor Salaita's viewpoints in those tweets. Instead, she claimed that the Administration's actions were taken because Professor Salaita's speech lacked "civility."

88.     The Board published a letter of support for the Chancellor the same day, also acknowledging that the University Administration's actions were taken based on Professor

Salaita's political speech, claiming that Professor Salaita's Twitter messages were "not an acceptable form of civil argument" and raising questions about his teaching ability. The Administration's claim of civility—based as it was on a handful of tweets—is concretely belied by the best and readily available evidence of his classroom and campus demeanor: his exceptional teaching evaluations from Virginia Tech specifically praise his temperament and openness to differing viewpoints at the highest levels of the teaching scale.

89.     Not only did the Board and the Chancellor admit that the Administration acted based on Professor Salaita's political speech, their statements justifying their decision are plain pretext. On information and belief, the University has never fired, let alone punished, a faculty member for "uncivil" speech outside of the classroom and campus, and not addressed to its students or faculty.

90.     Neither the Chancellor nor the Board made any reference to the pressure from donors to terminate Professor Salaita's appointment that had been taking place.

91.     With regard to the charge of antisemitism, a simple review of Professor Salaita's other tweets would have revealed that Professor Salaita is a vocal opponent of antisemitism. The University Administration made no effort to learn about these other, readily-available tweets, or Professor Salaita's views more generally.

92.     The Administration's other claim—that Professor Salaita's tweets rendered him "uncivil" and unfit to teach the University's students—was merely a defamatory means of justifying the decision to fire him for views the University officials did not like. Academics regularly engage in discussions that are provocative, and even sometimes unpleasant; indeed, universities have long been recognized as the place to challenge orthodoxy and push intellectual boundaries. And the hiring committee's dossier showed that Professor Salaita had a stellar

teaching record and that he had never been criticized for treating a student or colleague in the classroom or on campus unfairly, or with anything but utmost respect. Indeed, the University Administration provided no indication that it had investigated Professor Salaita's teaching record or scholarship before deciding to fire him. Moreover, Professor Salaita's tweets were sent from his personal Twitter account, from his home in Virginia, during a period in which he was not teaching any students. Professor Salaita has never mentioned his Twitter account to his students, let alone encouraged them to sign up to follow him.

93.     Finally, no one in the University Administration ever spoke to Professor Salaita to hear his side of the story. And the University Administration failed to consult the President of the Faculty Advisory Committee or conduct a hearing before the Committee on Academic Freedom and Tenure, as is required under the Statutes before a tenured faculty member can be dismissed.

94.     On September 11, 2014, after the school year had already begun, the Board of Trustees finally met to vote on the appointments of new faculty. This was the meeting in which the formality of completing Professor Salaita's appointment was supposed to occur. Indeed, the Board approved more than 120 tenured or tenure-track faculty members, almost all of whom had already begun working and teaching at the University on August 16, 2014. Not a single one of these appointees was mentioned by name during the meeting, and they were all voted on and approved at once.

95.     Solely because of his protected speech, Professor Salaita was treated differently. In contravention of the promises and commitments made to Professor Salaita to induce him to leave his previous tenured position for one at the University of Illinois, Chancellor Wise informed the Board that she was not recommending Professor Salaita for approval. To a chorus of "Shame, shame, shame" from the large crowd, the Board voted down Professor Salaita's appointment. The

vote was highly orchestrated, and a foregone conclusion, carried out solely to create the impression that the Administration had fulfilled its commitment. It had not. The Chancellor had already told Professor Salaita in her August 1 termination letter that she would not recommend him to the Board and that the Board would likely not approve him. Upon information and belief, her reversal of course, in which she put Professor Salaita's name up for a vote with a formal statement *not* recommending his appointment, has never before been done at the University.

96. Trustee James Montgomery cast the lone dissenting vote. In the 1950s, Trustee Montgomery advocated and supported unpopular African-American causes while a student at the University, and faced condemnation for doing so. He analogized Salaita's speech to his own experience challenging prevailing views, describing himself as "almost as vocal as Dr. Salaita when I carried my picket signs along the streets of this campus."

97. A few days after the meeting, Board Chairman Christopher Kennedy admitted in an interview with a newspaper that the decision to deny Professor Salaita his appointment to the faculty was based on Professor Salaita's tweets critical of Israeli policy. Kennedy made clear that he and the other Board members disagreed with Professor Salaita's strongly-worded criticisms of Israel's military campaign in Gaza—so much so that they chose to characterize them as antisemitic—and that they refused to complete his appointment on that basis.

98. Defendant Kennedy twice stated to news publications that he believed the comments of Professor Salaita's that he reviewed were "anti-semitic" and "blatantly anti-semitic"—statements that were unfounded and contrary to available evidence that Kennedy chose not to review. This carelessly-leveled charge defamed Professor Salaita personally and professionally, and falsely caricatured Professor Salaita in contradiction to his nuanced and deeply researched and respected academic scholarship.

99.     Professor Salaita's tweets were not antisemitic, nor is he an antisemite. Had

Chancellor Wise and the Board of Trustees consulted the University's own expert faculty, for

example Professor Michael Rothberg, the Head of its own English Department and Director of the

University's Initiative in Holocaust, Genocide and Memory Studies, they might not have

committed such blatant viewpoint discrimination or defamed Professor Salaita. Professor Rothberg

wrote a thoughtful letter asking the Chancellor to complete Professor Salaita's appointment. He

wrote:

> While I continue to believe that political speech—no matter how controversial or
> extreme it might be considered—is protected by the First Amendment and the
> core values of Academic Freedom, I have also observed many interpretations of
> Professor Salaita's protected speech about the Israeli bombing of Gaza that I
> consider misguided and that deserve to be refuted. I strongly believe that neither
> Professor Salaita himself nor the tweets that are at issue are antisemitic. I say this
> as someone personally and professionally sensitive to expressions of
> antisemitism. Indeed, Professor Salaita has stated repeatedly in numerous tweets
> and writings that have not been cited by his detractors that he opposes
> antisemitism and racism of all kinds. I find these writings to be sincere and
> observe that nobody has brought a single piece of evidence to bear that would
> contradict Professor Salaita's explicit personal opposition to antisemitism. The
> tweets that have been reproduced again and again in reports on this case are not
> expressions of antisemitism but criticism of how charges of antisemitism are used
> to excuse otherwise inexcusable actions.

100.    In explaining his vote against Professor Salaita at the September 11 meeting,

Defendant Fitzgerald said he would have the same reservations about someone who posted

homophobic or racist remarks. Not only were Professor Salaita's statements not antisemitic, but

the University's record does not jibe with Fitzgerald's stated position. In 2012, University of

Illinois professor emeritus Robert Weissberg garnered headlines when he was fired by the National

Review Online for making racist comments in a speech at a gathering of white supremacists, a

meeting he had evidently been attending regularly for several years. Despite a public outcry, the

University took absolutely no action at all—not censure or condemnation, let alone termination.

Moreover, in 2010, the University initially fired adjunct religion professor Kenneth Howell for making homophobic statements in an email to students, but then re-hired Professor Howell and allowed him to continue teaching.

101.     Professor Salaita, in obvious contrast, remains without a job, without health insurance, in his parents' home, with his academic career in tatters. At the precise moment when he is "in the height of his productivity," he has been left without an institutional association that would allow him to conduct research and publish his scholarship. At the same time, the American Indian Studies Program has been left understaffed, and was forced to scramble to rearrange its fall course offerings. All this despite the fact that sixteen departments have voted no-confidence in the University's leadership after the decision to rescind Professor Salaita's appointment, and that Professor Warrior and the faculty of the American Indian Studies Program still support Professor Salaita and want him to join their ranks.

### Count I - 42 U.S.C. § 1983
### First Amendment
*Against the Trustee Defendants and Defendants Easter, Pierre, and Wise*

102.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

103.     In sending "tweets" regarding Israel and Palestine, from his personal Twitter account from his home in Virginia in the summer of 2014, Plaintiff acted in his capacity as a citizen, and not pursuant to any official university duties. His tweets never impeded his performance of his duties as a faculty member, or the regular operation of the University. The subject matter of the "tweets"—Israel and Palestine—is a matter of public concern, and Professor Salaita's comments about that conflict were made in an effort to contribute to the public debate. Such conduct is protected by the First Amendment of the United States Constitution.

104.     Plaintiff's protected speech, and the viewpoint he expressed in those tweets, though greatly distorted and misconstrued by Defendants, was a motivating factor in Defendants' decision not to recommend Professor Salaita's appointment and the rejection of Professor Salaita's appointment to the University's faculty.

105.     The University's retaliatory actions in response to Plaintiff's protected speech have had a chilling effect that acts as a deterrent to free speech.

106.     The termination of Professor Salaita's position with the University of Illinois directly resulted in substantial and irreparable harm to Professor Salaita, including the loss of a tenured position at the University, lost income, out of pocket expenses and severe emotional distress.

### Count II - 42 U.S.C. § 1983
### Procedural Due Process
### *Against the Trustee Defendants and Defendants Easter, Pierre, and Wise*

107.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

108.     By virtue of the parties' contractual agreement, Professor Salaita's reliance on the University's promises, and the University's representations and actions, Plaintiff possessed a property interest in his appointment to and membership in the University's tenured faculty.

109.     Plaintiff also suffered a deprivation of his liberty interest as a result of the false and defamatory statements members of the University Administration made about Professor Salaita, in conjunction with the Administration's denial of his appointment to the University's faculty. The false and defamatory statements—including but not limited to public statements erroneously claiming that Plaintiff is antisemitic or bigoted, attacking his scholarship and

credentials, and asserting that he is unfit to teach—caused Professor Salaita to suffer substantial harm and stigma to his professional, intellectual and business reputation.

110.     Despite Plaintiff's property and liberty interest in his appointment to the University's tenured faculty and his employment with the University, he was not provided with and pre-termination procedures whatsoever, including notice of the charges, an explanation of the evidence against him, an opportunity to tell his side of the story, or to be heard by an impartial decision maker. Nor was he provided any post-termination procedures.

111.     Based on the manner in which Plaintiff's appointment and employment were terminated, he was denied any hearing or opportunity to challenge that action either before or after it was taken. The University thereby deprived Professor Salaita of a property interest and a liberty interest in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

112.     As a direct and proximate result of the University's denial of pre-termination or post-termination procedures, Professor Salaita suffered substantial and irreparable harm, including lost income, the loss of a tenured position at the University, out of pocket expenses and severe emotional distress.

**Count III - 42 U.S.C. § 1983 and 42 U.S.C. § 1985**
**Conspiracy**
***Against all Defendants***

113.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

114.     All of the Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deny Professor Salaita's appointment to the University's faculty, all in violation of Plaintiffs constitutional rights, as described above.

115.    In this manner, the Defendants, acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

116.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

117.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

118.    As a direct and proximate result of the illicit agreement referenced above, Plaintiff's rights were violated and he suffered substantial and irreparable harm, including lost income, the loss of a tenured position at the University, out of pocket expenses, and severe emotional distress.

### Count IV – State Law
### Promissory Estoppel
#### *Against the Board of Trustees*

119.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

120.    As described more fully above, Defendants made an unambiguous promise of employment with indefinite tenure to Professor Salaita. Defendants also made a promise of employment subject to approval consistent with an obligation of good faith and fair dealing, which, in context, included (but was not limited to) complying with (a) the First Amendment of the United States Constitution, (b) general principles of academic freedom and the AAUP's *1940 Statement of Principles on Academic Freedom and Tenure* provided to Plaintiff with his offer, and (c) the University's own rules and regulations including the University of Illinois Statutes.

121.    Professor Salaita relied on these promises when, among other instances of reliance, he resigned his tenured faculty position at Virginia Tech, his wife resigned her position,

he leased his residence in Blacksburg to a tenant, pulled their young son out of his school, and made a deposit on a new residence in Illinois. Professor Salaita would not have taken any of these actions in the absence of Defendants' promise of employment in a tenured faculty position.

122.     Professor Salaita's actions were of a definite and substantial character, and were both foreseeable and reasonably expected by Defendants.

123.     Professor Salaita relied on these promises to his detriment, suffering damages as a result of this breach, in an amount to be proved at trial, including the loss of his income, his wife's income, the loss of the earnest money deposit on a residence, moving expenses and other out of pocket costs.

### Count V – State Law
### Breach of Contract
### *Against the Board of Trustees*

124.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

125.     As described more fully above, Professor Salaita formed a contract with Defendants by accepting their offer of employment in October 2013. Pursuant to the contract, the University agreed to recommend Professor Salaita to the Board of Trustees for appointment to the tenured faculty, and agreed that the appointment would be completed so long as Professor Salaita could meet ministerial requirements such as maintaining legal authorization to work in the United States.

126.     As described more fully above, Defendants' contractual obligations also included an obligation of good faith and fair dealing in performing the contract, which, in context, included (but was not limited to) complying with (a) the First Amendment of the United States Constitution, (b) general principles of academic freedom and the AAUP's *1940 Statement of Principles on*

*Academic Freedom and Tenure* provided to Plaintiff with his offer, and (c) the University's own rules and regulations including the University of Illinois Statutes.

127.     Professor Salaita substantially performed all of the contractual obligations that were required of him up to the time of breach.

128.     Defendants breached the contract by informing Professor Salaita that his nomination would not be recommended to the Board, by failing to recommend him to the Board for appointment, by voting against his appointment on impermissible and unlawful grounds, and terminating his employment.

129.     Moreover, in the performance of their contractual obligations to Salaita, Defendants also violated their obligations of good faith and fair dealing as to the terms and conditions of that contract.

130.     Professor Salaita suffered damages as a result of this breach, in an amount to be proved at trial, including the loss of his income, his wife's income, the loss of the earnest money deposit on a residence, moving expenses and other out of pocket costs.

**Counts VI and VII – State Law**
**Tortious Interference with Contractual and Business Relations**
***Against John Doe Donor Defendants***

131.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

132.     As described more fully above, John Doe Donor Defendants had knowledge of the University's contract with Professor Salaita and their commitment to complete his appointment to the University's faculty.

133.     John Doe Donor Defendants wrongfully, intentionally, and without just cause, demanded that the University terminate Professor Saliata's employment and refuse to complete his

appointment to the University's faculty, or else risk losing their financial contributions to the University. By doing so, they induced Chancellor Wise and others not yet known to Professor Salaita, as agents of the University, to breach their contract, violate Professor Salaita's constitutional rights, and destroy his job and business prospects.

134.    Professor Salaita suffered damages as a result of this breach, in an amount to be proved at trial, including the loss of his income, his wife's income, the loss of the earnest money deposit on a residence, moving expenses and other out of pocket costs.

## Count VIII – State Law
## Intentional Infliction of Emotional Distress
### *Against all Defendants*

135.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

136.    In the manner described more fully above, by inducing Professor Salaita to resign from his tenured faculty position at Virginia Tech and then abruptly terminating his position with the University of Illinois days before his arrival on campus to begin teaching, the Board, the Trustee Defendants and Defendants Easter, Pierre and Wise engaged in extreme and outrageous conduct.

137.    In the manner described more fully above, by interfering in Professor Salaita's appointment to the University's faculty, demanding that the University terminate his position, and issuing an ultimatum that the University must deny his appointment or else lose their financial support, all despite having knowledge of the University's contract and commitment to appoint Professor Salaita to the faculty, the John Doe Donor Defendants engaged in extreme and outrageous conduct.

138.    Defendants' actions set forth above were rooted in an abuse of power or authority.

139.     Defendants' actions set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

140.     Defendants' actions set forth above were undertaken with malice, willfulness, and reckless indifference to the rights of others.

141.     As a direct and proximate result of this misconduct, Professor Salaita suffered injuries, including severe emotional distress and great conscious pain and suffering prior to his death.

**Count IX – State Law**
**Spoliation of Evidence**
*Against Defendant Wise*

142.     Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

143.     As described above, Defendant Wise participated in the intentional destruction and spoliation of evidence central to this lawsuit, including but not limited to the two-page document about Professor Salaita given to her by an unknown donor.

144.     Defendant Wise and the University had a duty under 5 ILCS 160/1 *et seq.* to preserve evidence related to the denial of Professor Salaita's appointment to the University's faculty.

145.     Defendant Wise's destruction of the memo and any other evidence interfered with Professor Salaita's ability to prove his claims, thereby causing him further damages.

146.     Prior to destroying this and other relevant evidence, Defendant Wise knew of the existence of a potential cause of action against her and the University, and intended in destroying this evidence to interfere with Plaintiff's ability to prove his lawsuit. The misconduct described in

this Count was undertaken intentionally with malice and reckless indifference to the rights of others.

\* \* \*

147. Because the Trustee Defendants and Defendants Easter, Pierre and Wise acted within the scope of their employment, the Board of Trustees and the State of Illinois are therefore liable as their employer for any resulting damages and award of attorneys' fees.

WHEREFORE, Plaintiff Steven Salaita respectfully requests that the Court enter judgment in his favor and against all Defendants, for preliminary and permanent injunctive and equitable relief including but not limited to reinstatement by completing his appointment to the tenured faculty; and for monetary relief including compensatory damages, punitive damages, and attorneys' fees and costs, and for any other relief that this Court deems just and proper.

Dated: January 29, 2015                                 Respectfully submitted,

_____
One of Plaintiff's Attorneys

Maria LaHood (*pro hac vice* application pending)     Jon Loevy
Baher Azmy (*pro hac vice* application pending)       Arthur Loevy
Omar Shakir (*pro hac vice* application pending)      Anand Swaminathan
THE CENTER FOR CONSTITUTIONAL RIGHTS                  Gretchen Helfrich
666 Broadway                                          LOEVY & LOEVY
7th Floor                                             312 North May Street
New York, NY 10012                                    Suite 100
Phone: 212-614-6464                                    Chicago, IL 60604
Fax: 212-614-6499                                      Phone: 312-243-5900
                                                      Fax: 312-243-5902