## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|                                      |     |                                          |
|--------------------------------------|-----|------------------------------------------|
| STEVEN SALAITA,                      | )   |                                          |
|                                      | )   | Case No. 1:15 Civ. 924                   |
| Plaintiff,                           | )   |                                          |
|                                      | )   | Hon. Harry D. Leinenweber,               |
| v.                                   | )   | District Judge                           |
|                                      | )   |                                          |
| CHRISTOPHER KENNEDY, *et al.*,       | )   |                                          |
|                                      | )   |                                          |
| Defendants.                          | )   |                                          |
|                                      | )   | JURY TRIAL DEMANDED                      |

## PLAINTIFF'S RESPONSE TO THE MOTION TO DISMISS
## OF THE UNIVERSITY DEFENDANTS

Maria LaHood (*pro hac vice*)
Baher Azmy (*pro hac vice*)
Omar Shakir (*pro hac vice*)
THE CENTER FOR CONSTITUTIONAL
 RIGHTS
666 Broadway
7th Floor
New York, NY 10012
212-614-6464

Jon Loevy
Arthur Loevy
Anand Swaminathan
Steve Art
Gretchen Helfrich
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60604
312-243-5900

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

**INTRODUCTION**................................................................................1

**STATEMENT OF FACTS**................................................................3

**ARGUMENT** ......................................................................................8

**I.    PROFESSOR SALAITA HAS CLEARLY ALLEGED A CLAIM FOR FIRST AMENDMENT RETALIATION AGAINST THE INDIVIDUAL DEFENDANTS**................................................8

    A.    *Pickering* Balancing Cannot Be Resolved In Favor of Defendants At This Stage...............................................................9

        1.    *Pickering* Balancing is a Factual Inquiry Not Suitable for Resolution on a Motion to Dismiss...............................9

        2.    Defendants Cannot Meet Their Burden of Proving Potential Disruption .......................................................................10

    B.    The Complaint Sufficiently Alleges that Each Defendant Participated In and Approved Retaliatory Conduct Against Salaita For His Protected Speech ............................................12

**II.   PLAINTIFF STATES A PROCEDURAL DUE PROCESS CLAIM**.....................................................................14

**III.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**.......................................................................16

    A.    Defendants' Qualified Immunity Argument Cannot Be Resolved at the Pleading Stage ...........................................................17

    B.    Salaita Has a Clearly Established First Amendment Right Against Retaliation Based on his Protected Speech .........................18

**IV.   THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT**................................................................19

    A.    Salaita Has Pleaded a Binding, Enforceable Contract .........................20

        1.    Salaita Has Pleaded a Contract With a Condition Precedent to Performance .........................................................20

        2.    Even if The Facts Were Construed to Allege Only a Condition Precedent to Contract Formation, Salaita Has Pleaded a Valid Contract Claim.............................................25

TABLE OF CONTENTS—Continued

Page

i

      B.     The Dean and Other University Officials Had Actual and Apparent Authority To Bind the University ............................................................................27

V.    **SALAITA HAS STATED A CLAIM FOR PROMISSORY ESTOPPEL**........................................................................................................29

VI.   **THE BOARD AND THE TRUSTEES IN THEIR OFFICIAL CAPACITY ARE NOT ENTITLED TO SOVEREIGN IMMUNITY**.......................31

VII.  **SALAITA'S STATE LAW CLAIMS ARE ADEQUATELY PLEADED** ..........................................................................................................35

      A.     Salaita has Stated a Claim for Spoliation of Evidence ...........................35

      B.     Salaita Has Adequately Alleged Intentional Infliction of Emotional Distress ..............................................................................................36

      C.     Defendants Lack Standing to Dismiss Plaintiff's Tortious Interference Claims Against John Doe Donors, Which Are Nonetheless Adequately Pleaded .......................................................................37

VIII. **SALAITA'S CONSPIRACY CLAIM IS ADEQUATELY PLEADED AND NOT BARRED BY THE INTRACORPORATE CONSPIRACY DOCTRINE** ..................................................................................................38

      A.     Plaintiff Has Sufficiently Stated a Claim For Conspiracy ....................38

      B.     The Intracorporate Conspiracy Doctrine Should Not Apply to § 1983 Claims .................................................................................................39

**CONCLUSION** ..........................................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794 (7th Cir. 2007).............................38

*A.J. Maggio Co. v. Willis,* 316 Ill. App. 3d 1043, 1050 (1st Dist. 2000).....................29

*Alexander v. Diamond Healthcare Corp.*, 2012 WL 4049471 (W.D. Ky. Sept. 13, 2012)...........35

*Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001)...................................................17, 18

*Anderson v. Creighton*, 483 U.S. 635 (1987) .............................................................17

*Animashaun v. O'Donnell*, 1992 WL 5310 (N.D. Ill. Jan. 8, 1992)..............................37

*A/S Apothekernes Lab. for Specialpraeparater v. IMC Chem. Group,*
873 F.2d 155 (7th Cir. 1989) ........................................................................................23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2008) .......................................................................8

*Bartels v. Denler*, 30 Ill.App.3d 499 (1975) ............................................................26

*Benning v. Bd. of Regents of Regency Universities*, 928 F.2d 775 (7th Cir. 1991) .....................34

*Berco Invs. v. Earle M. Jorgensen Co.*, 861 F. Supp. 705 (N.D. Ill. 1994)....................23

*Bonds v. Mil. Cnty.*, 207 F.3d 969 (7th Cir. 2000)........................................................10

*Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502 (7th Cir. 2007) .........................36

*Boyd v. Travelers Ins. Co.*, 166 Ill. 2d 188, 196 n.2, 652 N.E.2d 267 (1995) ..............36

*Brown v. Chi. Bd. of Educ.*, 973 F. Supp. 2d 870 (7th Cir. 2013) .........................11, 18

*Caisse Nationale de Credit Agricole v. Beale,* 1995 WL 263490
(N.D. Ill. May 4, 1995) ..............................................................................................26

*Cannon v. Burge*, 2006 WL 273544 (N.D. Ill. Feb. 2, 2006) ..............................39, 40

*Cannon v. Univ. of Health Sciences/The Chicago Med. Sch.*,
710 F.2d 351 (7th Cir. 1983) .....................................................................................32

*Catholic Charities of Archdiocese of Chicago v. Thorpe*,
318 Ill.App.3d 304 (2000) ................................................................................20, 22, 23

*Chaklos v. Stevens*, 560 F. 3d 705 (7th Cir. 2009)......................................................10

*Chatham Surgicore, Ltd. v. Health Care Serv. Corp.*,
356 Ill. App. 3d 795 (1st Dist. 2005) ........................................30

*Chavez v. Illinois State Police,* 1996 WL 66136 (N.D.Ill. Feb. 13, 1996) ................................40

*Chequers Investments Associates II v. Am. Nat. Bank & Trust Co. of Chicago*,
1994 WL 496786 (N.D. Ill. Sept. 9, 1994) ..................................37

*Chi. Limousine Serv. Inc. v. City of Chicago*, Ill. App. 3d 489 (1st Dist. 2002) ..................31

*Clark v. Walker*, No. 04 C 941, 2004 WL 2967105 (N.D. Ill. Nov. 30, 2004) ...............15

*Coady v. Steil*, 187 F.3d 727 (7th Cir. 1999) ...........................18

*Cobb Alvarez v. Union Pacific Corp.* 962 F. Supp. 1049 (N.D. Ill 1997)......................23

*Cohen v. California*, 403 U.S. 15 (1971) ...........................14

*Colaizzi v. Walker*, 542 F.2d 304 (7th Cir. 1987) ...........................16

*Connick v. Myers*, 461 U.S. 138 (1983)........................10, 11, 12

*Cont'l Cas. Co. v. PPG Indus., Inc.*, 1987 WL 6601 (N.D. Ill. Feb. 6, 1987) ...............37

*Cooper v. Harris*, 1999 WL 261742 (N.D. Ill. Apr. 13, 1999)........................40

*Costello v. Grundon,* 651 F.3d 614 (7th Cir. 2011) ...........................25

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ...........................17

*David v. Village of Oak Lawn,* 1996 WL 210072  (N.D. Ill. Apr. 29, 1996) ...............40

*Dawson v. General Motors Corp.*, 977 F.2d 369 (7th Cir. 1992)........................20

*DeGroot v. Vill. of Matteson*, No. 13-08530, 2014 WL 3360562 (N.D. Ill. July 9, 2014)...........18

*Delgado v. Jones*, 282 F.3d 511 (7th Cir. 2003)........................18

*Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194 (7th Cir. 1996)........................9

*Edelman v. Jordan*, 415 U.S. 651 (1974) ...........................31, 33

*Elliott v. Thomas,* 937 F.2d 338 (7th Cir. 1991) ...........................19

*Elliott v. University of Illinois*, 365 Ill. 338 (Ill. 1936)........................32

iv

*Federal Deposit Ins. Corp. v. Nanula,* 898 F.2d 545 (7th Cir. 1990)............................................26

*Garcetti v. Ceballas,* 547 U.S. 410 (2006) ...............................................................10

*Gentry v. Duckworth*, 65 F.3d 555 (7th Cir. 1995)...........................................13

*George v. Walker*, 535 F.3d 535 (7th Cir. 2008) ...............................................13

*Gordenstein v. Univ. of Delaware*, 381 F. Supp. 718 (D. Del. 1974)...........................................33

*Greene v. Doruff,* 660 F.3d 975 (7th Circ. 2011).....................................................8

*Greenwood v. Ross*, 778 F.2d 448 (8th Cir. 1985) ...........................................33

*Grill v. Adams*, 123 Ill.App.3d 913 (1984) ...............................................24

*Grutter v. Bollinger*, 539 U.S. 306 (2003)...............................................12

*Gustafson v. Jones*, 117 F.3d 1015 (7th Cir. 1997) ...............................................8, 9, 18, 19

*Gustafson v. Jones*, 290 F.3d 895, 913 (7th Cir. 2002) ...............................................19

*Hamwi v. Zollar*, 299 Ill. App. 3d 1088 (1st Dist. 1998)...........................................31

*Hartman v. Moore,* 547 US 250 (2006)...............................................18

*Hatcher v. Cheng*, No. 13-00407, 2014 LEXIS 108958 (S.D. Ill. Aug. 7, 2014) ...........................................17

*Hefferman v. Bass*, 467 F.3d 596 (7th Cir. 2006).....................................................8

*Hernandez v. Dart*, 635 F. Supp. 2d 798 (N.D. Ill. 2009) ...........................................39

*Heuermann v. Andes*, 2013 WL 766311 (S.D. Ill. Feb. 28, 2013)...........................................8

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) .....................................................8

*Hobley v. Burge*, 2004 WL 1243929 (N.D. Ill. June 3, 2004)...........................................39

*Honadle v. Univ. of Vermont*, 115 F. Supp. 2d 468 (D. Vt. 2000) ...........................................34

*Hope v. Pelzer*, 536 U.S. 730 (2002) ...............................................17

*Howard v. City of Chicago,* 2004 WL 2397281 (N.D. Ill. Oct. 25, 2004) ...........................................39

*Illinois Valley Asphalt, Inc. v. J.F. Edwards Constr. Co.,*
90 Ill. App. 3d 768 (3rd Dist. 1980) ...............................................30

*In re Midway Airlines, Inc.*, 180 B.R. 851 (Bankr. Ill. 1995) ........................................................30

*Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000) .............................................................17

*Jefferson v. City of Harvey,* 2000 WL 15097 (N.D.Ill. Jan. 5, 2000) ............................................40

*J.S. Haren Co. v. Macon Water Auth.*, 145 F. App'x 997 (6th Cir. 2005) ....................................34

*Keck v. Keck*, 2013 Ill. App. 5th 120503-U, 8 (2013) ..................................................................24

*Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) ...........................12

*Klug v. Chicago School Reform Bd. of Trustees*, 197 F.3d 853 (7th Cir. 1999) ...........................16

*Kohl v. Murphy*, 767 F. Supp. 895 (N.D. Ill. 1991) ....................................................................36

*Kokkinis v. Ivokovich*, 185 F.3d 840 (7th Cir. 1999) ............................................................10, 11

*Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 607 N.E.2d 201 (1992) ........................................37

*Kovats v. Rutgers,* 822 F.2d 1303 (3d Cir. 1987) .......................................................................33

*Kroll v. Bd. of Trustees of Univ. of Illinois*, 934 F.2d 904 (7th Cir. 1991) ..................................32

*Kunik v. Racine Cnty., Wis.*, 946 F.2d 1574 (7th Cir. 1991) .......................................................39

*Lopez v. Bd. of Trustees of Univ. of Ill.*, 344 F. Supp. 2d 611 (N.D. Ill. 2004) ...........................15

*Loubser v. Thacker*, 440 F.3d 439 (7th Cir. 2006) .....................................................................38

*Marquez v. Turnock*, 967 F.2d 1175 (7th Cir. 1992) ..................................................................10

*Marshbanks v. City of Calumet City*, No. 13 C 2978,

2013 WL 6671239 (N.D. Ill. Dec. 18, 2013) ..............................................................................39

*Massey v. Johnson*, 457 F.3d 711 (7th Cir. 2006) ...................................................................8, 10

Mathews v. City of New York, 2015 U.S. App. LEXIS 3016 (2d. Cir. 2015) ..............................10

*Mayer v. Monroe Country Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007) ...............................10

*McAnelly v. Graves*, 126 Ill.App.3d. 528 (1984) ........................................................................21

*McDorman v. Smith,* 2005 WL 1869683 (N.D. Ill. Aug. 2, 2005) ...............................................39

*McGreal v. Ostrov*, 368 F.3d 657 (7th Cir. 2004) ................................................................10, 18

*McKee v. First Nat'l Bank of Brighton*, 220 Ill. App. 3d 976 (4th Dist. 1991) ......................21, 22

*Meade v. Moraine Valley Cmty. College*, 770 F.3d 680 (7th Circ. 2014) ......................................9

*Michalowicz v. Village of Bedford Park*, 528 F.3d 530 (7th Cir. 2008)........................................14

*Miller-Davis Co. v. Illinois State Toll Highway Auth.*, 567 F.2d 323 (7th Cir. 1977).................31

*Moore v. Watson*, 838 F.Supp.2d 735 (N.D. Ill 2012) ............................................................10, 18

*Morales v. Jones*, 494 F.3d 590 (7th Cir. 2007) ............................................................................12

*Moreno v. Town of Cicero,* 2002 WL 31017932 (N.D.Ill. Sept. 5, 2002)......................................40

*Mutter v. Madigan*, No. 13-CV-8580, 2014 WL 562017 (N.D. Ill. Feb. 13, 2014) .....................32

*Nat'l Org. for Women, Inc. v. Scheidler*, 1997 WL 610782 (N.D. Ill. Sept. 23, 1997) ...............38

*Newsome v. James,* 2000 WL 528475 (N.D. Ill. Apr. 26, 2000) ...................................................40

*Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*,
233 Ill. 2d 46, 906 N.E.2d 520 (2009) ...........................................................................................29

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117 (1991) .............................25

*Northen v. City of Chicago,* 1999 WL 342441 (N.D. Ill. May 17, 1999)......................................40

*Pearson v Callahan*, 555 U.S. 223 (2009).....................................................................................16

*Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013) .........................................................................8

*Pickering v. Bd. Of Educ.*, 391 U.S. 563 (1968).................................................................. passim

*Piggee v. Carl Sandburg Coll.*, 494 F.3d 667 (7th Cir. 2006)....................................................9, 11

*Pollak v. Bd. of Trustees of Univ. of Illinois*,

2004 WL 1470028 (N.D. Ill. June 30, 2004) .............................................................................32, 33

*Puri v. Blockbuster Music Retail*, 1995 WL 756855 (N.D. Ill. 1995) ..........................................23

*Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill.2d 281 (1990)................................20

*Quern v. Jordan*, 440 U.S. 332 (1979) ..........................................................................................31

*Ranyard v. Bd. of Regents,* 708 F.2d 1235 (7th Cir. 1983)...........................................31, 32, 33, 34

*Raymond v. Alexander,* 2012 WL 4388328 (S.D. Ill. Sept. 25, 2012)...........................................38

*Ripberger v. Corizon, Inc.,* 773 F.3d 871 (7th Cir. 2014) ...........................................13

*Rivera v. Lake County,* 974 F. Supp. 2d 1179 (N.D. Ill. 2013) ...........................................17

*Salto v. Mercado,* 1997 WL 222874 (N.D.Ill. Apr. 24, 1997)...........................................40

*Schoenberg v. Chicago Transit Authority,* 84 Ill. App. 3d 1132 (1980)...........................................27

*Sherman v. Curators of Univ. of Missouri,* 16 F.3d 860 (8th Cir. 1994)...........................................33, 34

*Smith v. City of Chicago,* 242 F.3d 737 (7th Cir. 2001) ...........................................17

*Soni v. Board of Trustees of the Univ. of Tenn.,* 513 F.2d 347 (6th Cir.1975)...........................................34

*Sow v. Fortville Police Dep't,* 636 F.3d 293 (7th Cir. 2011) ...........................................39

*Spalding v. City of Chicago,* No. 12 C 8777, 2014 WL 917274 (N.D. Ill. Mar. 10, 2014)...........................................8

*Suraita v. Hyde,* 665 F.3d 860 (7th Cir. 2011) ...........................................18

*Sweezy v. New Hampshire,* 354 U.S. 234 (1957)...........................................12

*TABFG, LLC v. Pfeil,* 746 F.3d 820 (7th Cir. 2014)...........................................37

*Thomas v. Bd. Of Exam'rs, Chi. Pub. Sch.,* 651 F. Supp. 664 (N.D. Ill. 1986)...........................................19

*United States v. Nat'l Treasury Employees Union,* 513 U.S. 454 (1995) ...........................................10

*Urlacher v. Dreams, Inc.,* 2010 WL 669449 (N.D. Ill. Feb. 22, 2010) ...........................................20

*Vail v. Board of Educ. of Paris Union School Dist. No. 95,* 706 F.2d 1435 (7th Cir. 1983)...........................................15

*Van Stan v. Fancy Colours & Co.,* 125 F.3d 563 (7th Cir. 1997) ...........................................36

*Virnich v. Vorwald,* 664 F.3d 206 (7th Cir. 2011)...........................................8

*Williams v. Brown,* 269 F.Supp.2d 987 (N.D.Ill.2003) ...........................................40

*Wilson v. Career Educ. Corp.,* 729 F.3d 665 (7th Cir. 2013)...........................................24

*Wolf-Lillie v. Sonquist,* 699 F.2d 864 (7th Circ. 1982)...........................................13

*Woods-Clendening v. Bd. of Educ.*, 2002 WL 1264000 (N.D. Ill. June 5, 2002).........................15

*Yatvin v. Mad. Metro. Sch. Dist.*, 840 F. 2d 412 (7th Cir. 1988)...................................16

## <u>STATUTES AND OTHER AUTHORITIES</u>

5 ILCS 160/2, 8.........................................................................................35

13 R. Lord, Williston on Contracts § 39:24, at 599 (4th ed. 2001) ...............................26

Restatement (Second) of Contracts § 90(1), at 242 (1981) ..........................................29

*Restatement (Second) of Contracts* § 205, Explanatory Notes § 245,
comment a, at 258 (1981) .........................................................................24

## <u>INTRODUCTION</u>

Professor Steven Salaita, an accomplished scholar and teacher, was hired to a tenured faculty position at the University of Illinois, following a rigorous national search and pursuant to clearly communicated letters of offer and acceptance. Over the next eleven months, Salaita and University officials prepared for his arrival: Salaita resigned his tenured position at another university and undertook significant effort and expenses to prepare for his family's move; the University scheduled Salaita to teach two courses, assigned him an office and set up his email account. Then, two weeks before the start of the semester, the University, under pressure from wealthy donors, summarily dismissed Salaita—without notice or an opportunity to be heard—because of disagreement with comments Salaita made on his personal Twitter account expressing unpopular views critical of Israeli government policy in Gaza. The University's leadership found Salaita's views unpalatable, as did their donor constituents, so they dismissed him.

Despite the obvious constitutional and contractual problems with the University's actions, the Board of Trustees of the University (the "Board" or "University") and the individually named Trustee members and University officials ("Individual Defendants") (collectively "University Defendants" or "Defendants") argue that none of the nine counts in Salaita's Complaint states a claim for relief. At this stage, when Salaita's allegations must be taken as true, such a dramatic result cannot be reached.

With regard to Salaita's First Amendment claim, Defendants do not dispute that (1) his extramural Twitter messages about the Israel-Palestine conflict were speech on a matter of public concern; and (2) his firing was not only motivated by this protected speech, it was the but-for cause of his firing—two admissions that alone preclude dismissal on the pleadings. Yet, Defendants ask the Court to resolve the fact-intensive *Pickering* balancing test—which weighs a

1

public employee's free speech rights against the public employer's interest in avoiding disruption—conclusively in their favor. That balancing is inherently not amenable to resolution on a motion to dismiss, and certainly not where the Complaint is replete with allegations demonstrating the heightened free speech protections applicable to Salaita's speech, and the pretextual and speculative nature of any claim of disruption. Salaita's First Amendment claim must be allowed to proceed.

Regarding Professor Salaita's contract, promissory estoppel and procedural due process claims, Defendants rely on an equally untenable position: that the parties had no legal obligations to one another at any point during the eleven months beginning when Salaita formally accepted the University's written offer and ending when the Board voted against his appointment. This argument ignores numerous allegations demonstrating offer and acceptance, as well as acts of reliance demonstrating the parties' mutual understanding that a contract had been formed.

Defendants also argue that the Individual Defendants are entitled to qualified immunity from Salaita's §1983 constitutional claims and that the Board is entitled to state sovereign immunity from his contract and promissory estoppel claims. Defendants' immunity claims, which only apply to Salaita's claims for monetary damages, not equitable relief, are wrong as a matter of law (and in other ways premature).

Defendants have no standing to dismiss the tortious interference claims as they are brought only against the John Doe Donors, parties yet-to-be named and served. Salaita's remaining claims of conspiracy under §1983 and §1985 and for intentional infliction of emotional distress and spoliation are properly and sufficiently pleaded. Defendants' Motion to Dismiss should be denied.

## STATEMENT OF FACTS

### A.      The University's Hiring of Professor Salaita

In 2012, the American Indian Studies ("AIS") Program at the University of Illinois at Urbana-Champaign began a rigorous, national search process to hire a new full-time faculty member. Compl. ¶20. Professor Steven Salaita, a tenured professor at Virginia Tech University with an expertise in Native American and Indigenous Studies, applied for the position. *Id*. ¶¶1, 18. Consistent with academic hiring practices, the relevant University faculty fully vetted his voluminous scholarship and prior teaching evaluations, which were uniformly stellar. *Id*. ¶¶2, 22. For example, Salaita received the highest Overall rating—"Excellent"—from over 90% of his students and received well above 90% ratings of Excellent in the evaluation category of "concern and respect" for students. *Id*. ¶22. Defendant Chancellor Phyllis Wise and the University Provost approved his appointment. *Id*. ¶31.

At the conclusion of this lengthy selection process, Interim Dean Brian Ross offered Salaita the position by letter dated September 27, 2013, an offer that was slightly revised on October 3, and that reaffirmed the "appointment will carry indefinite tenure." *Id.* ¶25. As is customary at the University, the offer enclosed the American Association of University Professors' ("AAUP") *1940 Statement of Principles on Academic Freedom and Tenure*, to which the University claimed to adhere. *Id.* ¶26. Salaita accepted the offer on October 9, and the parties agreed upon a start date of August 16, 2014. *Id*. ¶¶29, 71.

The University scheduled Salaita to teach two courses in the Fall 2014 semester in which students were able to enroll and for which course books had been ordered, assigned him an office, and were finalizing arrangements for his office furniture and University identification. *Id*. ¶32. In July 2014, the University informed Salaita that he was authorized to use his University of

Illinois email account. *Id.* ¶121. Defendant Wise invited Salaita, as a *bona fide* member of the AIS Program, to a fall reception for new faculty. *Id.* ¶36. In reliance on the contract he had with the University and the University's subsequent actions all of which uniformly reflected an employment relationship, Salaita resigned his tenured position at Virginia Tech, and he and his family made lengthy (and expensive) preparations to move to Illinois. *Id.* ¶121.

**B.      Professor Salaita's Extramural Speech**

In July 2014, Israel began an aerial bombardment and ground campaign in the Gaza Strip that killed approximately 2100 Palestinians, including more than 500 children. *Id.* ¶¶3, 63. Compelled to speak out, Professor Salaita took to his personal Twitter account, criticizing Israeli government policy and actions. *Id.* ¶¶3, 65-66. Exchanges on Twitter, a forum designed for instantaneous commentary and informal exchanges in reaction to current events, are intended to be pithy. Some of Salaita's tweets, meant to challenge prevailing views, were provocative and strongly-worded. *Id.* ¶¶65, 60. Salaita's tweets make clear, however, that his severe criticism of the practices of the Israeli *government* was not grounded in antipathy toward Jewish people, but in a belief that Jewish and Arab children are equal in the eyes of God. *Id.* ¶¶66-67. Salaita tweeted from his home in Virginia in the evening, after reading or watching accounts of what was happening in Gaza from various news and social media sources. *Id.* ¶64.[1]

On July 21, 2014, ideologically driven media outlets cherry-picked and republished a few

---

[1]      Disregarding the standards governing a motion to dismiss, Defendants seek to introduce their own "facts": a remarkably incomplete and inaccurate list of Professor Salaita's tweets that Defendants characterize as "inflammatory," which they then baldly assert, in even further defiance of the motion to dismiss standards, rendered Salaita "unfit" to teach. Defs' Br. 3-5. Defendants draw these "facts" from the Report of the University's Committee on Academic Freedom and Tenure, which they attach to their motion.  They fail to acknowledge, however, that they themselves poisoned the well: the CAFT Report states that it was Defendant Trustees' counsel who requested the inclusion of certain tweets in the Report, even though they were not otherwise material to CAFT's academic freedom and procedural due process analysis. CAFT Report, p. 6 n. 2. Regardless, Defendants' "facts" are not part of the allegations properly considered on a motion to dismiss.

of Salaita's tweets, and used them to falsely paint him as antisemitic. *Id.* ¶¶76, 99. Nevertheless, the next day, a University spokesperson responded to inquiries about the tweets by stating that Salaita "will begin his employment with the University on Aug. 16, 2014 . . . [as] an associate professor," and then, consistent with the AAUP's academic freedom principles, by explaining that "faculty have a wide range of scholarly and political views, and we recognize the freedom-of-speech rights of all of our employees." *Id.* ¶69.

### C. University's Retaliation in Response to Salaita's Speech

The University is highly dependent on private donors, as it receives only 12% of its funding from state appropriations. Compl. ¶9. Defendants came under pressure from private donors who stated they would withdraw financial support from the University because of Salaita's hiring. *Id.* ¶¶15, 76-85. On July 23, Defendant Wise received an email from Steven Miller, the owner of a venture capital firm, donor to the University, and namesake of an endowed professorship, who asked to meet with Chancellor Wise to "share his thoughts about the University's hiring of Professor Salaita." *Id.* ¶79. Defendant Wise rearranged her schedule to meet with Miller in Chicago on the morning of August 1, 2014. *Id.* ¶¶79, 85. Wise also met with at least one other donor who urged her to terminate Salaita's appointment and gave her a two-page memo about Salaita, which she subsequently destroyed. *Id.* ¶¶80-81.

On July 24, 2014, three days after the tweets were republished, Defendants Wise, Easter, Pierre, Kennedy, Fitzgerald, Hasara, Holmes, Koritz, McMillan and Strobel met in an executive session of the Board of Trustees in Chicago to discuss Salaita's tweets. *Id.* ¶¶17, 82-83. Without reviewing any other information about Salaita, such as his scholarship or teaching record; without consulting the faculty or dean involved in hiring him; and without providing Salaita notice, Defendants Kennedy, Fitzgerald, Hasara, Holmes, Koritz, McMillan and Strobel

collectively decided they would support a decision to terminate Salaita's appointment. *Id.* The entire executive session lasted just ten minutes. *Id.* ¶83.

On the morning of August 1, 2014, Defendant Wise met with Mr. Miller. *Id.* ¶85. The next day, on August 2, 2014, just two weeks before Salaita's agreed-upon August 16 start date (and as he was finalizing his family's move), Salaita received a letter dated August 1 from Defendants Wise and Pierre informing him that his "appointment will not be recommended for submission to the Board of Trustees in September." *Id.* ¶71. Wise and Pierre offered no explanation of the reasons for his dismissal or opportunity for Salaita to be heard. *Id.*

At the Board's September 11, 2014 meeting, nearly a month after the semester had begun and other new faculty had started working—and almost a month *after* the agreed-upon start date for Salaita—the Board approved more than 120 new faculty members in one *en bloc* vote, none of whom was mentioned by name. *Id.* ¶94. Pursuant to University standards and practice, Board "approval" has long been "a mere formality"—a "ratification" of the decisions made by the faculty to which hiring authority has been delegated, as it is the faculty that has the expertise to make such decisions. *Id.* ¶¶53-54. Yet, in Salaita's case, Wise informed the Board that she was rejecting the faculty's considered judgment, and recommending that he not receive Board approval. *Id.* ¶¶11, 95. Defendants Kennedy, Estrada, Fitzgerald, Hasara, Holmes, Koritz, McMillan and Strobel together voted against Salaita's appointment. *Id.* ¶95.

### D.    Defendants Concede Their Speech-Based Motivations for Termination

In her August 22, 2014, open letter to the University community, Defendant Wise explained that Salaita's termination was based on his tweets, which, in the Administration's view, lacked "civility." *Id.* ¶87. The same day, Defendants Easter, Pierre, Kennedy, Estrada, Fitzgerald, Hasara, Holmes, Koritz, McMillan and Strobel published a letter of support for Wise,

acknowledging that the University's actions were taken based on Salaita's tweets which, in the Board's view, were "not an acceptable form of civil argument." *Id*. ¶¶11, 12, 88.[2] Kennedy later affirmed that the University's adverse action was based on disagreement with Salaita's tweets critical of Israeli policy, which Kennedy believed were antisemitic. *Id*. ¶¶96-98.

Professor Salaita's tweets were not bigoted. English Professor Michael Rothberg, who directs the University's Initiative in Holocaust, Genocide and Memory Studies, explained in a letter to Chancellor Wise that Salaita could not be considered antisemitic under any fair reading of his work and tweets, that "nobody has brought a single piece of evidence to bear that would contradict Salaita's explicit personal opposition to antisemitism," and that his tweets "are not expressions of antisemitism but criticism of how charges of antisemitism are used to excuse otherwise inexcusable actions." *Id*. ¶99.[3]

As a result of Defendants' actions, Salaita's academic reputation has been severely damaged: he remains without a job, living with his wife and young son in his parents' home, his academic career in tatters. *Id.* ¶¶101.

---

[2]     Along with the Trustee Defendants, Defendants Easter and Pierre also signed the statement. *See* Message to the Univ. Cmty. from the President's Office, Univ. of Ill., *August 22 – An atmosphere for learning*, UNIV. OF ILL. (Aug. 22, 2014), *available at* https://www.uillinois.edu/president/massmail/2014_messages/Aug%2022%20atmosphere%20for%20learning/. A court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Federal Rule of Evidence 201(b)(2).

[3]     Defendants' decision to disregard their contract with Salaita and their subsequent defense of this breach on a principle of enforcing "civility" drew unprecedented, withering criticism from students and faculty at the University and across the country. Sixteen academic departments within the University voted "no confidence" in the University Administration, thousands of scholars pledged to boycott the University, and the premiere academic organizations in the country—including the AAUP, the Society of American Law Teachers, the Modern Language Association, the American Political Science Association, the American Historical Association, among others—issued public statements severely criticizing the University's betrayal of academic freedom and the First Amendment. Compl. ¶¶4, 86.

**ARGUMENT**

Notice pleading only requires a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). At the motion to dismiss stage, the court must "construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor," *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008)). "No claim should be dismissed unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Hefferman v. Bass*, 467 F.3d 596, 598 (7th Cir. 2006).

I. **PROFESSOR SALAITA HAS CLEARLY ALLEGED A CLAIM FOR FIRST AMENDMENT RETALIATION AGAINST THE INDIVIDUAL DEFENDANTS**

Salaita has properly pleaded a *prima facie* claim of retaliation under the First Amendment, which prohibits government officials from taking adverse actions against individuals—either public employees or private citizens—that were motivated even in part by the individuals' speech as a private citizen on a matter of public concern. *See Greene v. Doruff,* 660 F.3d 975 (7th Cir. 2011); *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006); *see also Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013). Defendants invoke the balancing test set forth in *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 574 (1968) to contend that they—as a public employer—enjoyed broad discretion to avoid undue "disruption" in the workplace that would supposedly arise from Salaita's extramural speech. But assessing undue disruption as part of the balancing required by *Pickering* is a factual undertaking that cannot be decided in Defendants' favor on a motion to dismiss.[4] Finally, Defendants' argument that Salaita has not linked

---

[4] *Pickering*'s balancing test is applied only in First Amendment cases involving *public employees, see, e.g., Gustafson v. Jones*, 117 F.3d 1015, 1018 (7th Cir. 1997), and so Defendants' reliance on *Pickering* is an implicit concession that Salaita was, in fact, an employee of the University. Therefore, by Defendants' own admission, Salaita should prevail on his contract, promissory estoppel and due process claims, *see infra* at Sections IV, V. However, even in the unlikely event that Defendants do prevail on

Defendants to his firing or his speech is belied by numerous allegations that the adverse action was caused by the Individual Defendants' conduct and motivated by Salaita's speech.

### A. *Pickering* Balancing Cannot Be Resolved In Favor of Defendants At This Stage

Defendants do not—and cannot—dispute that Salaita's speech related to a matter of public concern. *See* Compl. ¶1, 60-67. The Israeli military's bombing of Gaza and killing of hundreds of civilians, as well as the larger issue of Israel and Palestine, plainly constitute matters of public concern. *See Meade v. Moraine Valley Cmty. College*, 770 F.3d 680, 684 (7th Cir. 2014); *see also Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996) (public concern encompasses "matters in which the public might be interested, as distinct from wholly personal grievances . . . and casual chit-chat"). This presumptively establishes Salaita's First Amendment right. Defendants simply assert that their purported interest in avoiding disruption overrides Salaita's First Amendment rights, but this argument is fatally flawed.

### 1. *Pickering* Balancing is a Factual Inquiry Not Suitable for Resolution on a Motion to Dismiss

The prospect and degree of potential disruption that must be weighed in the *Pickering* balancing is a factual question that cannot be resolved on a motion to dismiss. It requires development and testing—and, ultimately, *balancing*—based on a full factual record. *See Gustafson*, 117 F.3d at 1019 ("[N]ormally, application of the *Pickering* balancing test will be possible only after the parties have had an opportunity to conduct some discovery."). Notably, *none* of the cases cited in Defendants' *Pickering* analysis was resolved at the pleading stage, including the two upon which they rely most heavily. *Piggee v. Carl Sandburg Coll.*, 494 F.3d

---

those claims, Plaintiffs would still have stated a retaliation claim for a failure to hire that was motivated by his speech. *See* Section I(B), *infra* (citing cases).

667, 672 (7th Cir. 2006) (resolved on summary judgment); *Bonds v. Mil. Cnty.*, 207 F.3d 969, 981 (7th Cir. 2000) (resolved after a full trial on the merits).[5]

Moreover, a *Pickering* balancing analysis could not possibly be resolved in Defendants' favor at this stage. The Complaint does not allege any disruption at the University, much less an interest in preventing disruption, and so Defendants' argument necessarily relies on facts not alleged—indeed, external facts that contradict those alleged in the Complaint. Defendants' assertion that Salaita's speech would have been disruptive cannot support a motion to dismiss.

## 2. Defendants Cannot Meet Their Burden of Proving Potential Disruption

Even if the Court were inclined to undertake a *Pickering* analysis at this stage—it should not—the balance tips exclusively in favor of Salaita's right to speak. Under *Pickering*, Defendants bear an affirmative burden to prove the potential for undue disruption. *Connick v. Myers*, 461 U.S. 138, 150 (1983); *Mayer v. Monroe Country Cmty. Sch. Corp.*, 474 F.3d 477, 478 (7th Cir. 2007). The burden is heightened when the plaintiff's speech "more substantially involves matters of public concern." *Id.*; *see also McGreal v. Ostrov*, 368 F.3d 657, 681-82 (7th Cir. 2004). Moreover, concerns about disruption must be "supported with an evidentiary foundation and be more than speculation." *Chaklos v. Stevens*, 560 F. 3d 705, 715 (7th Cir. 2009); *see also United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 457-59 (1995). The Complaint contains no allegations of disruption, but rather alleges that there would be no disruption at all. Compl. ¶¶86-93, 99. Indeed, Defendants' assertion that Salaita's continued employment would cause disruption is pure speculation, and certainly cannot rise to the level required to satisfy the University's heightened burden.

---

[5]     *See also Massey*, 457 F.3d at 716 (7th Cir. 2006) (cited by Defendants; resolved on summary judgment), *Kokkinis v. Ivokovich*, 185 F.3d 840, 845 (7th Cir. 1999) (same); *Marquez v. Turnock*, 967 F.2d 1175, 1179 (7th Cir. 1992) (cited by Defendants; resolved after full trial on the merits).

The Seventh Circuit considers several factors in assessing the likelihood of undue disruption under *Pickering*:

> (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kokkinis*, 185 F.3d at 845 (7th Cir. 1999).

The "time, place and manner" of Salaita's speech clearly demonstrate that he spoke as a member of the general public (Factors 4 and 7): Salaita posted his thoughts to a private Twitter account that his students were never informed of nor asked to follow, from his home, in the evening and during the summer—a time when he was not teaching any students. In the academic context, concerns about disruption primarily concern speech that takes place *within the classroom* and that is *directed at particular students*, *See, e.g.*, *Mayer*, 474 F.3d at 480; *Brown v. Chi. Bd. of Educ.*, 973 F. Supp. 2d 870, 877 (7th Cir. 2013); *Connick*, 461 U.S. at 153 n. 13. Additionally, the University did not require or direct Salaita to tweet, placing his speech outside the sphere of employment-related activities. *Morales v. Jones*, 494 F.3d 590, 595 (7th Cir. 2007) (employment-related activities are limited to "duties an employee is expected to perform").[6]

---

[6]     The University obliquely refers to *Garcetti v. Ceballas*, 547 U.S. 410 (2006), and the more restrictive First Amendment standards governing public employee speech that is undertaken as part of an employee's "official duties." But the University does not actually argue that it applies here.  Nor could it. *See Mathews v. City of New York*, 2015 U.S. App. LEXIS 3016 (2d. Cir. 2015) (police officer's speech raising concerns about the NYPD's Stop-and-Frisk policy did not occur pursuant to his official duties). The Seventh Circuit has applied *Garcetti* in the academic context only to employees in administrative or supervisory capacities, *Moore v. Watson*, 838 F.Supp.2d 735 (N.D. Ill 2012) (involving the executive director of University Communications), or to speech that took place within the classroom and was directed at a student, *Piggee* 464 F.3d at 671 (noting, in a case about an instructor handing a gay student pamphlets about the sinful nature of homosexuality during instructional time, that "we would have a different case" had the instructor "come up to [the student] in a local grocery store.").

11

Furthermore, the university context itself, with its strong guarantees of academic freedom for tenured faculty, heightens Salaita's speech interest and diminishes the University's interest in an employee's "personal loyalty" (Factors 2 and 5). *See Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) (stressing the constitutional import of "the expansive freedoms of speech and thought associated with the university environment"). The Supreme Court has warned that government scrutiny of the content of an individual scholar's speech at a state university is "unquestionably . . . an invasion of [his] liberties in the areas of academic freedom and political expression—areas in which government should be extremely reticent to tread." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).  Defendants' asserted fear of Salaita's commentary or perspective—or even his tone—reflects a distressingly dim view of the University's role in engaging or challenging controversial viewpoints.

### B.  The Complaint Sufficiently Alleges that Each Defendant Participated In and Approved Retaliatory Conduct Against Salaita For His Protected Speech

Defendants do not dispute that the University took an adverse action that was motivated by Salaita's extramural speech, Compl. ¶¶87, 88, but instead they argue that Salaita failed to allege each Individual Defendant's direct personal responsibility for the violation of his rights.[7]

To hold a defendant liable in a §1983 action, the plaintiff must prove that he "caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1982). Defendants are also liable if the alleged violation occurred with their "direction or with [their] knowledge and consent," meaning they "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Gentry v. Duckworth*, 65 F.3d 555, 561

---

[7]     The Defendant Trustee members' assertion is peculiar given Defendants' emphasis (albeit incorrect) on the Trustees' unfettered authority over faculty hiring decisions. Defs' Br. 9-12.

(7th Cir. 1995).[8] Plaintiff has pleaded such facts as to each Individual Defendant.

After Salaita's tweets were republished on July 21, 2014, Defendant Wise arranged to meet with donors pressuring her to fire Salaita or risk losing their financial support. Compl. ¶¶15, 76-85. On July 24, the Individual Defendants (except Defendant Estrada) all met in a ten-minute executive Board session to discuss Salaita's tweets, at which time the Defendant Trustees collectively decided they would support a decision to terminate his appointment. Compl. ¶¶17, 82-83. On August 2, 2014, Defendants Wise and Pierre informed Salaita that his appointment would not be recommended to the Board, without any notice, explanation, or opportunity to be heard. Compl. ¶71. At the September 11 Board meeting, based on Defendant Wise's recommendation, all of the Defendant Trustees voted down Salaita's appointment. Compl. ¶95. Defendants have admitted that their actions were motivated at least in part by disapproval of Salaita's speech. *See* Statement of Facts, Section D, *supra*; Compl. ¶¶87-88, 97-98, 100). These allegations must be taken as true, and are sufficient to hold the Individual Defendants liable under § 1983.

Finally, Defendants cannot evade liability at any stage with the facile argument that they objected only to the tone or "civility" of Salaita's expression, rather than the viewpoint expressed. First, the Complaint plausibly alleges that Salaita was fired for expressing his viewpoint. Second, even accepting Defendants' version of the facts (which would be improper at this stage), the Supreme Court has placed the tone and style in which political speech is

---

[8]     To their credit, Defendants do not argue that Plaintiff has not pleaded an adverse employment action. For good reason: Plaintiff undoubtedly states a First Amendment retaliation claim for the University's failure to hire him on account on account of his speech. *See George v. Walker*, 535 F.3d 535 (7th Cir. 2008) (failure to hire is an adverse action sufficient to make out a *prima facie* case of First Amendment retaliation); *cf. Ripberger v. Corizon, Inc.*, 773 F.3d 871, 884 (7th Cir. 2014) (failure to hire constitutes an "adverse job action" sufficient to support a Title VII retaliation claim). This is true even in the unlikely event that Defendants were to prevail on Salaita's breach of contract claim.

expressed on the same constitutional footing as the substance of that speech differently expressed. *See, e.g.*, *Cohen v. California*, 403 U.S. 15 (1971) (providing full constitutional protection to "Fuck the Draft" statement in courthouse despite asserted offensiveness). However Defendants characterize their motivations, Salaita has sufficiently alleged that he was retaliated against for exercising his First Amendment right to speak on a matter of public concern.

## II.   PLAINTIFF STATES A PROCEDURAL DUE PROCESS CLAIM

A procedural due process claim requires showing "(1) deprivation of a protected interest, and (2) insufficient procedural protections surrounding that deprivation." *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008). Defendants concede that they denied Plaintiff any notice or opportunity to be heard, and instead challenge whether he had a protected property or liberty interest.

### A.  Salaita Had a Protected Property Interest and Was Entitled to Due Process

Defendants' argument that Salaita had no property interest hinges on their contention that there were no contractual obligations between the parties. But as discussed below, Salaita has pleaded a valid contract claim under multiple contract theories. *See* Section IV, *infra*. Under any of those theories, the parties' contractual obligations vest Salaita with a protected property interest. *See, e.g.*, *Vail v. Board of Educ. of Paris Union School Dist. No. 95*, 706 F.2d 1435, 1437-38 (7th Cir. 1983).

Salaita has also alleged deprivation of a property interest even if there was no contract. "[T]he [Supreme] Court has refused to limit constitutional 'property' rights to mere contract rights." *Vail*, 706 F.2d at 1440 (7th Cir. 1983). "Legitimate and reasonable reliance on a promise from the state can be the source of property rights protected under the Due Process Clause and the civil rights statutes." *Id. See also Clark v. Walker*, No. 04 C 941, 2004 WL 2967105, at *4

14

(N.D. Ill. Nov. 30, 2004). As discussed in Section IV, *infra*, University officials induced Salaita to resign a tenured position and move to Champaign, demonstrating, among many other factors, the "legitimate and reasonable" expectation that Salaita's appointment would be completed. *Id. See also* Compl. ¶¶24-41, 68-70.

Defendants also argue that only the Board had the authority to make appointments and thus confer a property interest. Defs' Br. 21. As detailed in Section IV(B) *infra*, the Board delegated actual and apparent authority to University officials to contract with Salaita. In any event "reasonable reliance on assurances and conduct by university officials" can be "sufficient to create a property interest" even where "state law and university regulations . . . prohibited . . . such an appointment." *Vail*, 706. F.2d at 1440; *see also Woods-Clendening v. Bd. of Educ.*, 2002 WL 1264000, at *2 (N.D. Ill. June 5, 2002) (Section 1983 "speaks of actions taken under *color of state law* and not under authority of state law.").[9]

### B. Plaintiff Had a Protected Liberty Interest and Was Entitled to Due Process

A protected liberty interest arises from "infliction of a stigma to reputation accompanied by a failure to rehire (or, a fortiori, by a discharge)." *Klug v. Chicago School Reform Bd. of Trustees*, 197 F.3d 853 (7th Cir. 1999). This liberty interest exists "even if the failure to rehire, or

---

[9]      The cases Defendants cite in opposition are inapposite. *Thomas v. Bd. Of Exam'rs, Chi. Pub. Sch.*, 651 F. Supp. 664, 666 (N.D. Ill. 1986) is vastly different from this case. In *Thomas*, the plaintiff demanded a principal's certification despite failing the exam required to obtain the certificate, and without any evidence of a promise or even indication that certificates would be granted. *Id. Lopez v. Bd. of Trustees of Univ. of Ill.*, 344 F. Supp. 2d 611 (N.D. Ill. 2004) was a discriminatory denial of tenure case dismissed at summary judgment, where plaintiff presented no evidence of contractual commitments or promises to renew his contract. *Id.* at 623-24. *Yatvin v. Mad. Metro. Sch. Dist.*, 840 F. 2d 412 (7th Cir. 1988), decided on a directed verdict at trial, involved an applicant seeking "entitlement to consideration for a job" pursuant to an affirmative action plan, which the court found too attenuated to create a property interest. *Id.* at 417. *DeGroot v. Vill. of Matteson*, No. 13-08530, 2014 WL 3360562, at *2 (N.D. Ill. July 9, 2014) involved a firefighter given an expressly stated "conditional offer of employment"—exactly contrary to the allegations pleaded here—that required him to complete two exams, but he only completed one. *Id.* at *2-4.

the discharge, does not involve a job in which one has a property interest." *Id.* The key question in evaluating stigma is whether the harmful employment action was accompanied by "public charges that make it unlikely that anyone will hire him for a comparable job." *See Colaizzi v. Walker*, 542 F.2d 304, 307 (7th Cir. 1987). Salaita alleges that University officials made public statements falsely accusing him of antisemitism and questioning his qualifications as a teacher and as a scholar, Compl. ¶¶86-87, 91, 96, 98—false charges that have left him unable to secure another job in academia. *Id.* ¶4, 99. Defendants' simple disagreement with Salaita's allegations of severe harm to his career, Defs' Br. 22-23, n. 15, only creates a factual dispute that cannot now be resolved.

## III.     DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

The Individual Defendants assert they are entitled to qualified immunity from Salaita's First Amendment retaliation claim only. Defs' Br. 33-35. Qualified immunity protects government officials from damages liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v Callahan*, 555 U.S. 223, 231 (2009). A constitutional right is clearly established if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citation and quotation omitted). Plaintiff need not demonstrate that "the very action in question has previously been held unlawful," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), nor identify precedent arising from conduct "materially similar" to this case. *Hope*, 536 U.S. at 739.[10] The Individual

---

[10]     Defendants rely on one unpublished, out-of-district decision to suggest that plaintiff must identify an analogous case in order to overcome qualified immunity, an argument at odds with the Supreme Court cases above. Defs' Br. 34, citing *Hatcher v. Cheng*, No. 13-00407, 2014 LEXIS 108958, at *1, 5 (S.D. Ill. Aug. 7, 2014). In fact, *Hatcher* relies on *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001), which makes clear that an analogous case, while *sufficient* to defeat a qualified immunity defense, is not *necessary*.

16

Defendants' qualified immunity defense cannot be resolved at this stage. Salaita has alleged conduct that violates a long-standing and clearly established right to engage in protected speech without suffering retaliatory action by a public employer; the determination of whether that constitutional violation in fact occurred must come later.

### A. Defendants' Qualified Immunity Argument Cannot Be Resolved at the Pleading Stage

"Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate." *Alvarado v. Litscher*, 267 F.3d 648, 651-52 (7th Cir. 2001); *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1197 (N.D. Ill. 2013) (J. Leinenweber) (affirming inappropriateness of qualified immunity dismissal at the motion to dismiss stage). *See also Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal."). Indeed, the Supreme Court has warned that lower courts may never alter this basic pleading requirement of § 1983 claims simply because a defendant asserts a qualified immunity defense. *Crawford-El v. Britton*, 523 U.S. 574, 594-97 (1998); *Jacobs*, 215 F.3d at 765 n.3 (Plaintiff is "not required to plead factual allegations that anticipate and overcome a defense of Qualified Immunity."); *Alvarado*, 267 F.3d at 651-52. These principles apply equally here; Defendants' fact-dependent qualified immunity defense must await summary judgment or trial. *See Gustafson v. Jones*, 117 F.3d at 1021 (affirming denial at motion to dismiss stage of qualified immunity defense on First Amendment retaliation claim); *Spalding v. City of Chicago*, 2014 WL 917274 (N.D. Ill. Mar. 10, 2014); *see also Coady v. Steil*, 187 F.3d 727, 734 (7th Cir. 1999) (denying qualified immunity at

summary judgment because "*Connick–Pickering* balancing always involves fact specific balancing").[11]

### B. Salaita Has a Clearly Established First Amendment Right Against Retaliation Based on His Protected Speech

To the extent qualified immunity can be resolved at the motion to dismiss stage, it is only as to the purely legal question of whether the right was clearly established (not the fact-intensive inquiry into whether the right was violated). Here, the right to engage in protected speech without suffering retaliatory action by a public employer was clearly established long before the retaliatory conduct here, and affirmed repeatedly. *See Gustafson*, 117 F.3d at 1021 ("It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights."); *accord Hartman v. Moore,* 547 US 250, 256 (2006) (same); *Delgado v. Jones*, 282 F.3d 511, 520 (7th Cir. 2003) (same). *See also Suraita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011); *McGreal*, 368 F.3d at 683-84.

Ignoring this binding authority, Defendants attempt to redefine the right at issue, arguing that there is no clearly established right to speak if it causes disruption. Defs' Br. 35. This hyper-technical reading is inconsistent with Supreme Court and Seventh Circuit precedent on both First Amendment retaliation and qualified immunity. The argument improperly disguises a factual dispute—whether, applying the balancing test set forth in *Pickering*, potential for undue disruption outweighs Salaita's right to speak on a matter of public concern—as an immunity question. *See Elliott v. Thomas,* 937 F.2d 338, 341 (7th Cir. 1991) ("By sleight of hand you can

---

[11]    The only case Defendants cite granting qualified immunity on the pleadings involved considerations that are clearly inapplicable here. *Brown v. Chi. Bd. of Educ.*, 973 F. Supp. 2d 870, 873 (7th Cir. 2013) involved a five day suspension of a middle school teacher for discussing the "N-word" in his sixth grade grammar class. Moreover, Defendants' heavy reliance on *Elliott v. Thomas,* 937 F.2d 338, 341 (7th Cir. 1991)—a case predating *Hartmann* and subsequent Seventh Circuit cases—only proves Salaita's point, because the question of disruption was resolved on summary judgment based on a full factual record.

18

turn any defense on the merits into an immunity defense"). *Accord Gustafson v. Jones*, 290 F.3d 895, 913 (7th Cir. 2002) (denying qualified immunity after *trial* where defendant could present "no evidence to support" the employer's belief that any actual disruption would occur so as to have muddled the clarity of this right). The constitutional right at issue was clearly established long before *Pickering*, which is simply one case discussing how to evaluate whether that right has been violated. Defendants' qualified immunity defense cannot be decided at this stage.

## IV.     THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT

The allegations in the Complaint, taken as true, state several viable contract theories. Simplest of all, the Complaint alleges the two basic elements of contract formation: offer and acceptance. *See* Compl. ¶¶2, 25-31. Any condition—in this case, Board ratification scheduled to occur eleven months later—represents either a condition precedent to contract *performance,* or, in the alternative, a condition precedent to formation that was satisfied or waived. These are hornbook contract theories, requiring denial of Defendants' motion to dismiss.

Indeed, taking the allegations in the Complaint as true, the only *im*plausible theory is the one Defendants offer: that the parties had no contractual obligations to one another whatsoever in the eleven months between Salaita's written acceptance of the University's written offer through the September 11, 2014 Board meeting, despite taking numerous, significant actions to induce Salaita to reasonably rely on their promise of employment. *See* Compl. ¶¶32-36, 72. The University's position, if true, necessarily means that it would have had no contractual obligations to all other similarly recruited faculty until the Board meeting, at which point those faculty would already have been on campus and teaching classes for weeks. Defendants' argument turns the plausibility requirement on its head.

19

Certainly, taking the allegations in the Complaint as true, the issue cannot be resolved on a motion to dismiss. *See Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 289-90 (1990); *Catholic Charities of Archdiocese of Chicago v. Thorpe*, 318 Ill. App. 3d 304, 307 (2000); *see also Urlacher v. Dreams, Inc.*, 2010 WL 669449, at *2 (N.D. Ill. Feb. 22, 2010) (citing *Dawson v. General Motors Corp.*, 977 F.2d 369, 373 (7th Cir. 1992)).

### A. Salaita Has Pleaded a Binding, Enforceable Contract

#### 1. Salaita Has Pleaded a Contract With a Condition Precedent to Performance

The Complaint alleges contract formation based on the undisputed facts of offer and acceptance. The Board's subsequent approval process was a condition precedent to *performance* of the contract and not, as Defendants contend, precedent to the *formation* of the contract. Having established a validly formed contract, the conditions regarding the University's election to perform on that contract were constrained by the duty of good faith and fair dealing, the AAUP's principles on academic freedom, the University's General Statutes, and the First and Fourteenth Amendments—conditions the University breached. *See* Compl. ¶¶125-29.

> a. *Both the Contract Language and Parties' Conduct Demonstrate That a Contract was Formed*

All documents exchanged by the parties demonstrate contract formation. The University's October 3 offer letter explicitly created the power of acceptance in the recipient, Salaita. *Id*. ¶25. Salaita signed the letter on October 9, 2013, affirming the University's language: "I accept the above offer of October 3, 2013." *Id*. ¶¶27, 29. The written "supplement [to] the offer letter," dated October 3, made no reference to Board approval, but stated that the faculty "are looking forward to working with you as you get to campus." *Id*. ¶28. After Salaita accepted the offer, the University sent him an October 9 letter expressing that it "look[ed] forward to [his]

20

arrival on campus"; the letter made no reference to Board approval nor did it indicate that agreement was in any way contingent or premature. *Id.* ¶30.

In addition, through the documents exchanged, the parties agreed on all of the typical terms of a contract for employment, including salary, title and start date, as well as benefit information. *Id.* ¶¶25, 27. The offer letter included other language indicating that a contract would be, and was, formed upon acceptance: "*When you arrive on campus*, you will be asked to present proof of your citizenship and eligibility to work." *Id.* ¶27. And the terms of employment enclosed with the offer letter stated that new academic staff such as Salaita "*will receive* a formal Notification of Appointment from the Board once the hiring unit has received from the candidate all required documents," such as "the I-9, W-4, and the Authorization for Deposit of Recurring Payments form." *Id.* Accordingly, the condition of Board approval merely affected the obligations of the parties to *perform* an *already-existing* contract. "[W]here a condition goes solely to the obligation of the parties to perform, existence of such a condition does not prevent the formation of a valid contract." *McAnelly v. Graves*, 126 Ill. App. 3d. 528, 532 (1984).

The single conditional clause the University focuses on—to the exclusion of all of these well-pleaded facts—states that Salaita's appointment was "subject to the approval of the Board of Trustees." Defs' Br. 8-11.[12] The University incorrectly relies upon *McKee v. First Nat'l Bank of Brighton*, 220 Ill. App. 3d 976, 983-84 (4th Dist. 1991) for the proposition that the language "subject to" indicates a condition precedent to the formation of a contract. Defs' Br. 8. But in *McKee* the Illinois Appellate Court found that *a contract had been formed between the parties*, and that the conditions at issue were conditions precedent to the defendant's duty to *perform*

---

[12]     This condition actually contained a promise that Salaita would be recommended to the Board, a condition that was indisputably breached. Compl. ¶¶25, 95, 125.

"under the contract." 200 Ill. App. 3d at 983.[13]  Thus, *McKee* demonstrates that the "subject to" language is appropriately construed as creating a condition precedent to performance on an already existing contract.

Even if the "subject to" language were ambiguous as to whether Board approval is a condition precedent to contract formation or to contract performance, the issue would be unsuitable for resolution on a motion to dismiss. *See Catholic Charities*, 318 Ill. App. 3d at 307 ("Whether an act is necessary to formation of the contract or to the performance of an obligation under the contract depends on the facts of the case.") (internal quotations omitted); *accord Quake*, 141 Ill.2d at 289-90.

And where the language of the contract is ambiguous, it is also appropriate to consider parol evidence. *Quake*, 141 Ill.2d at 289-290. First, extrinsic evidence of reliance—including Salaita's resignation from his former university and impending relocation, and the University's preparation for Salaita's arrival on campus—further confirm that the parties reasonably believed that a contract had been formed, and acted pursuant to that contract. Second, timing suggesting that one party would be expected to act in reliance on the existence of the contract in the period prior to exercise of the condition indicates a contractual obligation on the other party. *See id.* at 281, 315. Here, given the date of the Board decision—11 months after the offer-acceptance and one month after the agreed upon start date—Salaita would rely in the extreme prior to the Board's ratification meeting.[14]

---

[13]     In fact, Defendants concede as much by citing the following passage from *McKee* in their brief: "The language 'subject to' generally indicates a party's promise is not to be *performed* unless a condition occurs." Defs' Br. 8 (quoting *McKee*) (emphasis added).

[14]     Defendants also present parol evidence, citing to provisions of Illinois law and the University's Statutes not referenced or incorporated in the offer letter or other communications to Plaintiff for the proposition that it was unreasonable for Plaintiff to believe that the parties had entered into any contractual commitments prior to Board approval. Defs' Br. 9-10. Salaita reasonably relied on the

Finally, as even Defendants' cited cases demonstrate, Defs' Br. 8, an intent to create a condition precedent to contract *formation* must be "apparent from the face of the agreement," *Catholic Charities*, 318 Ill. App. 3d at 309, through express language making clear that the instrument has no binding effect and creates no obligation on the parties. *See Berco Invs. v. Earle M. Jorgensen Co.*, 861 F. Supp. 705, 708-10 (N.D. Ill. 1994) (no contract formation because of language that "[t]his letter is not a binding agreement" and "[n]either Buyer nor Seller shall have any obligations with respect to the Property unless and until the Agreements are executed and delivered"); *Puri v. Blockbuster Music Retail*, 1995 WL 756855, at *7-8 (N.D. Ill. 1995) (no lease agreement in light of language that "neither party [shall] be legally bound in any way until this Lease has been fully executed by both Landlord and Tenant" and accompanying letter reaffirming nonbinding nature of agreement). The University's offer letter to Salaita is devoid of any such express or unambiguous statements.[15]

> b. *The University's Performance Under the Already Existing Contract Was Constrained By An Obligation of Good Faith and Fair Dealing*

Because Board approval was a condition precedent to performance on an already existing contract, the Board's conduct—including its conditional approval decision—was subject to "the duty of good faith and fair dealing." *Grill v. Adams*, 123 Ill. App. 3d 913, 918 (1984) (citing *Restatement (Second) of Contracts* § 205, Explanatory Notes § 245, comment a, at 258 (1981));

---

language and terms actually presented to him, not statutes and provisions the University chose not to share. In any event, the provisions the University cites merely state the general proposition that the University is operated through its Board, and does not undermine well-pleaded facts that the Board delegated significant authority to various University officials. Compl. ¶¶48-56.

[15]    Defendants' other cases are also easily distinguished. Defs' Br. 10-11. In *A/S Apothekernes Lab. for Specialpraeparater v. IMC Chem. Group*, 873 F.2d 155 (7th Cir. 1989), the letter at issue expressly specified that the agreement would be "subject to" Board approval "*whose discretion shall in no way be limited by this letter. . . .*" *Id.* at 155-57 (emphasis added). In *Cobb Alvarez v. Union Pacific Corp.*, 962 F. Supp. 1049 (N.D. Ill 1997), the context of the relationship revealed that the plaintiffs could not have reasonably believed that merely turning in their applications would entitle them to severance benefits defined in the application, regardless of business necessity. *Id.* at 1054-55

*Keck v. Keck*, 2013 Ill. App. 5th 120503-U, 8 (2013) ("Where the performance of the contingency or condition is within the control of a party to the agreement, the party for whose benefit the condition precedent runs is required to use reasonable efforts to have it occur."). That duty requires parties to act in a manner consistent with the parties' reasonable expectations. *See, e.g., Wilson v. Career Educ. Corp.*, 729 F.3d 665, 674 (7th Cir. 2013).

Taking the Complaint's allegations as true, the University's obligation of good faith and fair dealing placed limitations on the condition of Board approval. First, the Board's approval decision was constrained by the narrow criteria set forth in the University's October 3 offer letter and enclosed documents, which stated that Salaita would be recommended to the Board for approval and approved so long as he submitted the "required documents" and "forms," such as proof of citizenship and/or eligibility to work; and the parties' numerous acts of reliance further affirmed the parties' reasonable expectation that the Board's role was ministerial. Compl. ¶¶27, 39, 51, 55-56, 125. Second, the Board was obligated to adhere to principles of academic freedom as set forth in the AAUP's 1940 Statement and the University's Statutes enclosed and referenced in the University's October 3 offer letter. *Id.* ¶¶26, 41, 120. Third, the Board was obligated to exercise its approval decision in accordance with its obligations under the First and Fourteenth Amendments; compliance with the law is, after all, reasonably expected. *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991); *Costello v. Grundon*, 651 F.3d 614, 640 (7th Cir. 2011) ("[U]nder Illinois law, laws in existence at the time a contract is executed, are deemed, in the absence of contractual language to the contrary, part of the contract as though they were expressly incorporated therein.").

Under Salaita's natural reading, the Board could deny approval to a candidate who failed to maintain legal eligibility to work, or who it came to learn had plagiarized scholarly work or

lied about qualifications, without running afoul of the duty of good faith and fair dealing. Unlike Defendants' implausible eleven-month no-obligations theory, Salaita's theory permits him and the numerous other similarly-situated faculty who had started teaching by the time of the September 11 Board vote to reasonably rely on the University's offer-acceptance and corresponding duty of good faith to perform.

By rejecting Salaita's appointment because of his speech on a matter of public concern, the Board failed to meet these obligations of good faith and fair dealing. *Id*. ¶126. The Complaint thus alleges a valid claim for breach of contract with a condition precedent to performance.

### 2. Even if The Facts Were Construed to Allege Only a Condition Precedent to Contract Formation, Salaita Has Pleaded a Valid Contract Claim

Even if Board approval is deemed a condition precedent to contract *formation*, Salaita has adequately pleaded that the condition was not operative in this case because: (1) the condition precedent to formation was narrowly defined and, in any event, (2) was waived when the Board failed to make its approval decision for almost a year while inducing Plaintiff to perform.

First, the Complaint alleges that, based on the University's communications and conduct (detailed above), the condition precedent to contract formation is limited to ensuring that Plaintiff maintained eligibility to work at the University. This theory is well-pleaded based on the University's October 3 offer letter and enclosed "General Terms of Employment." Compl. ¶27. The Board's conduct affirms the circumscribed nature of its approval role as none of the other recruited faculty were subject to individual scrutiny; instead, their paperwork was submitted and they were approved *en bloc*. *Id.* ¶53. Here, Salaita met the condition precedent— he remained eligible to work—and a contract was formed and breached by the University.

Second, regardless of whether the condition precedent to contract formation is construed narrowly (as above) or broadly (as Defendants do), the Board waived that condition when it

failed to exercise its authority to deny Plaintiff's appointment for *over eleven months*. "A party may waive a condition in a contract, including a condition precedent." *Quake*, 141 Ill.2d at 309-10; *Bartels v. Denler*, 30 Ill. App. 3d 499, 501 (1975); 13 R. Lord, Williston on Contracts § 39:24, at 599 (4th ed. 2001) (reaffirming this general rule). *See also Caisse Nationale de Credit Agricole v. Beale*, 1995 WL 263490, at *3 (N.D. Ill. May 4, 1995) ("Under Illinois law, a party may waive conditions precedent placed in a contract for its own benefit." (citing *Federal Deposit Ins. Corp. v. Nanula*, 898 F.2d 545, 550 (7th Cir. 1990))).

The Board had ample opportunities to act on its reserved authority. It could have voted on Salaita's appointment at any one of the numerous Board meetings between the October 2013 offer-acceptance and the September 2014 meeting. The Board knew or should have known that its continuing failure to act meant that, in the interim, Plaintiff (like other faculty hires) would, in reliance on the offer-acceptance and subsequent conduct, resign another tenured position and undertake considerable effort and expense to relocate. Thus, the University waived any unfettered right of rejection when it failed to exercise that right for almost a year, while inducing Plaintiff to rely. After its waiver (occurring certainly before August 2, 2014), a contract with the previously-agreed terms was formed.

Under the University's implausible theory, even *after classes had started*, the University could have told Salaita and all similarly situated faculty to pack up their things and leave, and for any reason whatsoever. This position is even more untenable given the University's general hiring practices and academic hiring norms.

### B. The Dean and Others University Officials Had Actual and Apparent Authority To Bind the University

Defendants argue that, even if a contract was formed, Dean Ross and the other University officials who formed such a contract, including Chancellor Wise and members of her office, did

26

not have the authority to bind the Board and the University. Defs' Br. 11-12. First, Plaintiff's claim based on the existence of a condition precedent to contract formation (which was narrowly circumscribed, or otherwise waived), *see* Section IV(A)(2), *supra,* does not rest factually on the claim that Interim Dean Ross formed a contract. Thus, the agency arguments are inapplicable. Second, with regard to Plaintiff's contract theories based on an existing contract with a condition precedent to performance, Defendants' arguments are baseless.

As an initial matter, resolving agency questions is a fact-bound inquiry not properly decided at the motion to dismiss stage. *See, e.g.*, *Schoenberg v. Chicago Transit Authority*, 84 Ill. App. 3d 1132, 1138 (1980) ("Whether a person has notice of the lack of an agent's authority or is put on notice by circumstances is a question of fact."). This is especially true where, as here, Plaintiff alleges a clear delegation of actual authority to the Dean, Provost and others, consistent with principles of shared governance. Compl. ¶51. The University claims that the General Rules prohibit anyone other than the Secretary of the Board and the Comptroller from executing contracts and binding the University, Defs' Br. 11, but that contention is in contradiction with, and without citation to, the well-pleaded allegations in the Complaint. Plaintiff alleges that exactly such a delegation occurred here—authorizing offers to candidates, and setting employment terms such as salary and start date. *Id.* ¶¶48-55.

Moreover, the University's contention ignores other directly pertinent language in the same section of the General Rules, which state that "[t]he comptroller and secretary are *authorized to delegate* to responsible members of the staff of the University *authority to execute contracts* in the name of the comptroller and the secretary of the Board, as the case may require." Art. 2, Sec. 4(h) (emphasis added). Such delegation is, in fact, utterly routine at the University. *See* Compl. ¶39 (quoting CAFT Report recognition that "offers made by high administrative

27

officers, a president or a dean, are *customarily regarded as binding*") (emphasis added); *see also* Compl. ¶¶48-56.[16]

Even if it could be determined as a matter of law that the authority to officially bind the University to enter into a contract with a faculty hire is reserved for the Board, that reservation of authority is limited to paying salaries and bestowing a tenured title. Compl. ¶¶52-56. In other words, the Board's limited retained authority is the authority to *perform* under the contract.

Finally, Defendants rely on the principle that apparent authority cannot bind governmental bodies such as the Board because of the Eleventh Amendment. *See* Defs' Br. 11-12, n. 11-12. However, as set forth in Section V(A), *infra*, the Board is not entitled to sovereign immunity under the Eleventh Amendment, so the doctrine of apparent authority applies.

In order to prove apparent authority, a plaintiff must show that "(1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably relied on the agent's apparent authority to his detriment." *A.J. Maggio Co. v. Willis*, 316 Ill. App. 3d 1043, 1050 (1st Dist. 2000).

Plaintiff has pleaded all three of these elements. First, the Board had full knowledge of the hiring process applied to Salaita, as it had been used repeatedly to approve appointments, both in years past and with the other Fall 2014 recruits. Second, Plaintiff reasonably concluded that the Dean, Provost, Chancellor and others acted within the scope of their authority as this

---

[16]     Indeed, the Complaint does not state, and Defendants do not claim, that Dean Ross, the Provost, Chancellor Wise or any of the others who approved Salaita's hiring—in a manner consistent with dozens of other recruited faculty, *id.* ¶¶53-55—acted beyond the scope of their authority. The Board did not reject any other faculty appointments on the ground that University officials acted beyond the scope of their delegated authority; instead, they approved the appointments *en bloc, id.* ¶94, and the University's position would also implausibly suggest the Board would have carte blanche to reject contract terms already agreed upon such as salary or tenure status.

hiring process was consistent with national academic hiring norms and the University had never failed to honor such commitments. Compl. ¶95. Indeed, the AIS Program and other University faculty and administrators planning for Plaintiff's arrival and CAFT all likewise reasonably concluded that University officials made contractual commitments to Salaita and other recruited faculty. *Id*. ¶¶32, 39, 56. Third, Salaita clearly relied on the University officials' apparent authority, and, for the same reasons above, that reliance was reasonable and justified.

## V. PROFESSOR SALAITA HAS STATED A CLAIM FOR PROMISSORY ESTOPPEL

Even if the Court were to conclude that no contract or contractual obligations bound Salaita or the University, Salaita has still pleaded a claim for promissory estoppel. The doctrine of promissory estoppel provides that: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51, 906 N.E.2d 520, 523 (2009) (citing Restatement (Second) of Contracts § 90(1), at 242 (1981)).

Again, relying exclusively on an isolated reading of the "subject to" clause in the offer letter, Defendants contend (a) that no unambiguous promise was made to Salaita, and (b) that Plaintiff's reliance on any promise was unreasonable. In so arguing, Defendants again ignore and contradict the vast majority of the Complaint's allegations, which satisfy all elements of promissory estoppel or, at a minimum, create a question of fact that should not be resolved on the pleadings. *Illinois Valley Asphalt, Inc. v. J.F. Edwards Constr. Co.*, 90 Ill. App. 3d 768 (3rd Dist. 1980) (resolution of promissory estoppel generally "is a question of fact to be determined by the trial court.").

As more fully described above, the Complaint alleges that the University made two unambiguous promises: (1) that based on documents reflecting offer and acceptance and the University's conduct and practice, it agreed to hire Salaita, subject only to the very limited discretion to ensure that the required paperwork and eligibility had been completed and confirmed. Compl. ¶¶48-56, 125, 128. And, in the alternative, (2) that commensurate with the gravity of Salaita's expected reliance on the offer-acceptance documents and the University's conduct and practice, the Board's consideration of Salaita's appointment would accord with principles of good faith and fair dealing. Compl. ¶¶41, 126, 129. *See also* Section IV(A), *supra*.

These are legally enforceable promises. *See In re Midway Airlines, Inc.*, 180 B.R. 851, 944 (Bankr. Ill. 1995) ("The promise required to establish promissory estoppel. . . may be inferred from the words and conduct of the defendant."); *Chatham Surgicore, Ltd. v. Health Care Serv. Corp.*, 356 Ill. App. 3d 795, 800-803 (1st Dist. 2005) ("[A]n express promise is unnecessary.").

Salaita justifiably relied on the University's promises. Indeed, this is the very purpose of such promises, made routinely in academic hiring, because sought-after academics would not resign tenured positions if their candidacy were subject to unfettered reassessment by a Board with no qualifications or expertise in the relevant field. As CAFT stated, ratification of the University's position "would throw the process by which colleges and universities engage new faculty members into complete chaos to the detriment of both institutions and faculty members." Compl. ¶39.[17]

---

[17]     *Chi. Limousine Serv. Inc. v. City of Chicago*, Ill. App. 3d 489 (1st Dist. 2002), cited by Defendants, is inapplicable. The plaintiff in that case sought promissory estoppel claims against a municipality based on an expectation in the "continuance of the law" without change, completely different than the basis for reliance alleged herein. *Hamwi v. Zollar*, 299 Ill. App. 3d 1088 (1st Dist. 1998), also inapposite, involved an administrative review of an agency decision, after administrative and trial court hearings, not on pleadings.

## VI. THE BOARD AND THE TRUSTEES IN THEIR OFFICIAL CAPACITY ARE NOT ENTITLED TO STATE SOVEREIGN IMMUNITY

### A. Defendants Should Not Be Allowed To Invoke State Sovereign Immunity

The University's assertion of state sovereign immunity is relevant only to Plaintiffs' claims for monetary damages—not to his equitable claims for breach of contract or promissory estoppel. Contrary to Defendants' suggestion, Defs' Br. 31, the scope of Eleventh Amendment immunity from suit in federal court is a matter of federal law. *See Miller-Davis Co. v. Illinois State Toll Highway Auth.*, 567 F.2d 323, 330 (7th Cir. 1977). In *Ranyard v. Bd. of Regents*, the Seventh Circuit established a set of factors for determining immunity, beginning with the Supreme Court's holding that the "critical inquiry is whether a judgment would be paid from public funds in the state treasury." 708 F.2d 1235, 1238 (7th Cir. 1983) (citing *Quern v. Jordan*, 440 U.S. 332, 337 (1979)); *accord Edelman v. Jordan*, 415 U.S. 651, 663 (1974). *Ranyard* identified "subsidiary" factors, including "whether the state entity can sue and be sued, whether it performs an essential governmental function, and whether it enjoys a substantial degree of political independence from the state." *Id*.

Since *Ranyard* was decided in 1983, no court has undertaken a fresh, factual examination of the relationship between the University and the State of Illinois to determine whether it meets the *Ranyard* criteria. Instead, decisions regarding the Board's immunity have relied on older, pre-*Ranyard* precedent. The cases on which Defendants rely all ultimately derive from a 1936 decision, *Elliott v. University of Illinois*, 365 Ill. 338 (Ill. 1936), in which the Illinois Supreme Court held that the Board of Regents was an agent of the state. *See Kroll v. Bd. of Trustees of Univ. of Illinois*, 934 F.2d 904, 910 n.3 (7th Cir. 1991)(citing *Cannon v. Univ. of Health Sciences/The Chicago Med. Sch.*, 710 F.2d 351, 356 (7th Cir. 1983)(citing *Elliot*)); *Pollak v. Bd. of Trustees of Univ. of Illinois*, 2004 WL 1470028, at *1 (N.D. Ill. June 30, 2004) (same); *Mutter*

31

*v. Madigan*, No. 13-CV-8580, 2014 WL 562017 (N.D. Ill. Feb. 13, 2014) (same). When *Elliot* was decided, the Board had a very different relationship to the State and in particular to the public fisc. For example, *Elliot* found that the Board was "maintained by interest from its permanent endowment fund arising from grants of land from the United States and by appropriations from the General Assembly." *Id*. at 343. There is no mention of tuition or federal funds, each of which now provides the University more revenue than the State of Illinois, Compl. ¶9, or of private donations or any of the myriad sources of revenue which now make up the University's budget. The year before *Elliott* was decided, appropriations from the State of Illinois made up 66% of the University's income. *See* LLOYD MOREY, REPORT OF THE COMPTROLLER FOR THE YEAR ENDED JUNE 30, 1935 9 (University of Illinois 1935)(attached hereto as Exhibit A). Today, the figure is nearly *de minimus*, at 12%. Compl. ¶9.

A grant of Eleventh Amendment immunity is not irreversible. *See Pollak*, 2004 WL 1470028, at *2 (holding that "the designation of an agency or organization as an arm of the state is not immutable" but declining to conduct factual inquiry). Thus, changes in the sources of the University's income may warrant reconsideration of its status as a state agency. *See Kroll*, 934 F.2d at 910 n.3 ("Of course, the sources of income mentioned by Kroll may be relevant to the argument that the Board's ties to the public fisc are now insufficient to allow the Board to be characterized as a 'state agency' for purposes of the eleventh amendment."). Older precedent is not controlling since *Ranyard* subsequently set forth specific criteria to evaluate Eleventh Amendment immunity. *See Sherman v. Curators of Univ. of Missouri*, 16 F.3d 860, 864-65 (8th Cir. 1994) (refusing to rely on older circuit precedent and remanding for factual findings regarding the University of Missouri's status in light of *Greenwood v. Ross*, 778 F.2d 448, 453 (8th Cir. 1985), which laid out factors analogous to those in *Ranyard*).

32

The *Ranyard* criteria counsel against Eleventh Amendment immunity in this case. With only 12% of its budget coming from the State and with the ability to raise money from private sources, the University cannot credibly argue that any judgment in this case would or must come from the State. Even higher percentages of state funding than that available to the University have led to denials of sovereign immunity for other public universities. *See, e.g.*, *Kovats v. Rutgers,* 822 F.2d 1303, 1309 (3d Cir. 1987) (denying sovereign immunity to Rutgers where it had "substantial amounts of non-state funds" from which it could pay a judgment.); *Gordenstein v. Univ. of Delaware*, 381 F. Supp. 718, 721 (D. Del. 1974) (rejecting sovereign immunity where state funding to university was 34.1%, stating that "the University has both the power and the resources to pay any judgment entered against it. . . The potential impact upon the Treasury of the State of Delaware is indirect, at best.") (citing *Edelman v. Jordan*, 415 U.S. 651 (1974)). *See also Sherman*, 16 F.3d at 864-65 ("If Sherman's unrebutted factual allegations are true—for example, that only one-third of the University's operating budget comes from state appropriations—the University should explain why payment of contractual damages would necessarily implicate the state fisc."); *Honadle v. Univ. of Vermont*, 115 F. Supp. 2d 468, 470 (D. Vt. 2000) (University did not enjoy sovereign immunity where state financing was less than 10% of total funding).

The subsidiary factors identified in *Ranyard* likewise point away from immunity here. The University can sue and be sued. *See* 110 ILCS 305/1. And although education is an essential government function, Illinois is home to numerous institutions providing this function without the benefit of sovereign immunity, including state universities. Finally, the University enjoys a substantial degree of political independence from the state, as Salaita is not aware of any instances in which Board decisions have been overruled or vetoed by any state authority.

33

**B.  At A Minimum, the Court Should Allow Discovery on This Issue.**

 "The determination whether a state entity should enjoy the protection of the Eleventh Amendment requires careful appraisal of the relationship between the state and the institution being sued." *Benning v. Bd. of Regents of Regency Universities*, 928 F.2d 775, 777 (7th Cir. 1991). Moreover, "[e]ach state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances." *Id.* (citing *Soni v. Board of Trustees of the Univ. of Tenn.,* 513 F.2d 347, 352 (6th Cir. 1975)).

If the Court finds the record before it insufficient to permit the factual analysis required by *Ranyard*, Plaintiff respectfully requests permission to conduct discovery on this issue and present a fuller factual record. *See J.S. Haren Co. v. Macon Water Auth.*, 145 F. App'x 997, 998 (6th Cir. 2005) (remanding for discovery on sovereign immunity to allow Plaintiff to develop a factual record); *Alexander v. Diamond Healthcare Corp.*, 2012 WL 4049471, at *3 (W.D. Ky. Sept. 13, 2012) (denying 12(b)(6) motion and ordering discovery on issue of sovereign immunity).

**VII.  SALAITA'S STATE LAW CLAIMS ARE ADEQUATELY PLEADED**

**A.  Professor Salaita has Stated a Claim for Spoliation of Evidence**

First, the two-page memo that Defendant Wise discarded or destroyed plainly falls within the definition of "records" under the Illinois State Records Act (the "Act"): it constitutes material "received by" the Chancellor "in connection with the transaction of public business," as it regards the hiring of faculty by a state university. And it is certainly evidence of the "policies, decisions, [and] procedures" of the University, the very types of records that public officials are expected to preserve. 5 ILCS 160/2, 8. Defendants cite no support for their contention that the memo is not a public record, or that faculty hiring is not the type of agency activity covered by

the Act. Moreover, the retention of records is, in part, "designed to protect the legal and financial rights of . . . persons directly affected by the agency's activities." 5 ILCS 160/8. Salaita—like anyone hired by the University—is plainly a person directly affected by the University's actions. The question of whether Defendant Wise could nonetheless dispose of the document without running afoul of the statute, as well as whether the University's retention policy meets the "adequate and proper" standard of 5 ILCS 160/8, requires an analysis of the document and its contents, which cannot be undertaken solely on the pleadings.

Second, Salaita has plausibly alleged that a reasonable person in Defendant Wise's position "should have foreseen that the evidence was material to a potential civil action." Defs' Br. 30. Chancellor Wise knew that Salaita's appointment was generating controversy, and a decision not to recommend his approval to the Board based on extramural speech was an extraordinary step likely to cause both uproar and litigation. Compl. ¶¶38, 40, 76-80, 86, 89. Plaintiff has made at least "inferential allegations" that Defendant Wise knew—as any reasonable person would have—that evidence of the University's decision-making, including the memo, would be material. *See, e.g., Kohl v. Murphy*, 767 F. Supp. 895, 898 (N.D. Ill. 1991) (only inferential, rather than direct, allegations concerning material elements are necessary).

Third, Plaintiff's allegation that destruction of evidence, including the memo, "interfered with his ability to prove his claims," taken along with all of his allegations regarding the underlying claims, is sufficient to allege a "reasonable probability of succeeding"—a standard which prevents recovery only where "the underlying action was meritless"—that is, if he could not prevail "even with the lost or destroyed evidence." *Boyd v. Travelers Ins. Co.*, 166 Ill. 2d 188, 196 n.2 (1995), *as modified on denial of reh'g* (June 22, 1995); *see also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 510 (7th Cir. 2007).

### B. Salaita Has Adequately Alleged Intentional Infliction of Emotional Distress

Salaita has alleged conduct that is extreme and outrageous. His termination involved unprecedented and inappropriate intervention in a faculty appointment, generating significant outrage, including a no confidence vote in the administration by sixteen university departments and a boycott of the University by thousands of scholars. Compl. ¶4, 40. Defendants fired him with outrageous accusations that he was antisemitic and "unfit to teach," leaving his "academic career in tatters." Compl. ¶¶92, 97, 101; *see also id.* ¶¶34, 71, 92, 97. Where, as here, an employer's conduct is "egregious," an IIED claim is not foreclosed. *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 568 (7th Cir. 1997). Defendants cannot argue as a matter of law that their conduct is not extreme and outrageous, particularly since such in inquiry is by nature "fact-intensive." *Heuermann v. Andes*, 2013 WL 766311, at *5 (S.D. Ill. Feb. 28, 2013). And Salaita's severe emotional distress was a foreseeable consequence of Defendants' extreme conduct. *See Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 25, 607 N.E.2d 201, 213 (1992) (facts alleging outrageous conduct are sufficient to support allegation that plaintiffs suffered severe emotional distress as a result); Compl. ¶¶5, 73-73.

### C. Defendants Lack Standing to Dismiss Salaita's Tortious Interference Claims Against John Doe Donors, Which Are Nonetheless Adequately Pleaded

Salaita's claims for tortious interference are brought against the John Doe Donor defendants only, who have not been named or appeared in the case. Compl. ¶36. The University Defendants "lack[] standing to move for dismissal of a claim against another party." *Chequers Investments Associates II v. Am. Nat. Bank & Trust Co. of Chicago*, 1994 WL 496786, at *2 (N.D. Ill. Sept. 9, 1994).[18]

---

[18]     *See also Animashaun v. O'Donnell*, 1992 WL 5310, at *3 (N.D. Ill. Jan. 8, 1992) (a party seeking dismissal can obtain relief only as to himself (citing 5A C. Wright and A. Miller, *Federal Practice and*

Even if the University Defendants had standing to seek dismissal of these claims against other unnamed parties, Salaita has adequately pleaded each element of his tortious interference with contract claim and his tortious interference with prospective business relations claim. To state a claim for tortious interference with contract, a plaintiff must allege "a legally enforceable contract of which the defendant had knowledge, and the defendant's intentional interference inducing a breach by a party to the contract, resulting in damages." *TABFG, LLC v. Pfeil*, 746 F.3d 820, 823 (7th Cir. 2014). Plaintiff has alleged the existence of a contract, knowledge of the contract on the part of the John Doe Donors and intentional interference by inducing a breach that caused damages. *See* Section IV, *supra*; *see also* Compl. ¶¶78-80,132-34.

Plaintiff has also adequately alleged the four elements of a claim for tortious interference with business relations. He has alleged: 1) a "reasonable expectancy of entering into a valid business relationship," Compl. ¶78-80, 132-33; 2) John Doe Donors' "knowledge of that expectancy," as they demanded that the University terminate Salaita or they would withdraw their support, *id.*; 3) "defendant's intentional and unjustifiable interference that induced or caused a breach or termination of the expectancy," as their *quid pro quo* demand induced the University to breach Salaita's expectancy, *id.* ¶133; and 4) "damage to plaintiff resulting from defendant's conduct," which Defendants do not challenge. Compl. ¶134. *F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 800 (7th Cir. 2007).[19]

Furthermore, the conduct of the John Doe Donors enjoyed no privilege. This suit is not about general advocacy; it is brought only against those donors who insisted on a *quid pro quo*—

---

*Procedure* § 1349 ("The movant . . . has no standing to seek dismissal of the action as to nonmoving parties.")); *Cont'l Cas. Co. v. PPG Indus., Inc.*, 1987 WL 6601, at *2 (N.D. Ill. Feb. 6, 1987).

[19]     *Raymond v. Alexander*, 2012 WL 4388328 (S.D. Ill. Sept. 25, 2012) is inapposite, as the plaintiff there did not "appreciate" the difference between the two claims. *Id.* *9.  Here, however, Plaintiff has alleged both. Nonetheless, if Plaintiff's claims are unclear, he respectfully seeks leave to replead.

that the University abandon its commitment to Salaita or face financial loss. Inducement to commit unlawful retaliation is not protected. Defendants' reliance on *Nat'l Org. for Women, Inc. v. Scheidler*, 1997 WL 610782 (N.D. Ill. Sept. 23, 1997) is misplaced because that case specifically recognizes that there is no constitutional protection for a "petition" that amounts to "a conspiracy to violate constitutional rights." *Id. at* *30.

## VIII. SALAITA'S CONSPIRACY CLAIM IS ADEQUATELY PLEADED AND NOT BARRED BY THE INTRACORPORATE CONSPIRACY DOCTRINE

### A. Salaita has sufficiently stated a claim for conspiracy

A conspiracy allegation is sufficient it if alleges the parties, the general purpose and the approximate date. *See Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006). All Defendants are clearly named as parties to the conspiracy. Compl. ¶8-15, 113-118. The purpose of the conspiracy, "to deny Professor Salaita's appointment to the faculty," *Id.* ¶114, is sufficiently specific. *Accord Hernandez v. Dart*, 635 F. Supp. 2d 798, 810 (N.D. Ill. 2009) (conspiracy claim failed where plaintiff did not allege what "Defendants conspired to do, other than to generally 'depriv[e] [h]im of the equal protection of the laws.'"). Finally, the dates of the conspiracy are clear: July to September 2014. Compl. ¶¶76-77, 94-95.

Salaita's allegations are not speculative. He alleged that his appointment was discussed in communications and meetings between donors and Defendant Wise, Compl. ¶¶78-80, 85, and that the decision to terminate his appointment was agreed upon at meetings of Defendant Trustees on July 24, 2014, at which Defendants Wise, Pierre, and Easter were present, *id.* ¶¶17, 82, 83, as well as on September 11, 2014, in which Defendants Wise and Easter participated. *Id.* ¶¶94-95.[20] Defendant Trustees, Easter and Pierre issued a statement supporting Chancellor

---

[20]     *See* Minutes of Sept. 11, 2014 Board Meeting, *available at* http://www.trustees.uillinois.edu/trustees/minutes/2014/September-11-2014-BOT.pdf, at 11-12; Federal Rule of Evidence 201(b)(2).

Wise's action. *Id.* ¶88; n2, *supra*. Conspiracy allegations need not assert overt agreement, but must only be "sufficient to raise the inference of mutual understanding." *Kunik v. Racine Cnty., Wis.*, 946 F.2d 1574, 1580-81 (7th Cir. 1991); *see also Sow v. Fortville Police Dep't*, 636 F.3d 293, 305 (7th Cir. 2011).

### B. The Intracorporate Conspiracy Doctrine Should Not Apply to § 1983 Claims

Defendants cannot escape liability for constitutional violations by invoking the Intracorporate Conspiracy Doctrine ("ICD"), which the Seventh Circuit has never applied to §1983 claims. *See Marshbanks v. City of Calumet City*, 2013 WL 6671239, at *3 (N.D. Ill. Dec. 18, 2013). Most district courts have found that the doctrine does not apply. *See, e.g.*, *Cannon v. Burge*, 2006 WL 273544, at *14 (N.D. Ill. Feb. 2, 2006) *aff'd*, 752 F.3d 1079 (7th Cir. 2014).[21] The purpose of ICD is to "shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory." *Id.* at *15. But as in *Cannon*, "[t]he conduct plaintiff alleges here does not fit that mold." *Id.* at *15. Here, there is nothing "routine" about the unprecedented step of overturning the faculty's carefully considered decision to appoint Professor Salaita because of disapproval of his protected extramural speech.

### CONCLUSION

The University Defendants' motion to dismiss should be denied in its entirety.

---

[21] *See also Hobley v. Burge*, 2004 WL 1243929, at *8 (N.D. Ill. June 3, 2004); *Howard v. City of Chicago*, 2004 WL 2397281, at *8 (N.D. Ill. Oct. 25, 2004); *McDorman v. Smith*, 2005 WL 1869683, at *6 (N.D. Ill. Aug. 2, 2005); *Williams v. Brown*, 269 F. Supp. 2d 987, 994 (N.D. Ill. 2003), *vacated in part by Williams v. Brown*, 2003 WL 22454083 (N.D. Ill. Oct. 3, 2003); *Moreno v. Town of Cicero*, 2002 WL 31017932, at *3 (N.D. Ill. Sept. 5, 2002); *Newsome v. James*, 2000 WL 528475, at * *14-16 (N.D. Ill. Apr. 26, 2000); *Jefferson v. City of Harvey*, 2000 WL 15097, at * *4-5 (N.D. Ill. Jan. 5, 2000); *Northen v. City of Chicago*, 1999 WL 342441, at * *3-4 (N.D. Ill. May 17, 1999); *Cooper v. Harris*, 1999 WL 261742, at *3 (N.D. Ill. Apr. 13, 1999); *Salto v. Mercado*, 1997 WL 222874, at *1-2 (N.D. Ill. Apr. 24, 1997). *But see*, *David v. Village of Oak Lawn*, 1996 WL 210072, * *3-4 (N.D. Ill. Apr. 29, 1996), and *Chavez v. Illinois State Police*, 1996 WL 66136, at *7-8 (N.D. Ill. Feb. 13, 1996).

RESPECTFULLY SUBMITTED,

**STEVEN SALAITA**

By: /s/ Anand Swaminathan
*Counsel for Steven Salaita*

| | |
|---|---|
| Maria LaHood (*pro hac vice*) | Jon Loevy |
| Baher Azmy (*pro hac vice*) | Arthur Loevy |
| Omar Shakir (*pro hac vice*) | Anand Swaminathan |
| THE CENTER FOR CONSTITUTIONAL | Steve Art |
| RIGHTS | Gretchen Helfrich |
| 666 Broadway | LOEVY & LOEVY |
| 7th Floor | 312 North May Street, Suite 100 |
| New York, NY 10012 | Chicago, IL 60604 |
| 212-614-6464 | 312-243-5900 |

## **CERTIFICATE OF SERVICE**

I, Anand Swaminathan, an attorney, certify that on March 30, 2015, I filed the foregoing

Plaintiff's Opposition to the University Defendants' Motion to Dismiss using the Court's CM/ECF

system, which effected service on all counsel of record.

/s/ Anand Swaminathan
*Counsel for Steven Salaita*

41