```
 1                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   STEVEN SALAITA,                   )
                                       )
 4             Plaintiff,              )
                                       )
 5             v.                      )  No. 15 CV 00924
                                       )
 6   CHRISTOPHER KENNEDY, CHAIRMAN     )
     OF THE BOARD OF TRUSTEES OF THE   )
 7   UNIVERSITY OF ILLINOIS, et al., ) Chicago, Illinois
                                       )  July 15, 2015
 8             Defendants.             )  9:10 a.m.

 9                     TRANSCRIPT OF PROCEEDINGS

10          BEFORE THE HONORABLE HARRY D. LEINENWEBER

11   APPEARANCES:

12   For the Plaintiff:        LOEVY & LOEVY
                               BY:  MR. ANAND SWAMINATHAN
13                                  MS. GRETCHEN E. HELFRICH
                               312 North May Street, Suite 100
14                             Chicago, Illinois 60607
                               (312) 243-5900
15                             anand@loevy.com
                               gretchen@loevy.com
16
     For the Defendants:       PERKINS COIE, LLC
17                             BY:  MR. CHRISTOPHER B. WILSON
                                    MR. KEITH G. KLEIN
18                             131 South Dearborn Street
                               Suite 1700
19                             Chicago, Illinois 60603
                               (312) 324-8603
20                             cwilson@perkinscoie.com
                               kklein@perkinscoie.com
21

22   Court Reporter:          Judith A. Walsh, CSR, RDR, CRR
                              Official Court Reporter
23                            219 S. Dearborn Street, Room 1944
                              Chicago, Illinois 60604
24                            (312) 702-8865
                              judith_walsh@ilnd.uscourts.gov
25
```

1    (Proceedings heard in open court:)

2              THE CLERK:  15 C 924, Salaita versus Kennedy.

3              THE COURT:  Good morning.

4         MR. SWAMINATHAN:  Good morning, your Honor.  Anand

5    Swaminathan and Gretchen Helfrich for the plaintiff.

6         MR. WILSON:  Good morning, your Honor.  Chris Wilson

7    and Keith Klein on behalf of the University of Illinois.

8              THE COURT:  I gave you a week or so to work this out.

9    Did you?

10             MR. SWAMINATHAN:  I wish I could report that we had,

11   your Honor.  After the conference, we sent defendant an e-mail

12   immediately afterward saying, hey, although we filed the

13   motion and we were at impasse, we're willing to work with you

14   on any compromises that can be reached despite the motion.  If

15   you have any proposals to narrow these requests that would

16   address your concerns, let us know.

17        We had previously made proposals that had been

18   rejected; hence the motion.  We got a response on Monday

19   basically saying, hey, we're willing to talk to you, but we

20   didn't have any concrete proposals.  I spoke with defendants

21   yesterday.  We had no further proposals.

22        So with the exception of one of these where we did

23   some narrowing and may have made some movement toward an

24   agreement, we're before you on all of these requests.

25             THE COURT:  Let me see if I get what you're after.

1   It's a contention, I believe, that the Board was pressured by

2   outsiders into denying him a position.  And by your discovery,

3   you're attempting to determine whether this occurred.  Is

4   that --

5            MR. WILSON:  That's incorrect, your Honor.

6            THE COURT:  Pardon?

7            MR. WILSON:  That -- it's more complicated than that.

8            THE COURT:  Why isn't he entitled to that

9   information?

10           MR. WILSON:  He is entitled to that, and we're

11  producing that.  We're going to produce anything related to

12  Steven Salaita, anything from outside donors, any other

13  materials.

14           What they want to do is prove a lot of negatives

15  or -- for example, No. 2, they're contending that this wasn't

16  the result of outside donors or the result of the Board's

17  concern for the University but actual animus against

18  Palestine; that the individual Board members, Patrick

19  Fitzgerald, Christopher Kennedy, Judge Holmes, didn't -- they

20  actually did this because they don't like Palestine and they

21  didn't like Professor Salaita's views about Palestine.

22           So they want us to produce any documents we can find

23  at the university from the Board of Trustees that mention the

24  word "Israel" or "Palestine" or its peoples.  And we have told

25  them, we just think that's too broad.  And we're concerned

1  about the burden this has placed on the university.  And they

2  consistently have no concern for the burden on the university.

3       We're going to go through Skadden Arps e-mails of

4  Patrick Fitzgerald to determine whether he has any mention of

5  Israel or Palestine in there.  It's going to cost thousands of

6  dollars to no end.

7       There's no basis for them to contend that the eight

8  individual board members who voted against Dr. Salaita did so

9  because of an animus against Palestine.  They can take the

10  deposition of each of those board members who are highly

11  respected individuals across the state of Illinois, and they

12  can challenge them about whether or not this was based on

13  animus towards Palestine, but we think it's just too far a

14  bridge to make us go through an entire computer search.

15       For example, your Honor, if there's just a document

16  that Patrick Fitzgerald received that said, "Just got back

17  from Israel, great vacation," that's going to pop up.  We have

18  to have a team of lawyers review it for privilege.  And that's

19  going to occur dozens of times for each of these eight people.

20       And we think that's just a bridge too far.  And

21  really what it appears to be is imposing litigation costs on

22  the university for each of these little rabbit holes.

23       We'll produce anything about Steven Salaita, anything

24  from donors, but we just think documents related to Israel or

25  Palestine to prove a potential bias is punitive.

1    MR. SWAMINATHAN:  So let me address that because I

2  think what he's now saying is their concern is really about

3  the burden, it's not really as much about the relevance which

4  is correct because the bottom line is, this is a First

5  Amendment case.

6    It is a viewpoint discrimination case in which we

7  say, look, they -- he made statements critical of Israel and

8  as a result of those, he was fired.  The university doesn't

9  dispute he was fired over those specific tweets.  Okay.  So

10  they clearly said it's the speech.

11    Now we have to understand, what was it about that

12  speech that was so problematic.  And we believe -- and they

13  said publicly, we apply this to the relief standard, basically

14  we found his comments to be so uncivil that we decided to fire

15  this guy.  So we think that's a highly subjective standard.

16    A lot of people in the community have agreed with

17  that:  The Committee on Academic Freedom.  Tenure at the

18  university has agreed with that.  The American Association of

19  University Professors has agreed with that.

20    It's a highly problematic standard.  It's highly

21  subjective and it's most problematic because it allows someone

22  to say, hey, if you say something critical of somebody we all

23  dislike, Idi Amin or this person or that person, it's not

24  really so uncivil or harsh.  But if you say something that's

25  unpopular, it's particularly harsh and we may take action.

```
 1              THE COURT:  How can you narrow it down so they don't
 2    have to --
 3              MR. SWAMINATHAN:  Well, we've offered to.  And so
 4    here is what we --
 5              THE COURT:  Okay.  How have you offered to?
 6              MR. SWAMINATHAN:  What we've said is, okay, if you're
 7    doing this -- first, we said you go ahead and do a search on
 8    Israel and Palestine.  They came back to us and said, hey,
 9    that actually hits a substantial number of records.
10              Now that's surprising to us because let me just
11    address this.  These are not individuals who work in Middle
12    East studies or work in some specific department.  These are
13    board members of the university who like you and me are really
14    not -- there's no reason to think they're talking about Israel
15    or Palestine day in and day out so they're going to have a
16    thousand e-mails about Israel or Palestine.
17              If he's got five e-mails about a vacation that he
18    took, then he has five e-mails about a vacation.  They can
19    review them and not include them.
20              We need to understand why is it so burdensome to do
21    this search and just check.  If you come back to me and tell
22    me, it turns out for Patrick Fitzgerald or for this other
23    defendant it hits a thousand documents, then we're happy to
24    address that with you.  And that's what we've said.  But come
25    back to us and tell us what the concerns are.
```

1          And we are willing to work with you to narrow these

2    requests by dates, to put additional search terms in so

3    instead of just searching "Palestine," you search "Palestine"

4    and something, whatever it is.  But we can come up with ways

5    to narrow the request.

6          But ultimately, the request is relevant.  Tell us

7    that you have a specific reason to show that it is actually

8    burdensome, and we'll work with you.  But they haven't done

9    that.

10          MR. WILSON:  If I could, your Honor, we've offered to

11    produce everything and we will produce everything that

12    mentions Steven Salaita in any way.

13          Just to be clear, here's their contention:  There's

14    not going to be anything in Steven Salaita's documents that

15    show an anti-Palestine bias.  We want to go through all your

16    other e-mails that have nothing to do with Steven Salaita

17    because we think there might be something where Patrick

18    Fitzgerald or Chris Kennedy or Dr. Koritz or Karen Hasara, the

19    mayor of Springfield, have said something anti-Palestine.  And

20    we want you to go through the entire university, all their

21    e-mails, Skadden Arps, Schiff Hardin & Waite, the Merchandise

22    Mart, and find those.

23          And we said, we will give you everything about

24    Salaita and is it really -- we proposed this to counsel.  Do

25    you really think that if there's an anti-Palestine bias, it's

1   not going to show up in the Steven Salaita e-mails, the

2   biggest Palestine/Israel conflict that has come up in memory?

3   And they're going to not have it there but we're going to have

4   to go through all of these other hits?

5          Anything, somebody from the -- an Israeli professor

6   who sends something, that's going to be a hit.  There are

7   dozens of, hundreds of ways that Israel and Palestine could

8   show up on these.  And we submit --

9          THE COURT:  You're -- let me see if I -- the request

10  is that each of the defendants search his or her e-mails to

11  determine whether or not they sent any e-mails out that

12  mentioned Palestine or Israel.  Is that your request?

13         MR. SWAMINATHAN:  Basically, yes, whether or not

14  there's going to be documents that show hey, I'm a strong

15  supporter of Israel, I'm a harsh critic of Palestine, either

16  way.  And basically, if they show those things, that has an

17  impact on how they viewed and treated Steven Salaita.

18         Now, what I said to the defendants over and over,

19  tell me what you think is a reasonable way to do this in light

20  of what burdens you perceive.

21         And if they want to say to me, I talked to Patrick

22  Fitzgerald and he says, I don't have any communications back

23  and forth about Palestine.  I just don't get e-mails about it,

24  and I don't e-mail back about it.

25         All they have to do is make reasonable search

1    efforts, come back to me and tell me, "My reasonable search

2    efforts show me that he doesn't have any documents."

3          If they talk to each of these individuals and say,

4    hey, I don't have anything on this, then that may be simply

5    where we end up.

6          I'm not telling him exactly how to do the search.

7    I'm just saying it is highly relevant if they had a bias

8    against this viewpoint because this is employment viewpoint

9    discrimination case.  Do make reasonable efforts.

10          THE COURT:  Do you think you're going to find some

11    smoking gun to say that --

12          MR. WILSON:  And your Honor, you're exactly right

13    which is, this is predicated --

14          THE COURT:  Well, except, I mean, you can search my

15    e-mail.  I don't think I've ever mentioned Israel or Palestine

16    in any e-mail, not that I might not have a view one way or

17    another on it.  But it just seems to me I wouldn't have many.

18          MR. WILSON:  This is predicated, though, remember, on

19    them asking Patrick Fitzgerald at his deposition, "Do you

20    harbor a bias against Palestine," and him saying, "No."  They

21    want materials to impeach him because he ostensibly lied under

22    oath.

23          THE COURT:  What's wrong with that?

24          MR. WILSON:  Well, I think it's -- the burden against

25    that tiny sliver of information that they I don't think could

1    get, we'd have to go through an incredibly burdensome process.

2           THE COURT:  Not necessarily.  All he's asking, what,

3    is Israel, Palestine, and Salaita, right?

4           MR. SWAMINATHAN:  All I'm saying, yes, exactly.

5    Anything --

6           THE COURT:  How many e-mails did Patrick Fitzgerald

7    or Chris Kennedy or whoever else --

8           MR. WILSON:  But your Honor, we'll produce anything

9    about Salaita.  This is where it doesn't mention Salaita.

10          THE COURT:  But I can't -- I just wouldn't think

11   that, you know, that normally there would be very many.  I

12   think he's right.

13          MR. WILSON:  But what surprised us is when we pull

14   all these mailboxes and you just enter the term "Israel," you

15   get a lot of hits.  That's the problem.

16          THE COURT:  With Patrick Fitzgerald?

17          MR. WILSON:  No, with other people at the university.

18   We haven't done the Board yet.

19          THE COURT:  So you're only asking for the defendants,

20   right?

21          MR. SWAMINATHAN:  We're asking for the defendants.

22   We're asking for the defendants, the people who participated

23   in the decision making, so the defendants plus the two or

24   three, the chancellor or the administrators right next to her.

25   That's the relevant group of people who were the decision

1    makers.

2           THE COURT:  That seems to me that shouldn't be that

3    burdensome.  If it is --

4           MR. WILSON:  We'll come back if it is.

5           THE COURT:  All right.

6           MR. WILSON:  My concern is, it is.

7           THE COURT:  All right.  I'll order you to do that.

8    And however, you have the right to ask me to reconsider if it

9    appears to be too burdensome.  And I would suggest that maybe

10   you can work it out.

11          So what else is happening in the case?

12          MR. SWAMINATHAN:  So that's Request No. 2.  And there

13   are a number of additional requests.  And let me just give you

14   sort of the, here are the categories that the requests fall

15   into where we're asking for additional information.

16          So we've covered one of them which are really

17   requests designed to get at this issue of, is there a -- why

18   did they pick Steven Salaita's speech as being the subject on

19   which they were going to take action against him as opposed to

20   all the others in the university faculty who say controversial

21   things all the time.

22          And it's relevant for two reasons.  One is, it's

23   relevant to our First Amendment claim that they discriminated

24   against him based on his views and in particular his speech

25   and that it was his unpopular speech that caused problems,

1    unpopular speech that caused problems both because these

2    individuals didn't like it and they treated it as harsh

3    criticisms that they didn't like at a level that was different

4    in the way they treated other harsh criticisms that other

5    faculty made on other subjects and because they're more

6    willing to hear the views of donors and be influenced by those

7    views.

8            But here's the other reason it's also relevant,

9    because the university's defense in this case is that

10   Professor Salaita's case is sui generis and that because of

11   what he said and did, it was just so different, his criticisms

12   were so harsh and critical that they resulted -- they were

13   just too disruptive for the university to break them in.

14           And that's the university's claim since the

15   litigation is started which is a smart move.  Instead of

16   saying it was civility, it's disruptive because that's the

17   Pickering defense.  So they want to say, all right, under

18   Pickering, this is our defense, that it was disruptive.  So

19   they've already made that very clear in their motion to

20   dismiss.

21           So we want to test that and say we don't think

22   anything that he said was particularly disruptive vis-a-vis

23   other people who said controversial things at the university.

24           So for example, we've asked them for information

25   about three specific individuals:  A person who was a

1   professor at the university who was essentially a white

2   supremacist, a professor at the university who said things

3   that were harshly critical of homosexuals, and a professor who

4   was involved in an organization that's considered a terrorist

5   organization.

6           They say, I'm not producing any documents from any of

7   these people.  We say it's highly relevant.  If those people

8   said highly controversial things on different subjects, none

9   of them faced any kind of action or any kind of termination --

10          THE COURT:  There's three individuals you're seeking?

11          MR. SWAMINATHAN:  We're seeking three individuals.

12          THE COURT:  What's -- shouldn't they be allowed to

13  determine if there's comparables who were treated differently?

14          MR. WILSON:  Well, the comparable would be someone

15  who was subject to Board approval.  They're asking for

16  existing faculty.  That's the problem.  We didn't want this

17  person to become existing faculty and subject us to all the

18  problems we had with different faculty.  We'll stipulate there

19  are other faculty who have been problematic.

20          I don't know what having to produce all the documents

21  of any communication relating to Professor Weisberg, Professor

22  Howell, or Dr. Kilgore would advance this.  Those would be

23  trials within trials.  We'd have to comb the university to

24  find documents relevant to Kilgore, Howell, and Weisberg.

25          THE COURT:  As I understand his argument, that they

1    wouldn't be comparables because they weren't subject to Board

2    approval.

3         MR. SWAMINATHAN:  So the idea of comparables is

4    really an employment discrimination kind of concept.  This is

5    a different scenario.  They're saying, "I can't bring this

6    person in.  I can't have this person be part of the university

7    committee.  This person is unfit to teach at my university

8    because these comments were sufficiently disruptive" maybe

9    because so many donors weighed in or students weighed in or

10   other things.

11        A comparable doesn't have to be a faculty member

12   versus non-faculty member.  That is going to be relevant to

13   Professor Salaita's contract claims and promissory estoppel

14   claims, but they say this person is unfit to teach at this

15   university because of his speech.  His speech did unique

16   things that other speeches didn't do.

17        It's not about comparables in the context of whether

18   you're a -- by title a faculty member or by title almost a

19   faculty member or by title an adjunct faculty member.  The

20   question is just simply, is it disruptive?  How does the

21   university treat disruption?  It's going to try to defend this

22   case by saying, hey, his stuff was disruptive.  Well, what is

23   actually disruptive?

24        A thousand people came out and sent e-mails to the

25   faculty -- or to the administration about Kilgore or the guy

1    who is a white supremacist, well, that certainly suggests that

2    Professor Salaita's speech isn't really all that disruptive.

3    It's not something that would prevent you from being able to

4    bring this person into the university.  So that's the idea.

5    It's a little different in this context.

6            MR. WILSON:  This is about discovery.  Those are all

7    fine arguments.  They're fully developed, and he can make

8    those about different professors and how they were treated

9    differently.

10           The question is, does the university have to bear the

11   burden of providing any document relating to those professors

12   and any public statement they made during the last, I think,

13   15 years is what you asked for and then you narrowed it to the

14   last five years.

15           This, this would result in trials within trials.

16   They can make their arguments.  They can say --

17           THE COURT:  Well, the thing is, a trial within a

18   trial, if we go to trial and I allow it in -- I mean, this is

19   discovery.

20           MR. WILSON:  But your Honor, what would they gain

21   from additional documents about Professor Weisberg other than

22   to cause a burden on the university?  They have their

23   argument.

24           MR. SWAMINATHAN:  Let me explain that because here's

25   what will happen.  They are going to stand in front of a jury

 1    in this case, and they're going to say, "Professor Salaita's

 2    case was sui generis.  I got a thousand e-mails from students

 3    complaining about this professor.  I had tons of donors come

 4    out and tell me they didn't like this guy's speech.  It was so

 5    disruptive that I had to get rid of this guy."  That's their

 6    defense under Pickering.

 7          THE COURT:  Well, they didn't get rid of him; they

 8    didn't hire him.  That's different.

 9          MR. SWAMINATHAN:  Right, but -- it's a First

10    Amendment thing.  So I had to -- my only defense to a First

11    Amendment claim is, yes, I took action motivated by his speech

12    but it was sufficiently disruptive.  That's what a First

13    Amendment claim is.

14          In the case of Weisberg, he says something

15    controversial, said, "I didn't take action based on his

16    speech."

17          THE COURT:  You have evidence of what they said,

18    don't you?

19          MR. SWAMINATHAN:  I have evidence of what those

20    individuals said.

21          THE COURT:  Yes.

22          MR. SWAMINATHAN:  Yes, but I want to know what is the

23    university's decision making about -- because I know what they

24    said.  I don't know --

25          THE COURT:  Well, you know they didn't fire him so

1    you can --

2          MR. SWAMINATHAN:  But I don't know what the level of

3    disruption is for the university.  So I don't know, for

4    example, did the chancellor get a thousand e-mails about this

5    guy?  Was there picketing on campus that the chancellor had to

6    take into consideration when she decided whether it was

7    disruptive?

8          And here's the -- ultimately the point.  I need to be

9    able to defend against that claim when they stand in front of

10   the jury and say, hey, this was sui generis.  This is a unique

11   instance and there's no case like it.  I need to be able to

12   point to these other cases, a --

13         THE COURT:  You can.  You got their public

14   statements.

15         MR. SWAMINATHAN:  I only have their statement that

16   they said something controversial.  But they're going to say,

17   Salaita resulted in a thousand e-mails to the chancellor.

18         THE COURT:  Well --

19         MR. SWAMINATHAN:  I don't know what these other

20   people received.  And here's --

21         THE COURT:  And I'm inclined to agree with them, that

22   this is a little too far afield.  So I'll deny the motion in

23   that respect.

24         MR. SWAMINATHAN:  Okay.  So here are the other key

25   subjects.  They have to do with our contract, claims for

1    contract and promissory estoppel.  So the basic idea there is,

2    they contracted to bring this guy in back in 2013 for a year.

3           He's still teaching at his other university as a

4    tenured faculty member.  And then ultimately right before he's

5    about to come on to campus, they say, "We're not completing

6    your appointment."

7           Now, the contract claim is based on the idea that, of

8    course, the final approval of the Board is really a

9    ministerial function.  For the same reason that Professor

10   Salaita resigned from a tenured faculty position before coming

11   on to campus and was about to start on campus, so did 10 to 15

12   others who were resigning tenured faculty positions to come on

13   to the tenured faculty of the University of Illinois.

14          So the contract claim is very much -- and the

15   promissory estoppel claims are entirely about whether or not

16   Professor Salaita's reliance on the university's promises to

17   him -- the offer letter, the salary, all the commitments that

18   the university made to him -- that induced him and all the

19   other people in his same position to resign tenured positions,

20   get ready to come to the University of Illinois, prepare their

21   coursework of academics, their curriculum, and come on campus,

22   that that was a reasonable reliance on the promises that were

23   made to them, that was a reasonable reliance on the offer

24   letters that were provided.  So that's the central issue on

25   the contract and promissory estoppel claim.

1    So what we've asked for are documents relevant to

2  those claims.  So we've asked for a few things.  And really

3  these are all things that are tied directly to arguments that

4  the defendants have made in their motion to dismiss.

5    So for example, the university says in its motion to

6  dismiss, well, he can't have a contract with the university

7  because the only people who can bind the university by

8  contract are the secretary of the board and the comptroller of

9  the board, I think it is.

10    And so any other contract that's signed by --

11  Salaita's offer letter and other documents were signed by the

12  dean of the college, well, that doesn't mean anything.  Those

13  are powerless documents.

14    Well, we don't think that that's true.  People sign

15  contracts all the time in the university community.  And if

16  they're going to make that argument, I have to have the

17  opportunity to defend against that argument.

18    And so I'm simply saying, produce documents to me

19  just in the last five years where these individuals have said,

20  hey -- produce where people have entered into contracts and

21  bind the university other than the secretary and comptroller.

22  So that's the kind of contract claim request that we've made.

23    We said for a promissory estoppel claim, we need to

24  know, was it reasonable for Professor Salaita to have relied

25  on the promises of this job.

1          Well, 13 other people or 14 other people were in the

2    exact same position.  They resigned tenured positions with the

3    understanding they were going to come on to this campus and

4    have a job.

5          So did they engage in the exact same kind of reliance

6    on the exact same kind of promises because if they did, that's

7    strong evidence that Professor Salaita's reliance was also

8    reasonable.

9          So that's another set of document requests that we've

10   made where we said, hey, give us the information that's going

11   to allow us to prove our contract and promissory estoppel

12   claims and, more importantly, defend against the arguments

13   you're going to make against those claims.

14         MR. WILSON:  Your Honor, this is a great example of

15   the tactics that are being deployed against the university.

16   We have received requests for 16 different professors from all

17   different schools, school of engineering, school of --

18   different arts and sciences and said, we want to know

19   everything about those, all those other professors that were

20   approved the same day.

21         And we said, what could possibly be the relevance of

22   them.

23         They said, it gets to our promissory estoppel

24   argument.

25         We said, well, how about if we give you the offer

1    letters that they received and any letter they sent back

2    approving it, can we just pull those.

3         They said no, we want everything about those

4    professors, their history, their background that you had,

5    anything relating to the review.

6         It's just an incredible burden.  We'll produce the

7    documents that have the offer letter for 16 people.  We think

8    that's --

9         THE COURT:  Why isn't that sufficient?

10        MR. SWAMINATHAN:  First of all, they hadn't offered

11   that at the time of the motion.  They're offering that now.

12   They're saying, I'll give you the offer letter.

13        MR. WILSON:  I offered that yesterday.

14        MR. SWAMINATHAN:  And here's -- and here's what we

15   said.  We don't want anything from these individuals about

16   their scholarship, their academic credentials, any of those

17   things that would be part of their file.

18        Yes, we want the offer letter, and you don't have to

19   go back in time to the recruitment process of the individuals

20   before that.

21        But in addition to the offer letter just like in

22   Salaita's case, there's subsequent back and forth with the

23   university that says, okay, when is my start date, provide me

24   with the information about my salary and contract terms,

25   etcetera.  That kind of correspondence that is very much the

1   kind of negotiation and creation of a contract kind of

2   communication that we should also have.

3          And that's what we've told them:  Look, we're not

4   asking for this for everything about these individuals.  We

5   made that abundantly clear to them.  We just want

6   communications with these individuals that will show what were

7   the commitments that the university made to them and what were

8   their understandings and expectations.

9          THE COURT:  Isn't that in the contract and in the

10  commitment?

11         MR. SWAMINATHAN:  Well, there -- the offer letter

12  would be one.  And again, this is one where I said to them,

13  tell me what's reasonable.  If they come back to me and say

14  the only document in their file that shows anything about

15  communication, there's really only one communication back and

16  forth when they made they offer was the offer letter, then

17  that's all they have to produce.

18         We believe there's likely to be some additional

19  communications.  Produce them.  And if you don't -- and if

20  you're saying it's burdensome, tell me how you think -- tell

21  me what's reasonable.  Tell me why it's burdensome, and I'll

22  work with you.  They haven't offered to do that.  Their

23  objection here is, blanket objections and I'm not doing it.

24         THE COURT:  All right.  They've now agreed to give

25  you the offer letters, so I'll leave it at that at the moment.

1    If that doesn't work, you can re-request it.

2          MR. SWAMINATHAN:  If there are additional

3    communications subsequent to the offer letter like, here's the

4    follow-on letter that says here is the salary --

5          THE COURT:  All right.  Follow-up letters, follow-up

6    letters --

7          MR. WILSON:  If we can just pull what we have about

8    offer letters back and forth, that's fine.  It's just the

9    entire process --

10         THE COURT:  All right.

11         MR. WILSON:  -- or I'm moving to campus --

12         THE COURT:  Limit it at this time to the offer

13   letters.

14         Anything else?  Is that it?

15         MR. SWAMINATHAN:  There are more, your Honor.  So

16   there is -- so that was with regard to those individuals.  And

17   there's a related request.  So we have a request that says,

18   tell us about instances in which an individual was offered a

19   tenured faculty position at the university and was not

20   recommended for appointment by the chancellor.

21         In other words, just like, are there any other cases

22   like Salaita where you hire somebody, offer them the job, tell

23   them to come on campus --

24         THE COURT:  You just want the name?

25         MR. SWAMINATHAN:  We want documents for those

1    individuals.  What they've told us is, we don't think that

2    there's going to be any of those.  All I need is a response

3    that says, no such documents exist.

4         If they say -- all they have to do is make reasonable

5    search efforts.  Go talk to these people and say, hey, any

6    time in the last five years, did you ever hire somebody, say

7    I'm going to bring them in for the job and then recommend to

8    the Board --

9         THE COURT:  You're asking for the name of any

10   individual who was hired over the objection of the chancellor?

11        MR. SWAMINATHAN:  We're saying two things.  One is,

12   is there any instances where you offer the person a job and

13   the chancellor didn't recommend them to the Board, which is

14   what they committed to do for Professor Salaita.  And we're

15   saying, are there any instances when the Board rejected that

16   when some --

17        THE COURT:  In other words, you want evidence -- you

18   want instances where the Board and the chancellor disagreed?

19        MR. SWAMINATHAN:  Instances when they did something

20   different than what they did in Salaita.

21        THE COURT:  When they disagreed, when either the

22   Board -- when they hadn't hired them over their objection or

23   the Board rejected them over their -- his recommendation.

24        MR. WILSON:  Correct.  And your Honor, just so -- the

25   reason we were at loggerheads over this is that broad extra

1    ground which was they -- where the chancellor didn't make a

2    recommendation, there are all kinds of situations where

3    someone has been made an offer and then they decide not to

4    come, someone has been made an offer and they go to another

5    university; somebody, they decide not to make a recommendation

6    at an interim level.

7            We will give anything about -- and we've talked to

8    the board of trustees and said, are you aware of them.

9            THE COURT:  All right.  Produce instances where there

10   was a disagreement between the Board and the chancellor.

11   That's what he wants.  Okay?

12           MR. WILSON:  We'll get that.

13           MR. SWAMINATHAN:  I'm just going through the rest of

14   these, your Honor.

15           THE COURT:  Anything else?

16           MR. SWAMINATHAN:  There are a few more,

17   unfortunately, your Honor.  Okay.  So there's one that

18   simply -- that says, so they have a sovereign immunity defense

19   in this case.  So they say the Board is subject to sovereign

20   immunity.  That's a subject that is the subject of discovery,

21   appropriately the subject of discovery.

22           What we've said is, one of the key factors on whether

23   or not sovereign immunity applies is whether or not, is the

24   extent to which there is really oversight over the individual

25   by the state.

1          THE COURT:  Isn't that a legal issue?

2          MR. SWAMINATHAN:  It's a legal issue on which -- it

3   is considered an issue on which fact discovery is appropriate

4   to determine what is the extent to which sovereign immunity

5   would apply in a given instance.  And one of the relevant

6   factors is to what extent are you subject to oversight or

7   monitoring by the state.

8          So and that's -- those are standards that are set

9   forth in the Seventh Circuit and the Northern District --

10         THE COURT:  Isn't that for the Court to determine?

11         MR. SWAMINATHAN:  Based on relevant evidence as to

12  whether or not, in fact, there is any oversight or not in a

13  given organization or institution that's claiming a right to

14  sovereign immunity.  So here we're asking for something very

15  simple.

16         THE COURT:  In other words, you want them to say what

17  factors they believe --

18         MR. SWAMINATHAN:  Not even that, something much

19  smaller.  I'm just saying, hey, did -- the board of trustees

20  is the defendant.  And they're the one claiming sovereign

21  immunity.  I'm saying, does anybody oversee you as the board?

22  Is there any oversight from the state?

23         We know that by statute, a governor appoints the

24  board of trustee members, but does anything else happen?  Does

25  he check in on you?  Do you have to send him a report monthly?

1   Is there anything that involves oversight or monitoring by the

2   governor or anyone on his staff or just anyone over the board

3   of trustees?  That's highly relevant to whether or not

4   sovereign immunity applies.  And what they basically told me

5   in our meet and confers is, there's no documents like that.

6          So all that I'm saying is, say no such documents

7   exist.  What they said is just, "I object.  This is not

8   relevant and it's burdensome."

9          I'm simply saying if the answer is no such documents

10  exist, tell me no such documents exist.  I'm entitled to the

11  answer, not just an objection.

12          MR. WILSON:  Your Honor, it's very confusing what

13  they're asking for.

14          THE COURT:  I'm confused --

15          MR. WILSON:  The --

16          THE COURT:  -- which maybe is not the issue.

17          MR. WILSON:  The board of trustees is a creature of

18  statute created by the University of Illinois.  It is a legal

19  question.  They certainly can ask the board of trustees --

20          THE COURT:  Yes, it seems to me it's a legal question

21  and you can argue that.  And ultimately, it would be up to me

22  or whoever hears the case.

23          MR. SWAMINATHAN:  And in order to make that

24  determination, you've got to have information about what is

25  the extent of oversight of this organization, what is the

1  extent to which they get money from the State versus other

2  entities.  Those are all relevant considerations in your

3  decision.  We have to be able to put that information in front

4  of you.

5          We're asking for something very simple, which is

6  simply tell me whether this reporting relationship exists or

7  not.

8          MR. WILSON:  They're making a very unique argument,

9  which is the University of Illinois is not a creature of the

10  State of Illinois, it is not entitled to be treated as part of

11  the State of Illinois.  And so in order to buttress that

12  unique claim, they're seeking extremely broad documents.  And

13  it hasn't been limited in any way like this.

14          We could not figure out how to frame this with them.

15  I submit that the best way to do this is ask the Board of

16  Trustees including the past and current chair in their

17  depositions these kinds of questions, and they can go forward.

18          There aren't documents relating to this.  But we

19  would have to comb through a lot of university information to

20  determine that we could say, there's nothing --

21          THE COURT:  I'm going to deny that request.  What

22  other ones do you have?

23          MR. SWAMINATHAN:  Let's see.  Did we talk about --

24  okay.  So we have one that talks about the delegation of power

25  to enter into a contract.  That's one that I raised before but

1  we didn't address.

2        What the university basically said is, Professor

3  Salaita has no contract with the University of Illinois

4  because the individuals who entered into that contract, the

5  dean of the college and others with the approval of the

6  chancellor, chancellor's office, didn't have the authority to

7  even enter into a contract with him.

8        That's their argument in their motion to dismiss.  I

9  have to be able to defend against that argument.  And so I'm

10  saying, tell us about instances when people entered into

11  contracts other than the secretary and the comptroller who you

12  say are the only two people who can bind the university

13  because I have no doubt that there are others who can do that.

14        Now, I've offered to -- they say, I can't go across

15  the entire university and find every time somebody entered

16  into a construction project, construction contract or this or

17  that contract.

18        I said, start with the secretary and comptroller and

19  work down from there.  Just start with a few people and give

20  me some feedback, give me some answers on this, and we'll work

21  with you.  But what I've been told is, not relevant, too

22  burdensome, can't produce anything.

23        MR. WILSON:  Your Honor, this is a question of law as

24  to whether or not a contract was formed.  It's specific as to

25  Steven Salaita.  Whether or not --

1            THE COURT:  I agree.  I'll deny that request.

2            Anything else?

3            MR. SWAMINATHAN:  Yes, let me just check, your Honor.

4            We have a motion to compel interrogatory responses.

5            THE COURT:  Are they similar issues?

6            MR. SWAMINATHAN:  They are similar.

7            THE COURT:  Then the ruling would be the same.

8            MR. SWAMINATHAN:  Well, let me just -- if they are

9 the same types of issues, we can handle it that way.

10           So there is one that I think is related to your first

11 ruling granting our request in part.  So interrogatory -- this

12 is as to Chancellor Wise.  And what we've said to Chancellor

13 Wise is, is it your contention that Steven Salaita is

14 anti-Semitic or has made anti-Semitic remarks.

15           So what we've said is, for those specific Tweets that

16 you considered in making your decision that this is simply --

17 these are comments and speech that we think is too disruptive

18 or uncivil and so we're getting rid of you, did you view those

19 comments as anti-Semitic?

20           And what we basically -- just tell us whether or not

21 those instances you thought --

22           THE COURT:  Wouldn't you be better off deposing him?

23           MR. SWAMINATHAN:  Well, there's two things.  One is,

24 this is a little bit of a bizarre objection because other

25 defendants have responded to this request and given us answers

1    as to whether or not they thought that what Professor Salaita

2    said was anti-Semitic or not.

3              So we would just like a similar response from

4    defendant Wise.  I'm not sure why they've taken a different

5    position with regard to her.

6              MR. WILSON:  If I could, your Honor, we have -- if

7    you could give me the interrogatory.  The problem is that they

8    ask for as to each Tweet, each separate one, which one is

9    anti-Semitic and which one isn't.  And there are a number of

10   them.

11             Here are some of the Tweets:  "Zionist uplift in

12   America.  Every little Jewish boy and girl can grow up to be

13   the leader of a murderous colonial regime."

14             THE COURT:  Why don't --

15             MR. WILSON:  "Zionist, transforming anti-Semitism

16   from something horrible into something honorable."

17             THE COURT:  Why don't you take the deposition and if

18   you're unsatisfied, if you still need additional information,

19   then bring it back in front of me.

20             MR. SWAMINATHAN:  Yes.

21             THE COURT:  That seems to me that you're asking for,

22   you know, what their mental process was at the time they saw

23   these Tweets, I guess.

24             MR. SWAMINATHAN:  We'll take the deposition, your

25   Honor.

1       THE COURT:  All right.  Take the depositions.  And

2   I'll deny it without prejudice to re-raise it.

3       MR. SWAMINATHAN:  We've asked another interrogatory

4   request that's pretty straightforward:  Did you -- did you

5   personally in any way, degree, support, lobby, or urge the

6   decision of the committee on academic freedom.

7       So basically what happened there was a decision by

8   the committee on academic freedom and tenure within the

9   university.  They did an investigation and they said, hey,

10  they violated Professor Salaita's rights of academic --

11      THE COURT:  It seems to me you're better off asking

12  in a deposition.  You're going to get a lawyer's response

13  rather than the --

14      MR. SWAMINATHAN:  So -- yes.  So here's the only

15  other one that I think we ought to consider because it's the

16  only one for which the answer might be different.  We've asked

17  for them to identify other faculty members or candidates of

18  the faculty who made actual or alleged public remarks that you

19  consider racist, bigoted, sexist, inflammatory, profane,

20  vulgar, etcetera.

21      And the reason that request is different because

22  again, the relevance is like the ones we've talked about

23  earlier.  We want to know about why did you treat his

24  inflammatory, controversial remarks differently than others.

25  And there were likely others that were racist like the white

1    supremacist and the others.  There are other people who have

2    said things like that.  But it's important for us to be able

3    to do discovery.  I can't just do it by deposition because --

4    what I'm saying is just identify these other individuals so

5    that I can see if there's any appropriate discovery that I can

6    figure out.

7           Maybe as your Honor said, you have the statements.

8    Go see if you can figure out if it's disruptive or not

9    disruptive.

10          THE COURT:  You just want a list of names?

11          MR. SWAMINATHAN:  I want a list of the individuals.

12          MR. WILSON:  Your Honor, I think this is something

13   better for a deposition, if she can recall people.  Here's the

14   problem.  This, all other faculty members or candidates to the

15   faculty who have made actual or alleged public remarks of

16   which you were aware since January 1st, 2005, that you

17   consider racist, bigoted, sexist, inflammatory, profane,

18   vulgar, or uncivil, for each faculty member, please state what

19   the remarks were, whether they were --

20          THE COURT:  Okay.  Yes, that's --

21          MR. SWAMINATHAN:  Here's --

22          THE COURT:  I'll let you get a list.  I will make

23   them require the names but not what the remarks were.

24          MR. SWAMINATHAN:  The only other part of that

25   request -- I appreciate that, your Honor.  The other part of

1   that request was, were these remarks that were made, were

2   these comments that were made by the individuals something

3   that were made on campus or off campus.

4          THE COURT:  I'll let you get the names of the

5   individuals, and then you can question them at the

6   deposition --

7          MR. SWAMINATHAN:  Very good, your Honor.

8          THE COURT:  -- as to what it was.

9          Okay.  So the motion is granted in part and denied in

10  part.  How is that?

11         MR. SWAMINATHAN:  Thank you, your Honor.

12         THE COURT:  All right.  We need a further status.

13  When would you suggest?

14         MR. SWAMINATHAN:  30 days?

15         MR. WILSON:  Sure, come back in a month.

16         THE COURT:  30 days.

17         THE CLERK:  August 18th at 9:00.

18         MR. SWAMINATHAN:  Thank you, your Honor.

19         ATTORNEY 3:  Thank you, your Honor.

20    (Proceedings adjourned at 9:47 a.m.)

21

22

23

24

25

```
1              C E R T I F I C A T E

2        I, Judith A. Walsh, do hereby certify that the

3   foregoing is a complete, true, and accurate transcript of the

4   proceedings had in the above-entitled case before the

5   Honorable HARRY D. LEINENWEBER, one of the judges of said

6   Court, at Chicago, Illinois, on July 15, 2015.

7

8   /s/ Judith A. Walsh, CSR, RDR, CRR        July 21, 2015

9   Official Court Reporter

10  United States District Court

11  Northern District of Illinois

12  Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25
```