IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN SALAITA, | |
| Plaintiff, | |
| v. | Case No. 15 C 924 |
| CHRISTOPHER KENNEDY, Chairman of the Board of Trustees of the University of Illinois, *et al.*, | Judge Harry D. Leinenweber |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Dismiss Plaintiff Steven Salaita's Complaint for failure to state a claim under Rule 12(b)(6) [ECF No. 32]. For the reasons stated herein, the Motion is granted to the extent that Counts VI, VII, VIII, and IX are dismissed with prejudice, and denied as to the rest.

## I.  BACKGROUND

This case involves Dr. Steven Salaita's employment status with the University of Illinois following controversial statements he made via Twitter. The followings facts are culled from the Complaint, which the Court must accept as true in deciding a motion to dismiss. Dr. Salaita was a tenured professor at Virginia Tech when he discovered that the

University of Illinois at Urbana-Champaign ("the University") was looking for a professor in its American Indian Studies program. Dr. Salaita, who has expertise in Native American and Indigenous Studies, applied for the position, and the University began its vetting process. The process culminated in the University sending a letter to Dr. Salaita that is largely the subject of this lawsuit.

Because the letter is the source of most of the parties' disagreements, the Court reproduces the relevant portions of it here in full:

> Dear Professor Salaita:
>
> Upon the recommendation of Professor Jodi Byrd, Acting Director of the American Indian Studies, I am pleased to offer you a faculty position in that department at the rank of Associate Professor at an academic year (nine-month) salary of $85,000 paid over twelve months, effective [August 16], 2014. This appointment will carry indefinite tenure. This recommendation for appointment is subject to approval by the Board of Trustees of the University of Illinois.
>
> . . .
>
> At the University of Illinois, like at most universities in this country, we subscribe to the principles of academic freedom and tenure laid down by the American Association of University Professors (AAUP). The Statement on Academic Freedom and Tenure of the [AAUP] has been since 1940 the foundation document in this country covering the freedoms and obligations of tenure. . . . I am enclosing copies of these documents for your information, and commend them to your attention.

We would appreciate learning of your decision by 10/14/2013. I have included an enclosure describing some of the general terms of employment at the University. If you choose to accept our invitation, we would appreciate your returning a photocopy of this letter with the form at the bottom completed and signed. When you arrive on campus, you will be asked to present proof of your citizenship and eligibility to work (see the I-9 form). If you are not a U.S. citizen, this offer will be contingent upon your being able to secure the appropriate visa status. Should you accept our offer, our Office of International Faculty and Staff Affairs is available to assist you with this process.

Please let me express my sincere enthusiasm about your joining us. The University . . . offers a wonderfully supportive community, and it has always taken a high interest in its newcomers. I feel sure that your career can flourish here, and I hope earnestly that you will accept our invitation.

(Defs.' Mem. in Support of its Mot. to Dismiss ("Defs.' Mem."), Ex. 1, ECF No. 33-1). The letter is then signed by Interim Dean Brian Ross and includes a place for Dr. Salaita to sign. The signature page says "I accept the above offer of October 3, 2013" and includes spaces for Dr. Salaita's date of birth, citizenship status, and signature. Dr. Salaita signed this page and returned it on October 9, 2013, and the parties agreed that Dr. Salaita would start in his new position on August 16, 2014. The University also assigned Dr. Salaita two courses for the fall semester, assigned him an office, and provided him a University email address.

With the expectation that he would be starting at the University in August, Dr. Salaita resigned his position at Virginia Tech and started the process of moving his family to Illinois. The University paid a majority of Dr. Salaita's moving expenses. During this time, a skirmish between Palestine and Israel resulted in the death of "approximately 2100 Palestinians, including more than 500 children." (Pl.'s Resp. to Mot. to Dismiss, ECF No. 43 at 4). Dr. Salaita took to his personal Twitter account to voice his displeasure. The Court need not reproduce Dr. Salaita's tweets verbatim; to put it mildly, they were critical of Israel's actions and used harsh, often profanity-laden rhetoric.

Dr. Salaita's tweets soon garnered media coverage, which prompted the University to respond publicly regarding Dr. Salaita's employment. In response to one newspaper's request for comment, a University spokesperson said that "Professor Salaita will begin his employment with the University on Aug. 16, 2014. He will be an associate Professor and will teach American Indian Studies courses." (Compl., ECF No. 1 ¶ 69). The spokesperson went on to tout the University's policy of "recognize[ing] the freedom-of-speech rights of all *our employees*." (*Id.* (emphasis added)).

Despite the initial show of support, however, the University soon changed its tune. Letters and emails obtained via Illinois' Freedom of Information Act revealed that students, alumni, and donors wrote to the University's Chancellor, Phyllis Wise ("Wise"), to voice their concerns over Dr. Salaita joining the University. One writer in particular claimed to be a "multiple 6 figure donor" who would be ceasing support of the University because of Dr. Salaita and his tweets.

Two other specific interactions are critical to Dr. Salaita's Complaint. The first involves an unknown donor who met with Chancellor Wise and provided her a two-page memo about the situation. (Compl., ECF No. 1 ¶ 80). Wise ultimately destroyed the memo, but an email Wise sent University officials summarized it as follows: "He [the unknown donor] gave me [Chancellor Wise] a two-pager filled with information on Professor Salaita and said how we handle the situation will be very telling." (*Id.*) The second interaction involves a particularly wealthy donor who asked to meet with Chancellor Wise to "share his thoughts about the University's hiring of Professor Salaita." (Compl., ECF No. 1 ¶ 79). The meeting took place on August 1, 2014, but what was said during the meeting is currently unknown at this early

stage in the litigation. What is known, however, is that Chancellor Wise sent Dr. Salaita a letter on the same day stating that Dr. Salaita's "appointment will not be recommended" and that the University would "not be in a position to appoint [him] to the faculty of the University." (Defs.' Mem., Ex. A, ECF No. 33-1).

The University's Board of Trustees met on September 11, 2014 to vote on new faculty appointments. The Board unanimously and summarily appointed 120 new faculty members in a single vote, and then voted separately on Dr. Salaita's appointment. Chancellor Wise stated that, despite the earlier letter affirming that Dr. Salaita would be recommended for appointment, she was not recommending him. The Board then voted eight-to-one to deny Dr. Salaita's appointment. The vote occurred one month after the start of the semester, when the other appointed professors had already started teaching, and one month after Dr. Salaita's agreed-upon start date. According to the Complaint, this is the first time in the University's history that something like this has happened.

Following the Board's vote, Dr. Salaita filed this lawsuit. The Complaint contains nine counts against various Defendants. Count I alleges that the Board of Trustees, Chancellor Wise, and the University's President and Vice

President violated § 1983 by retaliating against Dr. Salaita for exercising his First Amendment free speech rights. Count II alleges that the same Defendants robbed Dr. Salaita of his procedural due process rights by depriving him of his job without any pre- or post-deprivation measures. Count III alleges that all Defendants engaged in a conspiracy to deprive Dr. Salaita of his job in violation of § 1985. Count IV alleges promissory estoppel against the Trustee Defendants. Count V alleges breach of contract against the Trustee Defendants. Counts VI and VII alleges that the various donor Defendants tortiously interfered with Dr. Salaita's contractual and business relations. Count VIII alleges that all Defendants intentionally inflicted emotional distress on Dr. Salaita. Finally, Count IX is a state-law spoliation of evidence claim against Chancellor Wise for destroying the two-page memo. Defendants now move to dismiss all counts under Rule 12(b)(6).

## II.  LEGAL STANDARD

A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *Hallinan v. Fraternal Order of Chi. Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). A complaint must contain "enough facts to state a claim to relief that is plausible on its face."

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). When considering a Rule 12(b)(6) motion to dismiss, a court must accept the plaintiff's allegations as true, and view them in the light most favorable to the plaintiff. *Meriwether v. Faulkner,* 821 F.2d 408, 410 (7th Cir. 1987). A court need not accept as true "legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)) (internal quotations and alterations omitted).

The overriding focus in the Court's analysis is notice — that is, whether the factual allegations in the complaint "give the defendant fair notice of the claim for relief and show the claim has 'substantive plausibility.'" *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. and Nw. Indiana,* No. 14-1729, 2015 WL 2151851, at *3 (7th Cir. May 8, 2015) (quoting *Johnson v. City of Shelby,* 135 S.Ct. 346, 347 (2014)).

### III. ANALYSIS

The crux of this case involves the agreement between Dr. Salaita and the University. Dr. Salaita claims that, by signing and returning the University's offer letter, he entered into an employment contract that the University

violated by firing him because of his political speech. According to the University, Dr. Salaita was never an employee and the parties never had a valid contract because Dr. Salaita's appointment was "subject to" the Board of Trustees' approval. Many of the parties' arguments hinge on whether there is a contract; thus, the Court will start with the breach of contract and promissory estoppel claims and then consider the remaining arguments.

### A. Breach of Contract (Count V)

The University's central argument is that the parties never entered into a valid contract. The University claims that the "subject to" language in its initial letter made its *offer* conditional on the Board's approval, and thus Dr. Salaita's acceptance was likewise only conditional. Dr. Salaita argues that the condition, if any, was a condition on *performance* under the contract, not on the offer itself. Moreover, Dr. Salaita argues that the condition was a mere formality and that the Board's approval was ministerial in nature.

Under Illinois law, the elements for a breach of contract claim are: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages."

*Vill. of S. Elgin v. Waste Mgmt. of Ill., Inc.,* 810 N.E.2d
658, 669 (Ill. App. Ct. 2004). Defendants' arguments go to
the offer element, and "the offeror has total control over its
own offer and may condition acceptance to the terms of the
offer." *McCarty v. Verson Allsteel Press Co.,* 411 N.E.2d 936,
944 (Ill. App. Ct. 1980). The ability to make an *offer*
conditional also extends to *performance*: that is, an offeror
may make *performance* under the contract subject to some other
condition. *See, McKee v. First Nat'l Bank of Brighton,* 581
N.E.2d 340, 343–44 (Ill. App. Ct. 1991). The difference is
crucial; if the condition applies to the *offer*, there is no
contract before the condition is satisfied, but if the
condition applies to *performance*, there is a valid contract
even if the condition is not satisfied. Moreover, if there is
a contract at all, then the obligation of good faith and fair
dealing — which is inherent in all contracts — applies.
*Martindell v. Lake Shore Nat'l Bank,* 154 N.E.2d 683, 690 (Ill.
1958).

The Court's first task is to interpret the contract, and
"Illinois uses in general a 'four corners' rule in the
interpretation of contracts." *Bourke v. Dun & Bradstreet
Corp.,* 159 F.3d 1032, 1036 (7th Cir. 1998) (quoting *Ford v.
Dovenmuehle Mortg. Inc.,* 651 N.E.2d 751, 755 (1995)). The

Court's goal is "to give effect to the intentions of the parties as expressed in the four corners of the instrument." *Allen v. Cedar Real Estate Grp., LLP,* 236 F.3d 374, 381 (7th Cir. 2001).

Under the four corners rule, "the threshold inquiry is whether the contract is ambiguous," and a contract term is "ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning." *Bourke,* 159 F.3d at 1036. There are generally two kinds of ambiguity: extrinsic or intrinsic. *Id.* The classic example of an extrinsic ambiguity involved a contract term that required cotton to be shipped aboard a ship named Peerless when there were two identically named ships to which the contract term could have referred. *Id.* (citing *Raffles v. Wichelhaus,* 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864)). Nothing about the contract term itself was ambiguous; the ambiguity arose from the surrounding, external facts. *See, id.* An intrinsic ambiguity, on the other hand, occurs when the term itself is susceptible to multiple reasonable interpretations without reference to anything outside the contract. *Id.* at 1037.

As to the offer in this case, the basic terms are about as unambiguous as they could possibly be. The offer letter says that the University is "pleased to offer [Dr. Salaita] a

faculty position." The offer then sets forth the important, relevant terms in plain English. The offer is for a salary of $85,000 and the position includes indefinite tenure. Finally, the University used unambiguous terms in drafting the means by which Dr. Salaita could accept: "I accept the above offer of October 03, 2013." Nothing about the actual offer, nor the mode of acceptance, indicates that no contract would be formed until after the Board's approval.

The University points solely to the "subject to" language as evidence that there was no contract, but that term, read in light of the other contract terms, is at least plausibly a term of performance. That term says that the University would recommend Dr. Salaita's appointment to the Board, but that the Board would have ultimate say on whether to appoint Dr. Salaita as a professor. The other concrete terms make clear that the parties had a contract, but that the University might be excused from performing if the Board rejected the University's recommendation. The University's own offer letter uses definite terms like "offer" and "acceptance" without any qualification. If the University really felt that there would be no contract whatsoever unless the Board first approved, it could have drafted its offer letter in those terms. It could have, for example, drafted the acceptance

that Dr. Salaita signed to say "If the Board ultimately approves of my recommendation, I will accept the appointment." Or the letter could have said, "You are not employed until the Board first approves of the University's recommendation." This is precisely what Purdue University did in *Lutz*. *See, Lutz v. Purdue Univ.,* 133 F.Supp.2d 1101, 1109 (N.D. Ind. 2001) (granting summary judgment in favor of Purdue when a professor's contract stated that he was "not officially employed until a completed and signed contract has been approved by the President of Purdue University").

Better still, the "subject to" provision could have used the word "offer," which courts have found "telling" when deciding whether an offer is conditional. *Allen,* 236 F.3d at 381 (finding that the contract drafter's "choice of the word 'offer' is telling" when he drafted a provision that said "*this offer* is subject to" a certain condition). Here, the University used the word "offer" when referencing the teaching position, but did not use the word "offer" when referencing the Board's approval as a condition. And, elsewhere in the letter, the University did explicitly impose a condition on the offer itself: "If you are not a U.S. citizen, *this offer* will be contingent upon your being able to secure the appropriate visa status." (Defs.' Mem., Ex. 1, ECF No. 33-1

(emphasis added)). This suggests that the University knew how to ensure that a condition related specifically to the offer, yet did not do so in referencing Board approval. Thus, the contract as a whole demonstrates that the parties intended to enter into a valid contract.

Moreover, to the extent that the "subject to" language is ambiguous as to whether it applies to contract formation or performance, the Court would look to extrinsic evidence to interpret the contract. *Bourke,* 159 F.3d at 1037. Taking the facts alleged in the Complaint as true, there is no doubt that the parties' actions demonstrated their intent to enter into a contract. The University paid for Dr. Salaita's moving expenses, provided him an office and University email address, assigned him two courses to teach in the fall, and stated to a newspaper that he would in fact join the faculty, despite his unsavory tweets. The University spokesperson went so far as referencing Dr. Salaita as one of "our employees." The University also did not hold a Board vote until after the start of the semester. If the Board vote was truly a condition to contract formation, then the University would have the Board vote on appointments before the start of a semester and before spending money on a new professor or treating the professor as a full-fledged employee. Finally,

the University actually held the Board vote despite its claim
that it had no agreement whatsoever.  If the University truly
felt no obligation to Dr. Salaita, the University could have
simply not put the appointment to a vote at all.  Instead, the
University still went ahead with the vote, which is at least
some evidence that it felt obligated to hold a vote according
to the terms of the offer letter.  Simply put, the University
cannot argue with a straight face that it engaged in all these
actions in the absence of any obligation or agreement.

Also, the University's argument, if applied consistently,
would wreak havoc in this and other contexts.  What if a
professor took the University's money to move to Chicago, but
decided instead to teach at Northwestern University before the
Board voted on her appointment?  According to the University,
that professor would be free to keep the money without fear of
a breach of contract claim.  And what about the other
professors who started teaching classes before the Board voted
on their appointment?  According to the University's argument,
those teachers were not employees and had no contract, despite
working for, and presumably getting paid by, the University.
Finally, what if, before a Board vote, the University offered
a job to a different person after already receiving the signed
acceptance letter from someone else?  According to the

University, the person originally offered the job would have no recourse because there was no contract. If the Court accepted the University's argument, the entire American academic hiring process as it now operates would cease to exist, because no professor would resign a tenure position, move states, and start teaching at a new college based on an "offer" that was absolutely meaningless until after the semester already started. In sum, the most reasonable interpretation of the "subject to" term in the University's offer letter is that the condition was on the University's performance, not contract formation.

Under the University's reading of the law, however, any "subject to" term in a contract is a talisman that offers the drafter a get-out-of-contract-free card. But the cases the University relies upon are distinguishable. In *Allen,* discussed above, the drafter explicitly referenced "this offer" when drafting a "subject to" condition. *Allen,* 236 F.3d at 381. Here, the University's "subject to" condition contains no similar explicit reference. And in *Cobb-Alvarez,* the purported "offer" was a letter that invited employees to apply for a program that would allow them to "quit in exchange for [a] severance package[]." *Cobb-Alvarez v. Union Pac. Corp.,* 962 F.Supp. 1049, 1054 (N.D. Ill. 1997). Rather than

provide a means for "accepting" the offer, the letter told employees that "if [they] appl[ied], [their] application[s] can be denied." *Id.* The plaintiffs tried to argue that the letter was an "offer" that they could "accept" simply by submitting an application, which the court found unreasonable. *Id.*

Here, in contrast, Dr. Salaita is not arguing that he "accepted" the job by submitting an application for it. Instead, he argues that, by signing the University's letter that said "I accept the above offer," he was, in fact, accepting the above offer. In short, the cases the University relies on involve contracts where the condition was, without question, a condition to contract formation. In this case, at the very least, there is a reasonable argument that the condition went to performance and not formation, which precludes dismissal.

In a related argument, the University asserts that, even if the basic elements of a contract exist here, Dean Ross had no actual or apparent authority to make a binding offer. The University also argues that under Illinois law, apparent authority cannot apply to bind the State of Illinois, which the University is a part of. The Court can quickly reject these arguments for two reasons.

First, Dr. Salaita's Complaint contains facts indicating that the University gave "the faculty departments and dean" the actual authority to make binding job offers. (Compl., ECF No. 1 ¶¶ 48-51). Although Dr. Salaita has not alleged precisely how or when the University gave Dean Ross actual authority, the facts alleged make it plausible that such a delegation occurred. For example, the Board ultimately voted on Dr. Salaita's appointment pursuant to Dean Ross's offer letter, even though Chancellor Wise had already decided she did not want Dr. Salaita to join the faculty. These facts make it plausible that the University and the Board gave Dean Ross actual authority to make a binding offer and in fact felt bound by his offer. Otherwise, why hold a vote at all? Moreover, for the other 120 professors mentioned above, the Board voted on their appointment in one block, after they had already started teaching, and without reference to any terms of employment like salary. If the Board did not delegate authority to these professors' respective deans to make binding offers that set essential employment terms, then how did those terms get set? The Board apparently voted without discussing any employment terms, and according to the University's argument, no one with actual authority has yet to make a binding offer as to those essential terms. Also, if

the University and Board had not delegated actual authority to the deans, why did the University allow the other professors to start working before the Board vote?  If the deans had no authority to make any binding offers, the University would have been confused as to why 120 professors showed up to work when no one with actual authority had offered them a job.  In short, the Complaint contains facts that make it plausible that the Dean Ross had actual authority.

Second, to the extent that actual or apparent authority is a disputed issue, the issue is best resolved at trial or on a motion for summary judgment.  *See, Schoenberger v. Chi. Transit Auth.,* 405 N.E.2d 1076, 1081 (Ill. App. Ct. 1980) (upholding a trial court's determination — based on extensive evidence and testimony — that the plaintiff could not have reasonably believed an agent to have apparent authority to bind the defendant).

In sum, Dr. Saliata has pleaded an adequate breach of contract claim.

### B.  Promissory Estoppel (Count IV)

Dr. Salaita's Complaint also contains a promissory estoppel count in the alternative to his breach of contract claim.  Under Illinois law, a plaintiff may *plead* both breach of contract and promissory estoppel but cannot pursue both

once a contract is found to exist, either by judicial determination or by the parties' admission. *Discom Int'l, Inc. v. R.G. Ray Corp.,* No. 10 C 2494, 2010 WL 4705178, at *5 (N.D. Ill. Nov. 10, 2010) (citing *Prentice v. UDC Advisory Servs., Inc.,* 648 N.E.2d 146, 150 (Ill. App. Ct. 1995)). As discussed above, the Court has found that Dr. Salaita has pleaded a breach of contract claim, but not that he has proved it. Thus, even though Dr. Salaita cannot ultimately recover under both claims, the Court must analyze whether Dr. Salaita's promissory estoppel claim survives a motion to dismiss.

To establish a promissory estoppel claim, a plaintiff must prove that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.,* 906 N.E.2d 520, 523 (Ill. 2009). Dr. Salaita argues that the University made two unambiguous promises: first, it promised to hire Dr. Salaita subject to limited Board approval, and second, it promised that the Board would consider Dr. Salaita's appointment in "accord with principles of good faith and fair dealing." (Pl.'s Resp. to Mot. to

Dismiss, ECF No. 43 at 30).  The Court need not consider the second promise because Dr. Salaita has adequately pleaded the first, which precludes dismissing his claim.

The University's key arguments are that any alleged promise was either (1) subject to a condition, and therefore ambiguous, or (2) made by someone without apparent or actual authority.  The Court already rejected these arguments and need not discuss them again.  Dr. Salaita's Complaint contains facts to support a promissory estoppel claim.  According to those facts, the University unambiguously promised to recommend to the Board that Dr. Salaita be appointed as a tenured professor.  In reliance on that promise, Dr. Salaita resigned a valuable tenured position at a respected institution and moved his family to Illinois.  The University must have reasonably foreseen that Dr. Salaita would act on its promise because it paid for most of his moving expenses after he accepted the position.  But after Dr. Saliata arrived in Illinois, the University reneged on its promise when Chancellor Wise informed the Board that Dr. Salaita was in fact *not* recommended for appointment.  Dr. Salaita is now left with neither his previous job nor his prospective job.  These facts are sufficient to state a promissory estoppel claim in the alternative to his breach of contract claim.

## C. First Amendment (Count I)

Count I in Dr. Salaita's Complaint alleges that certain Defendants violated his First Amendment free speech rights in violation of § 1983. In order to state a First Amendment retaliation claim, Dr. Salaita must allege fact showing that: "(1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action." *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006). For the purposes of this claim, it does not matter whether the University's action is characterized as firing Dr. Salaita or simply not hiring him; failure to hire is enough to constitute a deprivation under the second element. *See, George v. Walker,* 535 F.3d 535, 538 (7th Cir. 2008). Dr. Salaita alleges that the Board and individual Defendants Robert Easter (the University President), Christephe Pierre (Vice President), and Chancellor Wise either fired or refused to hire him because of the content of his tweets.

The University's Motion does not dispute that Dr. Salaita's speech was constitutionally protected or that he suffered a deprivation in the form of either being fired or not hired. Instead, the University argues first that Dr. Salaita has not pleaded facts that implicate the specific

Defendants named in Count I.  The University also argues that Dr. Salaita was not fired because of his constitutionally protected speech, and that even if he was, the University's interest in providing a safe and disruption-free learning environment outweighs Dr. Salaita's free speech interest under the balancing test in *Pickering v. Bd. of Educ.,* 391 U.S. 563, 574 (1968).

### 1.  *Claims Against the Individual Defendants*

As to the University's first argument, "[a]n *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolfe-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983). This is the personal responsibility requirement, and "[a]n official satisfies the personal responsibility requirement . . . if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir. 1985) (internal quotation marks omitted).  Put another way, the defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir. 1995) (internal quotation marks omitted).

The University argues that Dr. Salaita has not stated a claim against the individual Board members because they acted "within the scope of their statutory mandate" when they met to discuss Dr. Salaita's candidacy and when they ultimately voted against his appointment. (Defs.' Mem., ECF No. 33 at 16). This argument ignores the other allegations in the Complaint and reasonable inferences drawn from those allegations. The Board did not meet to discuss Dr. Salaita's candidacy until *after* the inflammatory tweets, and it singled only him out for an individual vote despite summarily affirming other professors who do not appear to have made any inflammatory tweets. Viewed in Dr. Salaita's favor, these facts make it plausible that the Board acted specifically because it disagreed with Dr. Salaita's political speech. And although the Board may have met and voted in accord with statutory requirements, that alone cannot immunize it from all liability. If the University's argument is correct, the Board's members would never be liable under § 1983 — no matter how egregious the constitutional violation — as long as they acted within their statutory authority. The Court therefore finds that the Complaint states a claim against the individual Board Defendants.

The University also argues that Dr. Salaita has failed to state a claim against President Easter, Vice President Pierre, or Chancellor Wise. As for Chancellor Wise, the Complaint contains more than enough allegations to state a claim against her, and the University's arguments go more to the merits than the sufficiency of the complaint. Although Chancellor Wise might ultimately win on the merits, the Court must view the allegations in Dr. Salaita's favor, and those allegations state that Chancellor Wise fired or failed to hire Dr. Salaita because she and various donors disagreed with his political speech. These facts demonstrate that Chancellor Wise facilitated, approved, and condoned the conduct that led to Dr. Salaita's deprivation, which is enough to state a claim. *See, id.*

The allegations against President Easter and Vice President Pierre, however, are not as abundant. The only allegations in the Complaint that relate to President Easter concern his attendance at a July 24, 2014 meeting where the Board and the other individual Defendants decided to fire, or at least not hire, Dr. Salaita. As to Vice President Pierre, the only allegations against him demonstrate that he was also at the July 24 meeting and that he joined Chancellor Wise in sending the letter that informed Dr. Salaita he was fired or

at least not being hired. These allegations are sparse indeed, but they are just enough to raise a plausible inference that President Easter and Vice President Pierre condoned, or at least turned a blind eye, toward the decision to fire Dr. Salaita because of his political views and speech. *See, id.*

### 2. Sufficiency of Dr. Salaita's First Amendment Claim

The University's second argument is that its action was not motivated by the *content* or *viewpoint* of Dr. Salaita's tweets, and that even if it was, its interest in providing a disruption-free learning environment outweighs Dr. Salaita's free speech interest under the balancing test in *Pickering*. The first part of the argument is premature; summary judgment or trial will reveal the University's actual motivation, but the facts viewed in Dr. Salaita's favor amply support a claim that the University fired Dr. Salaita because of disagreement with his point of view. The University's attempt to draw a line between the profanity and incivility in Dr. Salaita's tweets and the views those tweets presented is unavailing; the Supreme Court did not draw such a line when it found Cohen's "Fuck the Draft" jacket protected by the First Amendment. *Cohen v. California,* 403 U.S. 15, 26 (1971). The tweets' contents were certainly a matter of public concern, and the

topic of Israeli-Palestinian relations often brings passionate emotions to the surface. Under these circumstances, it would be nearly impossible to separate the tone of tweets on this issue with the content and views they express. And the Supreme Court has warned of the dangers inherent in punishing public speech on public matters because of the particular words or tone of the speech. *See, id.* ("[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process.") At the motion to dismiss stage, the Court simply cannot find that the University was not at all motivated by the content of Dr. Salaita's tweets.

The University next argues that the Court should apply the balancing test in *Pickering* and find that under no set of facts could Dr. Salaita prove that his First Amendment rights were violated. This argument is also premature. "Normally, application of the *Pickering* balancing test will be possible only after the parties have had an opportunity to conduct some discovery." *Gustafson v. Jones,* 117 F.3d 1015, 1019 (7th Cir. 1997). Of course, there are some cases where a plaintiff has "pled herself out of court," but those are "rare cases" indeed. *Klug v. Chi. Sch. Reform Bd. of Trs.,* 197 F.3d 853, 859 (7th Cir. 1999). The cases in which it is clear at the

motion to dismiss stage that a First Amendment claim is certain to fail usually involve speech that is not on a matter of public concern or speech that is not protected at all. *See, e.g., id.* at 858 ("[I]n the context of this complaint, the association seems much more devoted to petty office politics than to matters of public concern."); *Chi. Sch. Reform Bd. of Trs. v. Substance, Inc.,* 79 F.Supp.2d 919, 928 (N.D. Ill. 2000) ("Defendants possessed no First Amendment right to publish copyrighted tests."). This is not one of those rare cases because Dr. Salaita's has alleged facts that plausibly demonstrate he was fired because of the content of his political speech in a public forum. In other words, Dr. Salaita's tweets implicate every "central concern" of the First Amendment. *Burson v. Freeman,* 504 U.S. 191, 196 (1992) (stating that there are "three central concerns in our First Amendment jurisprudence: regulation of political speech, regulation of speech in a public forum, and regulation based on the content of the speech."). The Court therefore declines to engage in a full-fledged *Pickering* balancing analysis at this early stage in the litigation.

Additionally, even if the Court were to apply the balancing test, it would still have to view the facts in Dr. Salaita's favor. And when the plaintiff's speech "more

substantially involve[s] matters of public concern," the defendant must make a "stronger showing" of potential disruption. *Connick v. Myers,* 461 U.S. 138, 151 (1983); *see also, McGreal v. Ostrov,* 368 F.3d 657, 681–82 (7th Cir. 2004) ("The employer bears the burden of justifying a particular disciplinary action, and a stronger showing may be necessary when an employee's speech more substantially involves matters of public concern."). A cursory look at the Complaint reveals facts that provide some evidence of potential disruption, but also some evidence that there would be no disruption. For example, the Complaint alleges that that University faculty fully supported Dr. Salaita's appointment, including faculty members that disagree with Dr. Salaita on the substance of his speech. (Compl., ECF No. 1 ¶ 99). Although *Pickering* balancing is not appropriate at this stage in this case, it appears that the evidence is conflicting as to the level of disruption Dr. Salaita's appointment would cause. Thus, viewing this evidence in Dr. Salaita's favor, it seems unlikely that the University would win its *Pickering* challenge at the motion to dismiss stage.

Dr. Salaita's Complaint alleges facts showing that he was fired or not hired because of the University's disagreement with his personal speech in a public forum on a matter of

public concern.    This is enough to survive a motion to dismiss.

### D.  Procedural Due Process (Count II)

A procedural due process claim has two elements:   "(1) deprivation of a protected interest, and (2) insufficient procedural protections surrounding that deprivation." *Michalowicz v. Vill. of Bedford Park,* 528 F.3d 530, 534 (7th Cir. 2008).   The University's Motion does not challenge the second element; instead, the University argues that Dr. Salaita had no property interest at all.   The University's core argument stems from its earlier argument that Dr. Salaita had no contract, which the Court already discussed above.   Dr. Salaita's Complaint pleads a sufficient breach of contract claim, and he was therefore deprived of a property interest when the contract was allegedly breached.   Thus, Dr. Salaita has pleaded a procedural due process claim.

As an additional basis for alleging a due process violation, Dr. Salaita alleges that the University deprived him of his liberty interest when it made unflattering public statements about him.   Because Dr. Salaita's due process claim survives dismissal based on the property interest discussed above, the Court need not address the parties' arguments related to this issue.

### E.  Conspiracy (Count III)

Count III alleges that Defendants conspired to deprive Dr. Salaita of his appointment to the University faculty.  The University argues that the claim is facially deficient and that the intra-corporate conspiracy doctrine applies to bar Dr. Salaita's conspiracy claim.

The Seventh Circuit has noted that, even before *Twombly* and *Iqbal,* "conspiracy allegations were often held to a higher standard than other allegations." *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir. 2009).  "[M]ere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her [is] not enough." *Id.*  To survive a motion to dismiss, a plaintiff must "allege the parties, the general purpose, and the approximate date of the conspiracy." *Loubser v. Thacker,* 440 F.3d 439, 443 (7th Cir. 2006).  The Court must be realistic, however, in light of what information is available to a plaintiff at the time a complaint is filed.  *Id.* ("The dates on which particular defendants joined the conspiracy are not alleged, but that is not the kind of information that a plaintiff can be expected to have when she files her complaint.")  Under current pleading standards, the ultimate issue is whether the factual allegations in the complaint "give the defendant fair notice of the claim for relief and

show the claim has 'substantive plausibility.'" *Girl Scouts of Greater Chi. and Nw. Indiana,* 2015 WL 2151851, at *3 (quoting *Johnson,* 135 S.Ct. at 347).

Dr. Salaita's Complaint alleges facts that give a conspiracy claim substantive plausibility. The parties are clearly identified as the Board and its members and various administration officials. The facts in the Complaint, viewed in Dr. Salaita's favor, detail the dates of the alleged conspiracy and its general purpose: to retaliate against Dr. Salaita because of his tweets. The University makes much of the lack of allegations regarding precisely what words were said in forming the alleged conspiracy, but Dr. Salaita cannot know that information without discovery. *See, Loubser,* 440 F.3d at 443. He was not at that July 24 meeting, for example, and so he cannot know exactly what was said there. But what the Complaint does allege is that, after that July 24 meeting, the administration Defendants and the Board collectively decided that Dr. Salaita would not join the faculty. This meeting occurred in short proximity to the publication and news coverage of Dr. Salaita's tweets, and the Complaint alleges that these tweets were presented at the July 24 meeting. These facts, taken together, make it at least plausible that Defendants collectively agreed to a course of

action that would deprive Dr. Salaita of his job. The facts also detail steps taken after that meeting to lay the groundwork for justifying the decision, such as a public explanation from the administration Defendants and a public statement from the Board showing support for the administration's actions. Simply put, Dr. Salaita has pled sufficient facts to put Defendants on notice as to the source, dates, and members of the conspiracy. The Court cannot demand that he also allege what was said at meetings that occurred outside his presence. Were that the pleading standard, no plaintiff could state a conspiracy claim if the conspiracy was formed behind closed doors, as conspiracies often are. *Cf. id.*

The University also argues that the intra-corporate conspiracy doctrine bars Dr. Salaita's claim. The general thrust of that doctrine is that "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Wright v. Ill. Dep't of Children and Family Servs.,* 40 F.3d 1492, 1508 (7th Cir. 1994). Since the Seventh Circuit recognized that doctrine, it has been applied in other contexts. *See, Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623, 633

(7th Cir. 1999) (applying the doctrine to supervisors and subordinates instead of just managers). To date, however, the Seventh Circuit has not said whether the doctrine extends to § 1983 claims. *See, Marshbanks v. City of Calumet City,* No. 13 C 2978, 2013 WL 6671239, at *3 (N.D. Ill. Dec. 18, 2013).

Without Seventh Circuit authority on point, both parties claim that a majority of district courts support their position. Dr. Salaita relies on § 1983 police misconduct cases, where a majority of courts, including this Court, have refused to apply the intra-corporate conspiracy doctrine. *See, Hobley v. Burge,* No. 03 C 3678, 2004 WL 1243929, at *10-11 (N.D. Ill. June 3, 2004) (collecting cases). The University points out that other courts have found that "the majority of district courts in the Seventh Circuit apply the concept to § 1983 cases." *Mnyofu v. Bd. of Educ. of Rich Twp Sch. Dist. 227,* 832 F.Supp.2d 940, 948 (N.D. Ill. 2011). Although the two statements appear inconsistent, the court in *Stenson* noted the key difference between the two types of cases: in one line of cases, the alleged illegal conduct involved a "routine, collaborative business decision," and in the other line, the conduct was not routine. *See, Stenson v. Town of Cicero,* No. 03 C 6642, 2005 WL 643334, at *8-9 (N.D.

Ill. Mar. 15, 2005). That is why, in police misconduct cases, most courts have found the doctrine inapplicable. In such cases, the alleged conduct is usually "not the product of routine police department decision-making." *Newsome v. James,* No. 96 C 7680, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000).

Taking the facts in the Complaint as true, Defendants actions were far from routine — they were unprecedented. At a minimum, the University's conduct here was not routine in relation to the other professors who were all appointed summarily and without individual consideration. The Complaint alleges that never before has the Board or University singled out a professor for similar treatment in response to extramural speech on a matter of public concern. The only difference between Dr. Salaita and the other 120 professors who were treated differently appears to be Dr. Salaita's tweets. This increases the plausibility of Dr. Salaita's conspiracy claim generally and his specific claim that he was being punished for his speech. None of these allegations demonstrate the type of routine conduct that the intra-corporate conspiracy doctrine was meant to protect; thus the doctrine is inapplicable and Dr. Salaita has stated a conspiracy claim.

## F. Tortious Interference with Contractual and Business Relations (Counts VI and VII)

Dr. Salaita alleges that currently unknown John Doe Defendants demanded that "the University terminate [Dr.] Salaita's employment . . . or else risk losing their financial contributions to the University." (Compl., ECF No. 1 ¶ 133). The University's main argument for dismissing these counts is the lack of a contract, which the Court discussed above and need not discuss again. The University also argues that the Complaint does not allege facts satisfying the elements of the two claims and that, even if it did, the unknown donors' speech is protected by the First Amendment.

Dr. Salaita first argues that the University does not have standing to seek dismissal of these counts. This is so, according to Dr. Salaita, because the donor Defendants have not yet been named or appeared in this case, and Counts VI and VII apply only to those Defendants. But, as the University correctly responds, the Court may dismiss any count *sua sponte* if it is obviously deficient on its face. *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir. 1997). Thus, the Court may consider whether the claims are worthy of *sua sponte* dismissal.

To state a claim for tortious interference with contractual relations, the plaintiff must allege "a legally

enforceable contract of which the defendant had knowledge, and the defendant's intentional interference inducing a breach by a party to the contract, resulting in damages." *TABFG, LLC v. Pfeil,* 746 F.3d 820, 823 (7th Cir. 2014). The facts alleged support the existence of a legally enforceable contract, discussed above, that the donor Defendants knew about. The Complaint also alleges that those Defendants sought to induce the University into breaking its contract with Dr. Salaita by threatening the University to withhold donations. Finally, the Complaint alleges facts establishing that Dr. Salaita was damaged by the breach. This is sufficient to state a tortious interference claim generally.

Aside from disputing the existence of the contract, the University does not seriously dispute that the Complaint alleges facts generally establishing tortious interference. Rather, the University argues that the claim cannot survive because the alleged conduct, *i.e.,* the donors' threats to withhold donations, is protected by the First Amendment. The Court agrees. Courts cannot apply state tort laws if doing so violates the First Amendment. *Nat'l Org. for Women, Inc. v. Scheidler,* No. 86 C 7888, 1997 WL 610782, at *31 (N.D. Ill. Sept. 23, 1997). *Scheidler* is the only case the parties discuss, and that case contains a thorough and convincing

analysis for when economic pressure crosses the line from protected speech to unprotected tortious interference. That case involved a defendant that sent a letter "threatening controversy and conflict with antiabortion activists if [the plaintiff] were allowed to enjoy the benefits of [a] lease." *Id.* at *23 (internal quotation marks omitted). The plaintiff argued that the letter constituted tortious interference because it sought to induce one party to break its contract, but the court rejected that argument. *Id.* at *23–31.

The court analyzed the contours of the First Amendment and found that the defendant's speech was protected from a tortious interference claim. *Id.* at *31. The court found that "nonviolent campaigns that are (1) politically motivated, and (2) waged against an entity by a commercial noncompetitor are protected under the First Amendment." *Id.* Because the defendant only threatened peaceful protest, and because the defendant was not a commercial competitor seeking to eliminate competition, the court found that the First Amendment protected the defendant from a tortious interference claim. *Id.* at 30–31.

Moreover, the defendant's speech was protected, even though it was posed as a *quid pro quo* threat. *Id.* Regarding

the importance of being able to influence the government, the court noted:

> "It is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed. To hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns."

*Id.* at 28 (quoting *Missouri v. Nat'l Org. for Women, Inc.,* 620 F.2d 1301, 1314-115 (8th Cir. 1980)). The court found that this rationale applied to the defendant's letter, even though it sought to induce one party to break its contractual obligations. *Id.* at 31.

This case is no different than *Scheidler*. The donor Defendants exercised their First Amendment rights by contacting the University to express their displeasure with Dr. Salaita's hiring. Similar activity was found to be protected in *Scheidler*, and the Court sees no reason to rule differently here. Dr. Salaita tries to distinguish *Scheidler* by characterizing the donor Defendants' speech here as a *quid pro quo* demand, but this distinction is without merit. As noted above, the letter in *Scheidler* was also of a similar *quid pro quo* nature. Because it is clear on the face of the Complaint that the donor Defendants' allegedly tortious

activity is protected by the First Amendment, Dr. Salaita cannot possibly prevail on his tortious interference claims. The First Amendment is a two-way street, protecting both Dr. Salaita's speech and that of the donor Defendants. The Court therefore dismisses Counts VI and VII.

## G. Intentional Infliction of Emotional Distress (Count VIII)

Dr. Salaita alleges that he suffered severe emotional distress after Defendants induced him to resign his prior job and move to Illinois before ultimately firing him. To state a claim for intentional infliction of emotional distress, Dr. Salaita must allege that (1) Defendants' conduct was "truly extreme and outrageous, (2) Defendants intended that their conduct would inflict severe emotional distress or at least knew that there was a "high probability" that the conduct would cause severe emotional distress, and (3) that the conduct "in fact cause[d] *severe* emotional distress." *McGrath v. Fahey,* 533 N.E.2d 806, 809 (Ill. 1988).

As to the conduct, it must be "'so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency.'" *Pub. Fin. Corp. v. Davis,* 360 N.E.2d 765, 767 (Ill. 1976) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). This is especially true in the employment context. "Courts are cautious in their treatment of

emotional distress claims in the employment domain, because if 'discipline, job transfers, or even termination could form the basis of an action for emotional distress, virtually every employee would have a cause of action." *Safi v. Royal Jordanian Airlines,* No. 08 C 7365, 2010 WL 4339434, at *4 (N.D. Ill. Oct. 25, 2010) (quoting *Welsh v. Commonwealth Edison Co.,* 713 N.E.2d 679, 684 (Ill. App. Ct. 1999)). Put simply, a plaintiff must point to more extreme conduct than an unlawful termination. *See, Stoecklein v. Ill. Tool Works, Inc.,* 589 F.Supp. 139, 146 (N.D. Ill. 1984) (finding that an employer's conduct was not sufficiently outrageous when the employer terminated the plaintiff because he was "too old," in violation of age discrimination laws).

The facts in the Complaint, even viewed in Dr. Salaita's favor, do not demonstrate conduct that is beyond all bounds of decency. Although the Complaint states First Amendment and breach of contract claims, the mere fact that an employer violated the law does not, by itself, constitute sufficiently outrageous conduct. *See, id.* The Court does not doubt the severity of harm Dr. Salaita suffered to his career and reputation, but the University's decision to fire him, even if illegal, is not the type of conduct that justifies an emotional distress claim. *See, e.g., Milton v. Ill. Bell Tel.*

*Co.,* 427 N.E.2d 829, 833 (Ill. App. Ct. 1981) (finding that a plaintiff stated an emotional distress claim when his employer demanded that he violated criminal laws by filing false reports, then continually harassed and eventually fired him for not filing those reports). Because the conduct at issue is nothing more than an allegedly unlawful termination, Dr. Salaita's claim for intentional infliction of emotional distress must be dismissed.

## H.  Spoliation of Evidence (Count IX)

In this count, Dr. Salaita alleges that Chancellor Wise wrongfully destroyed a two-page memo, and possibly other evidence, that would have been helpful to Dr. Salaita in pursuing his claims. Unlike some states, Illinois "does not recognize a tort for intentional spoliation of evidence." *Borsellino v. Goldman Sachs Grp., Inc.,* 477 F.3d 502, 509 (7th Cir. 2007). Instead, spoliation claims are analyzed as general negligence claims, "which to prevail will eventually require showing a duty (in this case to protect documents), a breach of that duty, causation, and damages." *Id.* The damages element for spoliation claims requires allegations that the "destruction of evidence *caused the plaintiff to be unable to prove* an underlying lawsuit." *Boyd v. Travelers Ins. Co.,* 652 N.E.2d 267, 271 (Ill. 1995). Thus, Dr. Salaita

does not have to first lose the underlying suit in order to show damages, but the facts alleged must show that the destruction prevents him from proving his underlying suit. *Id.*

Dr. Salaita has not explained what claims in this suit he is unable to prove due to the lost memo. Rather, he generally alleges that the destruction "interfered with [his] ability to prove his claims, thereby causing him further damages." (Compl., ECF No. 1 ¶ 145). This is insufficient to state a negligent spoliation claim, especially to the extent that the evidence was intended to help prove claims that the Court already dismissed above. *Boyd,* 652 N.E.2d at 271 n.2 ("[I]f the plaintiff could not prevail in the underlying action even with the lost or destroyed evidence, then the defendant's conduct is not the cause of the loss of the lawsuit.").

Furthermore, the Complaint's allegations do not demonstrate that Chancellor Wise owed Dr. Salaita a duty at the time she destroyed the memo. Dr. Salaita claims that the duty arose from the State Records Act, which outlines Illinois' requirements for retaining records. *See,* 5 ILCS 160/8. Dr. Salaita fails to cite a single case where this statute formed the basis for a negligent spoliation claim, and the Court cannot find such a case. Also, citing this general

statute is not enough for negligent spoliation claims; Dr. Salaita must show that Chancellor Wise specifically owed *him* a duty to preserve this specific memo. *Forsythe v. Clark USA, Inc.,* 864 N.E.2d 227, 280 (Ill. 2007) ("[T]he touchtone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff."). This requirement is especially important in Illinois, where "the general rule . . . is that there is no duty to preserve evidence." *Martin v. Keeley & Sons, Inc.,* 979 N.E.2d 22, 28 (Ill. 2012).

Finally, any harm caused by the loss of the memo is at least minimized by the fact that Chancellor Wise sent an email to University officials briefly summarizing what was in the memo. Although this is not as helpful as having the actual memo, Dr. Salaita has at least some idea of what was in the memo and will be able to explore that topic further in discovery.

In sum, because Dr. Salaita has not established that Chancellor Wise owed him a duty to preserve the memo or that he was damaged by the destruction, Count IX must be dismissed.

## I. Immunity Issues

The University's final argument is that various Defendants are immune from suit, either on sovereign immunity grounds or qualified immunity grounds. The Court will consider each argument in turn.

### 1. *Sovereign Immunity*

Dr. Salaita's Complaint implicates two sovereign immunity issues. The first is whether the Eleventh Amendment bars all of Dr. Salaita's claims — state and federal — against the Board and the individual Defendants in their official capacities. If the Eleventh Amendment grants those Defendants immunity, the inquiry is at an end and those Defendants would be dismissed. If, however, the Eleventh Amendment poses no obstacle to this lawsuit in general, the issue then becomes whether this Court has jurisdiction to hear Dr. Salaita's state law claims in light of the Illinois Court of Claims Act, 705 ILCS 505/1 *et seq.* The Court has already dismissed Dr. Salaita's state law claims in Counts VI, VII, VIII, and IX, so the only remaining state law claims potentially at issue would be Count IV (promissory estoppel) and Count V (breach of contract).

Two additional factors make things much more complicated here. First, the Eleventh Amendment issue applies to all of

Dr. Salaita's claims, state and federal. *Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 777 (7th Cir. 1991). The Illinois Court of Claims Act issue, however, applies only to Dr. Salaita's remaining state law claims. *Id.* Second, federal law applies in deciding whether the Eleventh Amendment provides Defendants blanket immunity, whereas state law applies in deciding whether the Illinois Court of Claims ("ICC") has exclusive jurisdiction over Dr. Salaita's state law claims, assuming the Eleventh Amendment allows such claims at all. *Id.* The parties put their various arguments regarding all of these issues into a hodge-podge rather than teasing them out separately, thereby obscuring, rather than clarifying, the Court's task. Even worse, Dr. Salaita's response ignores entirely all applicable state law and focuses solely on arguing that the Board should not be considered part of the state. To make the analysis clearer, the Court will first discuss the Eleventh Amendment issue and the application of federal law to that issue. The Court will then discuss the Illinois Court of Claims Act and the state law that applies.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by

Citizens or Subjects of any Foreign State." Despite its plain language, "the amendment has been construed to forbid suits prosecuted against a state by its own citizens as well." *Id.* (citing *Hans v. Louisiana,* 134 U.S. 1 (1890)). Dr. Salaita's sole argument is that the Board should no longer be considered part of the State of Illinois for sovereign immunity purposes under the test set forth in *Ranyard v. Bd. of Regents,* 708 F.2d 1235, 1238 (7th Cir. 1983). The University responds that the Court need not resort to that test because several cases over the years have consistently reaffirmed that the Board is an arm of the state. *See, e.g., Pollak v. Bd. of Trs. of Univ. of Ill.,* No. 99 C 710, 2004 WL 1470028, at *2–3 (N.D. Ill. June 30, 2004).

Though the parties have spilled much ink on this issue, the Court need not reach it for several reasons. First, the Eleventh Amendment does not bar claims seeking injunctive relief like Dr. Salaita seeks here. *See, Mutter v. Madigan,* 17 F.Supp.3d 752, 758 (N.D. Ill. 2014) ("[A] suit for prospective injunctive relief is not deemed a suit against the state and thus is not barred by the Eleventh Amendment.") (internal quotation marks omitted). Thus, to the extent Dr. Salaita seeks an injunction reinstating him as a professor, the Eleventh Amendment does not require dismissal of the Board

or the individual Defendants sued in their official capacities.

Second, the Eleventh Amendment only bars "unconsenting" states from suits in federal court, *Benning,* 928 F.2d at 777, and the Illinois Supreme Court has recently clarified that state law allows claims like Dr. Salaita's to be brought outside the ICC. *Leetaru v. Bd. of Trs. of Univ. of Ill.,* 32 N.E.3d 583, 595–98 (Ill. 2015). As discussed below, the allegations in Dr. Salaita's Complaint bring his suit outside the ICC's exclusive jurisdiction. Thus, the Court need not decide whether the Board should still be considered part of the state for Eleventh Amendment purposes because, even if it is, state law allows Dr. Salaita's claim to proceed in federal court.

Turning to the state law issue directly, the University argues that the ICC possesses exclusive jurisdiction over Dr. Salaita's state law claims. In Illinois, "[t]he doctrine of sovereign immunity was abolished . . . by the 1970 Constitution '[e]xcept as the General Assembly may provide by law.'" *Id.* (quoting Ill. Const 1970, art. XIII, § 4). Shortly after abolishing constitutional sovereign immunity, Illinois adopted statutory sovereign immunity when the General Assembly enacted the State Lawsuit Immunity Act, 745 ILCS

5/0.01 *et seq.* *Id.* The statute provides that "the State of Illinois shall not be made a defendant or party in any court," "except as provided in the . . . Court of Claims Act." 745 ILCS 5/1. The Court of Claims Act, in turn, gives the ICC exclusive jurisdiction over several matters, including "[a]ll claims against the State founded upon any contract entered into with the State of Illinois" and "[a]ll claims against the State for damages in cases sounding in tort." 705 ILCS 505/8(b), (d).

The University argues that this statutory language covers Dr. Salaita's breach of contract and promissory estoppel claims and that he must therefore bring those claims before the ICC. But the Illinois Supreme Court has made clear that the analysis is not so simple. "Whether an action is in fact one against the State and hence one that must be brought in the Court of Claims depends on the issues involved and the relief sought." *Leetaru,* 32 N.E.3d at 595. *Leetaru* explains that there are exceptions to when the ICC will have exclusive jurisdiction: the Illinois Lawsuit Immunity Act "affords no protection . . . when it is alleged that the State's agent acted in violation of statutory *or constitutional law* or in excess of his authority." *Id.* at 595 (emphasis added). The court went on to explain that "not every legal wrong committed

by an officer of the State will trigger this exception." A claim for "simple breach of contract and nothing more," for example, will not trigger the exception. *Id.* at 596. But when the state's action is alleged to be unauthorized or unconstitutional, the state cannot "justifiably claim" sovereign immunity. *Id.*

The court in *Leetaru* ultimately found that the ICC did not have exclusive jurisdiction when the plaintiff alleged that the University violated his due process rights in investigating academic misconduct. *Id.* at 597. The court found sovereign immunity inapplicable even though the University was acting within its authority to investigate academic misconduct. *Id.* Even when the state acts within the scope of its authority, sovereign immunity will not protect it from claims that it violated a plaintiff's constitutional rights. *Id.*

The University argues that the Board and its members were acting within their authority whey they voted against Dr. Salaita's appointment. But Dr. Salaita has alleged in his state-law counts that the Board and its members violated the First Amendment in acting within that authority. If the plaintiff in *Leetaru* could seek injunctive relief outside the ICC based on the University's allegedly unconstitutional

conduct in investigating academic dishonesty, Dr. Salaita can pursue similar injunctive relief here based on the Board's alleged violation of the First Amendment in voting against his appointment. *See, id.* Thus, at least as to his claims for injunctive relief, Dr. Salaita can proceed in federal court.

That leaves Dr. Salaita's state-law claims for damages. This is the thorniest issue because Dr. Salaita's Complaint falls squarely between two competing principles. On the one hand, the Illinois Supreme Court has said repeatedly that "sovereign immunity affords *no protection* when agents of the State have acted in violation of . . . constitutional law" (the "No Protection Principle"). *Id.* (emphasis added). This language is broad and implies that, so long as there are allegations of constitutional misconduct, a state-law claim can proceed in any venue. On the other hand, that court has also made clear that there is a difference between seeking damages and an injunction, and claims for damages against the state belong in the ICC (the "Damages Principle"). *See, id.* at 598. Thus, Illinois law is clear regarding the two extremes. First, if a state-law claim alleges constitutional violations **and** seeks only an injunction, the No Protection Principle allows the claim to proceed outside the ICC without violating the Damages Principle. Second, if a claim alleges

no constitutional violation **and** seeks monetary damages, the Damages Principle requires the claim to proceed in the ICC without violating the No Protection Principle.

This case, however, pits the two principles against each other. Under the No Protection Principle, Dr. Salaita's claim can proceed outside the ICC because his breach of contract and promissory estoppel claims allege constitutional violations. But under the Damages Principle, Dr. Salaita's claim belongs exclusively in the ICC because he is seeking damages in addition to an injunction. Illinois law is not clear in this gray area, with most cases falling into the two extremes described above. *Compare, id.* at 594–98 (allowing the claim to proceed outside the ICC when the complaint alleged a due process violation and only sought an injunction), *with Healy v. Vaupel,* 549 N.E.2d 1240, 1247–48 (Ill. 1990) (finding that claim belonged in the ICC when the complaint did not allege a constitutional violation and sought damages).

Although Illinois law is not clear on this issue, the reasoning in past cases indicates that the No Protection Principle likely wins over the Damages Principle. In *Healy,* a case cited with approval in *Leetaru,* the Illinois Supreme Court looked to the "basis for the . . . action" to determine whether it belonged in the ICC. *Healy,* 549 N.E.2d at 1248.

Importantly, the plaintiff sought damages as a remedy for negligence that did not involve the violation of any constitutional provision or statute. *Id*. The Illinois Supreme Court found that the action belonged exclusively in the ICC "[b]ecause the plaintiff does not allege that any of the defendants acted . . . *in violation of law*." *Id.* (emphasis added). This indicates that if the claim at issue had involved a constitutional violation, the ICC would not have had exclusive jurisdiction, even though the claim sought monetary damages. Thus, the Court finds that, because Dr. Salaita's remaining state-law claims (Counts IV and V) allege that the Board acted in violation of the First Amendment, sovereign immunity "affords no protection," even as to claims for damages. *See, Leetaru,* 32 N.E.3d at 597; *see also, Healy,* 549 N.E.2d at 1248.

As to the administration Defendants, the University argues that Dr. Salaita cannot sue them in their official capacities because they do not have the authority to provide what Dr. Salaita seeks: reinstatement. According to the University, only the Board has that power. The University is correct that Dr. Salaita's claims are no good against any Defendant who does not have the power to grant him the injunctive relief he seeks. *See, Mutter,* 17 F.Supp.3d at 758.

But it is not clear on the face of the Complaint whether the administration Defendants have control over Dr. Salaita's reinstatement. Thus, the Court cannot yet dismiss the administration Defendants to the extent they are sued in their official capacities. If, at summary judgment or trial, there is no evidence that the administration Defendants have the power to reinstate Dr. Salaita, then the Court would dismiss those Defendants to the extent they are sued in their official capacities. Dismissal at this stage, however, is premature.

In sum, neither the Eleventh Amendment nor the Illinois Court of Claims Act prohibits Dr. Salaita's state-law claims for injunctive relief. As for his claims for damages, the ICC does not have exclusive jurisdiction because Dr. Salaita's Complaint alleges that the Board acted in violation of the Constitution.

### 2. *Qualified Immunity*

Lastly, the University argues that the individual Defendants are all entitled to qualified immunity to the extent that they are sued in their individual capacities. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (internal quotation marks omitted). The doctrine "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

Although there are instances where qualified immunity is decided at the motion to dismiss stage, *see, e.g., Danenberger v. Johnson,* 821 F.2d 361, 365 (7th Cir. 1987), complaints are "generally not dismissed under Rule 12(b)(6) on qualified immunity grounds, *Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir. 2001). This is because qualified immunity is a defense, and plaintiffs are not usually required to plead around a defendant's defenses. *See, id.* Put bluntly, "'Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal.'" *Id.* at 652 (quoting *Jacobs v. City of Chicago,* 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring)).

This case is a prime example of why qualified immunity would be inappropriate at the dismissal stage; the Court would have to go well beyond the facts alleged in the Complaint to resolve the qualified immunity issue here. Part of the University's argument is premised on the assumption that it

will win on the merits of Dr. Salaita's First Amendment claim. As discussed above, Dr. Salaita has adequately pleaded such a claim.  Thus, to resolve the qualified immunity issue in the University's favor at the motion to dismiss stage would be akin to predetermining that the University will ultimately win on the merits.  This, the Court cannot do.  Thus, the Court finds that the qualified immunity issue is best left for summary judgment or trial.

## IV.  CONCLUSION

For the reasons stated herein, the University's Motion to Dismiss [ECF No. 32] is granted to the extent that Counts VI, VII, VIII, and IX are dismissed with prejudice.  The Motion is denied as to the remaining counts.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 8/6/2015